# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

Civil Docket No. 3:12-cv-00456-MOC-DSC
(Consolidated with No. 3:12-cv-00474
and No. 3:12-cv-00624)

| | |
|---|---|
| MAURINE NIEMAN, | <u>CLASS ACTION</u> |
| Plaintiff, | **[CORRECTED] CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **FED. R. CIV. P. 23** |
| DUKE ENERGY CORPORATION, JAMES E. ROGERS, ANN MAYNARD GRAY, LYNN J. GOOD, STEVEN K. YOUNG, WILLIAM BARNET III, G. ALEX BERNHARDT, SR., MICHAEL G. BROWNING, DANIEL R. DIMICCO, JOHN H. FORSGREN, JAMES H. HANCE, JR., MARC E. MANLY, E. JAMES REINSCH, JAMES T. RHODES, AND PHILIP R. SHARP, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF ALLEGATIONS .......................................................................2

III.    JURISDICTION AND VENUE .........................................................................19

IV.     THE PARTIES....................................................................................................19

     A.      Lead Plaintiffs .......................................................................................19

     B.      Exchange Act Defendants......................................................................20

     C.      Securities Act Defendants......................................................................25

     D.      Relevant Non-Party: Progress................................................................28

V.      FACTUAL BACKGROUND TO THE MERGER AND OUSTER OF
     JOHNSON ..........................................................................................................29

     A.      Duke Approaches Progress Regarding a Strategic Business
          Combination............................................................................................29

     B.      Johnson Is Established as the CEO of the Combined Company ............31

     C.      Duke and Progress Execute the Merger Agreement...............................35

     D.      Duke's Increasing Concerns Regarding Johnson Following the
          Merger Agreement..................................................................................39

     E.      Duke Files the Misleading Merger Registration Statement and
          Prospectus Materials ..............................................................................44

     F.      Shareholders Vote to Approve the Merger Based on
          Representations that Johnson Would Be CEO.......................................48

     G.      Duke Unsuccessfully Tries to Back out of the Merger;
          Progress Retains Litigation Counsel......................................................52

     H.      Defendants Solidify Their Undisclosed Plan to Oust Johnson ..............57

     I.      The Merger Becomes Effective; Defendants Immediately
          Oust Johnson..........................................................................................64

     J.      Gray and Duke's Outside Attorney Unceremoniously Inform
          Johnson of His Removal .........................................................................69

     K.      Fallout from the Disclosure of Defendants' Termination of
          Johnson ..................................................................................................74

VI.     SECURITIES ACT VIOLATIONS ................................................................86

     A.     The Merger Registration Statement Contained False and
          Misleading Statements and Omitted Material Facts in Violation of
          §11 of the Securities Act ........................................................................86

     B.     The Prospectus Materials Contained False and Misleading
          Statements and Omitted Material Facts in Violation of §12(a)(2) of
          the Securities Act ...................................................................................91

VII.    EXCHANGE ACT VIOLATIONS .................................................................92

     A.     The Exchange Act Defendants' False and Misleading Statements
          and Material Omissions During the Class Period ...................................92

     B.     Reasons Why the Exchange Act Defendants' Statements Were
          False and Misleading When Made ........................................................96

     C.     The Exchange Act Defendants' Scienter ..............................................98

          1.     Knowledge or Reckless Disregard ...........................................98

          2.     Motive to Commit the Fraud .....................................................99

          3.     Defendants' Manufactured *Post Hoc* Excuses and Pretexts
               for the Ouster of Johnson .......................................................100

          4.     The NCUC and North Carolina DOJ Settlements;
               Rogers and Manly Forced Out ...............................................107

VIII.   LOSS CAUSATION ...................................................................................109

IX.     DEFENDANTS ARE NOT ENTITLED TO THE PROTECTIONS OF THE
      PSLRA'S SAFE HARBOR PROVISION ...................................................111

X.      CLASS ACTION ALLEGATIONS .............................................................112

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD OF THE
      MARKET DOCTRINE ................................................................................113

# I.     INTRODUCTION

1.      Lead Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund and LongView LargeCap 500 Index VEBA Fund ("Amalgamated Bank"), Gerald and Carolyn Friesen, and Craig Bacino as Trustee for the Janice and Craig Bacino Trust (collectively, "Lead Plaintiffs") bring this class action for violations of the federal securities laws.

2.      Lead Plaintiffs' Complaint is based upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, *inter alia*, investigation of: (a) public filings and documents submitted by Duke Energy Corporation ("Duke" or "the Company") and Progress Energy Inc. ("Progress") to the United States Securities and Exchange Commission ("SEC") and the North Carolina Utilities Commission ("NCUC"); (b) press releases, public statements, news articles, securities analyst reports and other publications disseminated by or concerning Duke and Progress; (c) statements, e-mails and sworn testimony from current and former Duke and Progress executives and directors; and (d) other publicly available information. Lead Plaintiffs believe that additional substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

3.      Lead Plaintiffs assert claims for violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") based upon materially false and misleading representations and omissions made in: (i) a Registration Statement filed on Form S-4/A with the SEC on July 7, 2011, incorporated by reference in numerous public filings thereafter, and rendered effective on July 2, 2012 (the "Merger Registration Statement"); and (ii) Prospectus filings with the SEC (the "Prospectus Materials") in connection with Duke's merger with Progress on July 2, 2012 (the "Merger"). The Securities Act claims assert strict liability and

negligence and are not based on any allegation of deliberate or intentional misconduct. Lead Plaintiffs specifically disclaim any reference to or reliance upon fraud allegations for these claims. The Securities Act claims are asserted against Duke, its Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors, James E. Rogers ("Rogers"), Lead Director, Ann M. Gray ("Gray") and eleven additional Duke officers and directors.[1]

4.     Separately, Lead Plaintiffs assert claims for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons who purchased or otherwise acquired Duke securities between June 11, 2012 and July 9, 2012, inclusive (the "Class Period"). The Exchange Act claims are asserted against Duke, Rogers, Gray and Duke's Executive Vice President and former Chief Legal Officer and Corporate Secretary, Marc E. Manly ("Manly") (collectively, the "Exchange Act Defendants"). The Securities Act Defendants and the Exchange Act Defendants are collectively referred to herein as "Defendants."

## II.     SUMMARY OF ALLEGATIONS

5.     This action involves a corporate takeover, CEO ouster and false statements concerning executive succession that variously have been described as "***an incredible act of bad faith***," "***the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street***" and "***one of the greatest corporate hijackings in US business history***."[2]

---

[1]     The additional Duke officers and directors named as Defendants for the Securities Act claims are: Duke's Chief Financial Officer ("CFO"), Lynn J. Good ("Good"), Duke's Controller, Vice President and Chief Accounting Officer, Steven K. Young ("Young") and Duke Directors, William Barnet III ("Barnet"), G. Alex Bernhardt, Sr. ("Bernhardt"), Michael G. Browning ("Browning"), Daniel R. DiMicco ("DiMicco"), John H. Forsgren ("Forsgren"), James H. Hance, Jr. ("Hance"), E. James Reinsch ("Reinsch"), James T. Rhodes ("Rhodes"), and Philip R. Sharp ("Sharp") (collectively, with Rogers, Gray and Duke, the "Securities Act Defendants").

[2]     All emphasis is added unless otherwise noted.

6.      In late May 2010, Duke Energy – one of the largest electric utility companies in the United States – approached Progress, a large Raleigh-based electric utility and Fortune 500 company, to express interest in a possible business combination.   After several informal discussions between Duke and Progress executives, in late June 2010, Duke's board formally authorized Rogers to explore a potential deal.   On or about July 7, 2010, Rogers personally called Progress's then-CEO, William D. Johnson ("Johnson"), to discuss the possibility of a merger.   Given Duke's problematic past, and to make the proposed merger appealing to Progress's executives, its shareholders, and state regulators, from the outset of the negotiations it was agreed that Johnson would be CEO of the combined company.  As Johnson later testified before the NCUC:  "*[E]arly on in the first conversation*, the message was we'd like to talk about a combination *in which you would be the CEO – me, Bill Johnson* – and that Mr. Rogers would become Executive Chairman."  Johnson Tr. (Vol. 1) at 17, 19.[3]  Former Progress Director Hyler corroborated this fact: "[F]rom the first conversation [regarding the Merger] it was Bill Johnson, CEO, and Jim Rogers, Executive Chairman."  Hyler Tr. at 149-50.  Hyler also stated that Duke never once raised the possibility of Rogers (or anyone else) becoming CEO of the merged company.

7.      Following Rogers' initial call, the parties engaged in months of intensive meetings, due diligence, conference calls and formal negotiations regarding a potential merger. Rogers and Johnson met or talked more than two dozen times and Johnson attended numerous

---

[3]      "Johnson Tr. (Vol. 1)" refers to the July 19, 2012 transcript of testimony before the NCUC.  "Johnson Tr. (Vol. 2)," "McKee Tr." and "Hyler Tr." all refer to the July 19, 2012 transcript of testimony of Johnson, E. Marie McKee ("McKee") and James B. Hyler, Jr. ("Hyler") before the NCUC.  "Rogers Tr. (Vol. 1)" and "Rogers Tr. (Vol. 2)" refer to the July 10, 2012 transcripts of testimony before the NCUC.  "Gray Tr. (Vol. 3)" refers to the July 20, 2012 transcript of testimony before the NCUC.  "Gray Tr. (Vol. 4)" and "Browning Tr." both refer to the July 20, 2012 transcript of testimony before the NCUC.  Lead Plaintiffs will provide copies of the transcripts at the Court's request.

meetings and dinners with various Duke executives and directors. Throughout this process, it was well-established, and repeatedly represented to Progress, that Johnson would be the CEO of any combined entity. Indeed, Duke's Lead Director Gray testified that Johnson already was "***settled on as the CEO for the combined company***" at the time of the companies' meetings in 2010. At no point during any of the discussions with Progress did Defendants disclose any material concerns with Johnson's ability to serve as CEO of the combined company.

8.      Duke's longstanding agreement that Johnson would be CEO of any combined entity was not only a material provision of the eventual Merger Agreement (defined herein), it also was one of the primary reasons Progress even considered Duke's overtures in the first instance. Indeed, the key strategic value of the deal was to increase the size and scope of Duke's "regulated" utility operations, a more traditional "grind-it-out" area of the business that provides more stability and consistency in earnings and dividends than "non-regulated" operations (*i.e.*, international and renewable businesses). Because Progress was known as a successful "regulated" utility with nearly 99% of its revenues derived from regulated operations, Duke projected that if it merged with Progress, its regulated business would increase from approximately 79% to 88% of its total revenues, providing "an improved business risk profile due to the increased proportion of regulated earnings and cash flows following completion of the merger."

9.      During several Progress board meetings in 2010 to discuss the merits of the Merger, the board repeatedly emphasized that they "viewed the strategic emphasis on the regulated utility business as ***critical*** to the value of the potential transaction," and, therefore, "***viewed having Mr. Johnson as the [CEO] of the combined company as an important element*** in ensuring implementation of that strategy." In other words, because the major strategic

purpose of the deal was to increase the size of Duke's "regulated" utility footprint – an area where Progress and Johnson excelled – it was crucial to the Progress board, and shareholders, that Johnson lead the combined company.

10. Duke also knew during this time that Rogers was not an attractive choice as CEO and public face of the Merger due to his alleged involvement in a major ethics scandal being investigated by the Indiana Utility Regulatory Commission in 2010 and 2011. The case involved allegations of substantial conflicts of interest and inflation of costs relating to Duke's Indiana Edwardsport facility and was later expanded to include "allegations of fraud, concealment, and/or gross mismanagement." Accordingly, Duke knew that obtaining regulatory and shareholder approval of the deal (as well as the Progress board's consent) would have been far more difficult, if not impossible, if Rogers was proposed as CEO of the combined company.

11. Additionally, Rogers' presumed successor at Duke, James L. Turner ("Turner"), resigned in late 2010 in connection with the same Indiana ethics investigation. This left Duke with no credible candidate to put before the numerous regulatory commissions to shepherd such a large and complex deal through. As *Reuters* reported, one long-time Duke shareholder activist explained that "he supported the merger of Progress into Duke because he thought Johnson's presence would lead to greater accountability and help 'restore respect and integrity' at Duke following an executive shake-up there last year related to an over-budget coal-fired plant under construction in Indiana." Defendants knew they needed to make Johnson the face of the Merger long enough to get the deal approved.

12. On January 8, 2011, after six months of intensive negotiations, Duke and Progress executed a formal agreement to combine the two companies (the "Merger Agreement"). As required by Progress, and consistent with the parties' prior negotiations, the Merger Agreement

expressly provided that "Duke's Board of Directors **shall cause [Johnson] to be appointed as the President and Chief Executive Officer of Duke**" and that Rogers would be Chairman. Importantly, the Merger Agreement mandated that Progress could terminate the Merger at any time "if Duke shall have breached or **failed to perform in any material respect any of its representations** . . . contained in this Agreement." Johnson's service as CEO was one such representation. Accordingly, a breach of that material representation would have allowed Progress to terminate the deal, subjecting Duke to severe financial penalties, including a potential $675 million termination fee.

13.     On January 10, 2011, Duke publicly announced the Merger and emphasized that "[w]hen the merger is completed, Rogers will become executive chairman . . . [and] Johnson will become president and chief executive officer of the new company." Following the news, securities analysts highlighted the importance of Johnson's role as CEO. As one analyst reported: "We believe the merger will also reduce risk by deepening and strengthening Duke Energy's management team. Jim Rogers . . . will cede the position of chief executive office to Bill Johnson, who is likely to maintain a stronger focus on operations." The analyst also noted "the separation of the positions of chairman and chief executive officer could, in our view, contribute to **improved corporate governance**."

14.     On July 7, 2011, after four successive amendments, Duke publicly filed Amendment No. 5 to the Merger Registration Statement, signaling its intent to register 264 million shares of Duke common stock to effect a 1-for-3 reverse stock split necessary to cover the share exchange with Progress shareholders on the Merger closing date. The Merger Registration Statement stated unequivocally that "**Mr. Johnson will serve as the president and chief executive officer of Duke Energy** and Mr. Rogers will serve as the executive chairman."

This representation was repeated more than a dozen times in various forms throughout the Merger Registration Statement.

15.     The Merger Registration Statement did not, however, simply represent that Johnson's appointment as CEO was a mere contractual technicality, or that it was subject to Duke replacing him after only a day (or a few minutes) on the job.   Rather, it explicitly referenced and attached Johnson's employment agreement "term sheet" which "provide[d] for a *three-year term* of employment *commencing upon completion* of the merger."   Moreover, it contained detailed representations about Johnson's *long-term* duties, responsibilities and strategic role following the Merger closing:

> In his capacity *as president and chief executive officer, Mr. Johnson will have* all duties customary to such position, including *developing the strategic plan for Duke Energy*, developing and communicating the vision and mission for Duke Energy, developing public policy positions for Duke Energy, selecting the executive management team with the input of the executive chairman, developing an annual budget for approval by the Duke Energy board of directors, *driving the strategic financial and operational results of Duke Energy and representing Duke Energy to the public and investors*.

16.     The Merger Registration Statement also stated that Johnson's appointment as CEO was subject only to his "ability and willingness to serve" and that, "[i]n the event either Mr. Johnson or Mr. Rogers is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to *confer and mutually designate a replacement*."   Accordingly, the Merger Registration Statement clearly represented that Johnson would actually serve as CEO and lead the combined company for the long-term following the Merger.   Defendants repeated these statements and referenced the Merger Registration Statement in numerous Prospectus filings prior to the July 2, 2012 Merger closing.

17.     Based on Defendants' unequivocal representations, Duke and Progress shareholders approved the Merger on August 23, 2011.   In recommending the Merger to its

shareholders, Duke repeatedly represented that "Mr. Johnson will be the president and chief executive officer of the combined company." Indeed, Defendants included a "Q&A" section of the proxy solicitation portion of the Merger Registration Statement explaining Johnson's position in unambiguous terms:

> Q: What will Jim Rogers' role be with Duke Energy *following completion of the merger*? What will Bill Johnson's role be?
>
> A: Duke Energy and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and *Mr. Johnson will serve as president and chief executive officer of Duke Energy following the completion of the merger*.

18. Unbeknownst to investors, the SEC, the NCUC and the Progress board, the representations made in the Merger Registration Statement and Prospectus Materials regarding Johnson's role as CEO were materially untrue and misleading, and omitted material facts. Investors were never informed that for months *prior* to the filing of those materials – and even before the Merger Agreement was signed in January 2011 – Defendants were already discussing amongst themselves purportedly serious and irreconcilable concerns about Johnson and had adopted the view that Johnson's appointment as CEO was merely a technical requirement of the Merger Agreement necessary to get the deal approved, and that the Duke board could simply get rid of Johnson once the Merger was complete.

19. Indeed, as further detailed below, during a November 19, 2010 meeting between Johnson and the Duke board *eight months before* the Merger Registration Statement was filed, it was already apparent that Duke's directors had significant issues with Johnson. According to Gray, at that meeting, Johnson "describe[d] himself as being an individual who likes to learn, but not be taught. That was an expression that stayed with our board, and we watched for that to develop." Gray Tr. (Vol. 3) at 19. As *Bloomberg* later reported, the expression "is attributed to

Winston Churchill. Gray . . . didn't get the reference. She later testified that Johnson's quip 'stayed with our board,' and not in a good way."

20. On November 21, 2010, following the meeting with Johnson, Duke Director and Defendant DiMicco, e-mailed Rogers expressly questioning Johnson's role as CEO:

> Jim, it was a good meeting Friday [November 19, 2010] and as you asked I gave you my straight and fully honest input from my perspective as a sitting CEO. I know I was the only one that really does see Bill [Johnson] as a threat to the deals [sic] success. I have to tell you *I was very disturbed by the view if it doesn't work out with Bill we will make the change in 2 years or so. This needs to be done right from the beginning – he is either the right guy or he is not.* If he is not then it is a *deal killer for me*. There is a certain arrogance in his take it or leave it view of the deal with him as CEO or the deal is a bad deal and they don't do it! You say it in his attack of Bill that had nothing to do with Bill's point. *If it is such a great deal then make their board and shareholders a direct offer without Bill as guaranteed the CEO slot. Let him go head to head with Jim Turner in the new company for the job!*

Accordingly, Duke's "view" eight months prior to the filing of the Merger Registration Statement was that Johnson's role as CEO was, at best, necessary for completion of the Merger, but not for the future of the new Duke.

21. In the months following the November 2010 meeting – Johnson's fourth such meeting with Duke's directors – Defendants' concerns about Johnson and their undisclosed opposition to allowing him to serve as CEO intensified. According to Duke Director Browning, "*by the time* we got to the point where we were going to *sign the merger agreement* [in January 2011], there was *clearly some concern as to whether Bill was the right guy*." Browning Tr. at 45. The opposition only increased following the Merger Agreement. For example, on April 4, 2011, Rogers sent an e-mail to Duke executives, including Defendant and CFO Good, with the subject, "[m]erger status and potential issues" stating in pertinent part:

> Team,
>
> I talked with [Duke Lead Director] Ann [Gray] this morning and in the course of the conversation she ask [sic] about the integration. After expressing my views

(tone/arrogance/lack of respect/inflated sense of capability especially in light of their track record), *she is properly concerned about a clash of cultures as I am.*

I suggested that we address it at the board meeting. I would like to set out every issue that appears *at this time we have a conflict* – model; what is in Raleigh etc etc.

It is important that they have a clear point of view on these issues. It will enhance my ability to address these issues as you all kick them to Bill and me to resolve.

*This email should not be shared with anyone.*

22. Even at this early stage, therefore, Rogers knew that Defendants' serious concerns with Johnson had to remain hidden given the express terms of the Merger Agreement and the severe repercussions Duke faced if it breached that agreement.

23. On June 20, 2011, only 17 days before the filing of the Merger Registration Statement and Prospectus Materials, Johnson again met with Duke's Lead Director Gray and other board members to discuss the Merger. During this meeting, Duke's directors expressed significant concerns about the integration of Duke and Progress and the perception that Johnson and "the Progress team [were] trying to impose Progress practices, systems and everything else, on the Duke process." Johnson Tr. (Vol. 1) at 22-23; Johnson Tr. (Vol. 2) at 67. As Gray later admitted, the Duke directors' concerns about Johnson were not abated by the June 2011 meeting and "it led to the conclusion that the – his – his presence at the board meeting was [only] moderately successful." Gray Tr. (Vol. 3) at 25, 90-91, 99. Gray also revealed "an exchange between [Johnson] and [Duke Director Barnet] *that some directors reacted not positively to*," which "tempered our enthusiasm for the conduct of that meeting." *Id.* at 90, 98-99.

24. According to Johnson, the June 20, 2011 meeting was the *last time* any of the Defendants raised with him any purported concern regarding Progress imposing its culture on Duke. He also testified that the meeting was his *last meeting* with the Duke board prior to his ouster on July 2, 2012. Johnson Tr. (Vol. 1) at 72-74, 91. Indeed, despite Johnson's repeated

offers to meet with the Duke board as late as June 2012, a few weeks before the Merger closed, Rogers assured him, "***No need to. Everything's fine. There's just no reason to come to the board***." Johnson Tr. (Vol. 2) at 33-34. In truth, the Duke board did not meet with Johnson again following the June 2011 meeting because they were already opposed to Johnson leading Duke after the Merger. These material facts were not disclosed to investors when Defendants filed, and repeatedly referenced thereafter, the Merger Registration Statement and Prospectus Materials, in violation of §§11, 12(a)(2) and 15 of the Securities Act.

25.     In December 2011, Duke and Progress received notice that the Federal Energy Regulatory Commission ("FERC") had only "conditionally" approved the Merger, subject to a mitigation plan addressing the FERC's concerns about the combined market power of the merged company. Over the next six months (from December 2011 to approximately June 2012), Duke and Progress halted integration work and focused their efforts exclusively on addressing the FERC's order. Despite the ongoing mitigation efforts and the importance of having the incoming CEO involved, Johnson later testified that "[f]rom December [19], 2011 until June [11], 2012, with the exception of some social greetings and seeing people at meetings, ***I did not meet with, see, or speak to a Duke director, a Duke employee, a Duke manager, except for Mr. Rogers***." Johnson Tr. (Vol. 1) at 40. Accordingly, Johnson explained, "there was no opportunity during that six months [leading up to the Merger] for anybody to observe my cultural integration, my leadership skills, my ability to put the two companies together." *Id*. at 41.

26.     Johnson testified that following the FERC's initial rejection of the mitigation plan in December 2011, Defendants "explored every avenue to get out of this merger." *Id*. at 42. Unbeknownst to investors, Defendants tried several strategies to scuttle the Merger without

incurring penalties, including: (i) inflating the cost of complying with the FERC order (thereby attempting to create a "burdensome regulatory effect" that would allow termination of the Merger); (ii) delaying compliance with the FERC order to run out the clock past the Merger closing date, which also would terminate the Merger; and (iii) disparaging the Merger to Wall Street analysts to position Duke in the event Defendants' attempt to trigger the burdensome effect provision was successful.  Johnson Tr. (Vol. 1) at 86-91, Johnson Tr. (Vol. 2) at 43-46, 54.

27.    Johnson also revealed that Rogers even tried to renegotiate the financial terms of the Merger.  Johnson rightly refused: "***I said we're not renegotiating the deal***.  ***That's [$]675 million*** [the potential termination penalty]."   Johnson Tr. (Vol. 1) at 45.   In response to Defendants' conduct, in late January 2012 Progress took the unusual step of hiring outside litigation counsel from New York to protect its interests and "make sure that this deal got done." *Id.* at 48.  Johnson has since testified that he believes Duke had "buyer's remorse" and that Duke "wanted the merger, then they didn't want it, then they couldn't get out of it, and then they didn't want to be stuck with me as the person who dragged them to it."  *Id.* at 85-86.

28.    Unable to get out of the Merger without facing financial penalties and investor backlash, on May 3, 2012 the Duke board met to discuss specific strategies to ensure that Johnson would not remain CEO of the merged company.   Defendant Gray subsequently conceded that by no later than May 3, 2012, Defendants began to focus "on the fact that perhaps ***Bill [Johnson] was not going to be*** – we should seriously consider whether he's the ***right person to be CEO***."  Gray Tr. (Vol. 3) at 72-73.  Defendants knew, however, that Johnson's role as CEO of the new Duke was a material, irrevocable provision of the Merger Agreement, a fact that had been repeatedly represented to investors and regulators.

Case 3:12-cv-00456-MOC-DSC   Document 60   Filed 01/29/13   Page 15 of 128

29.     Between May 3 and May 30, 2012, Defendants held a series of meetings and set in motion a plan to remove Johnson as CEO.  Having already determined that Johnson would not be the CEO of the new Duke, Defendants could not disclose their intentions to the Progress board without breaching the Merger Agreement.   Indeed, Gray admitted that the option of disclosing Duke's issues with Johnson to the Progress board was "closed out" by Duke's "obligation as a clause of the merger agreement to appoint [Johnson] CEO."  Gray Tr. (Vol. 3) at 76-77.   Later, when Gray was pressed by NCUC Commissioner Bryan E. Beatty about why Duke did not disclose its issues to Progress or Johnson, she admitted:

> I think our board felt that when you have a *vote of no confidence*, it's – it's *not the type of shortfall that can be remediated*.   You can't say, Bill, maybe you should do X or, you know, or don't do Y.  *A vote of no confidence is, you know, really, a huge – you can't – you can't remediate a vote of no confidence, in our opinion.*  So when – when the board felt that way, there really didn't appear to be a reason [to raise concerns with Progress] because *we couldn't remediate it*.

*Id.* at 77.

30.     Duke's board also determined that it could not defer removing Johnson to a later date as previously discussed in November 2010.  As Gray testified, "it would be harmful and inappropriate to . . . leave it a period of time and address this issue later . . . . *We felt we'd had enough* indication of Bill's leadership style, which was contrary to ours."  *Id.* at 79.  Duke Director Browning also admitted that "for me, the – my loss of confidence in Bill's ability to lead the team – *for me, the toothpaste was out of the tube*, and I couldn't figure out how to get it back in, whether I talked to him or not.  It just – it – *I just don't see how it could happen* in – for me in that point of the process."  Browning Tr. at 70.  In fact, Gray admitted that by "late spring" 2012, Defendants had, without Johnson's or the Progress board's knowledge, hired a New York corporate public relations firm, Joele Frank Wilkinson Brimmer Katcher ("Joele Frank"),

specializing in, *inter alia*, "crisis communications" and helping "companies defend themselves against aggressive actions by activist investors."

31.    Rather than disclose the truth and advise shareholders and regulators of the material undisclosed facts regarding Johnson and the plan to remove him, Defendants concealed those facts and continued to file false documents and make misleading statements to the SEC, NCUC, FERC and Duke and Progress investors regarding the Merger.  From May 4, 2012 until only three days before the Merger closed, Duke continued to file numerous false Prospectus Materials on SEC Forms 425 and Forms 8-K that, in bold letters, "***urge[d] investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement . . . because they contain important information***."  At Defendants' urging, therefore, shareholders continued to rely upon the false Merger Registration Statement and Prospectus Materials that omitted material facts about Defendants' undisclosed opposition to Johnson as CEO and their plan to get rid of him following the Merger.

32.    On June 23-24, 2012, Rogers met with Gray and Browning to confirm Defendants' plan regarding the immediate removal of Johnson and to secure Rogers' official agreement to replace Johnson upon termination.  Two days later, Defendants prepared a "dry run" and "test call" of the Duke board meeting at which Johnson would be removed.  To obfuscate these maneuvers and allow for the immediate termination of Johnson following the Merger, on June 27, 2012, Defendants hastily presented Johnson with a formal "Employment Agreement" that incorporated the "term sheet," including the purported three-year employment term as CEO, as described in the Merger Registration Statement.

33.     On June 28, 2012, the *Charlotte Observer* published a joint interview with Rogers and Johnson entitled "Duke Energy Execs Discuss What's Next."  In the interview, Rogers, who had already agreed to replace Johnson in a matter of days, did not disclose or even hint at Johnson's impending dismissal or any of the material facts summarized above.  Instead, he willingly chose to speak, made misleading statements and gave investors the false impression that the Merger was on track – with Johnson as CEO – and that the two executives needed only to "work to bring the two cultures [of Progress and Duke] together to become one culture."  Two weeks later, Rogers cited "culture" issues as a reason for Johnson's termination.  Ironically, Rogers was also asked during the June 2012 interview whether Duke had to address "trust" issues given its recent ethical issues in Indiana:

> Question:     Does Duke have to **rebuild trust with the public**, in light of protests over Edwardsport, ethics and this year's N.C. rate hike?

> Rogers:     **I don't think we have a problem**.  Any business has got to be continually working to do good things to get positive support in the community.

34.     On July 2, 2012, at approximately 4:02 p.m., the Merger became effective.  Notably, Rogers continued to deceive Johnson (and shareholders) until the very end.  As Johnson testified:  "Rogers came to my office.  We chatted about the merger, politics, all these things.  At about 4:20 [p.m.], he said we have to go to the 4:30 [p.m.] board meeting.  **We can't be late for your election**."  Johnson Tr. (Vol. 1) at 101.  Johnson later recalled that the meeting lasted approximately 20 minutes: "I'm elected CEO.  **Handshakes, pats on the back, congratulations all around**."  *Id*.

35.     Less than two hours after the Merger became effective, and after eighteen months of unequivocally assuring investors and regulators that Johnson would serve as CEO of the combined company, the newly constituted board of the new Duke abruptly voted to demand Johnson's resignation and re-install Rogers as CEO.  The vote was entirely predetermined.  ***All***

***ten Duke directors voted in favor of terminating Johnson***. ***All five Progress directors voted***

***against***. For over an hour, Defendant Gray provided the Progress board with a single vague

reason for the change: Johnson's "leadership style." According to legacy Progress Director

McKee, "[Gray] never elaborated further than '[h]e is not a good fit' for one hour." "I couldn't

believe it. I – I didn't know whether to cry or throw up." McKee Tr. at 125-26. Gray's singular

excuse later morphed into five or six pretexts as Defendants developed their official story.

36.     Handwritten notes taken from the board meeting confirm that the legacy Progress

directors, like investors, were blindsided. Legacy Progress Director Carlos Saladrigas

("Saladrigas") stated he "***fe[lt] like there was a scheme to do this***" and noted that "having

[Johnson] as CEO was part of what made the deal attractive." Director McKee was "shocked" as

Johnson was "among the highest caliber" executives and she had "rarely seen such [a] high level

of performance." McKee also questioned whether Defendants had considered the "shareholder

impact" of the move. Those same legacy Progress directors have since testified that it was clear

that Duke's vote to remove Johnson was prearranged. According to Hyler "it was obvious that

the decision had been made." Hyler Tr. at 164. Johnson agreed: "***Oh, I believe [the legacy***

***Duke directors] were fully briefed***. Having been at a lot of board meetings and votes before, ***I***

***believe that vote was predetermined before they got there***." Johnson Tr. (Vol. 2) at 17-18.

37.     Regarding the timing of his removal, Johnson later observed that "there's a clear

provision in the merger agreement that I was going to be the CEO. And had they [the Duke

board] said before the closing that that wasn't going to be the case and the Progress board said,

oh, no, we're going to hold you to that, ***then you have a breach of the merger agreement***."

Johnson Tr. (Vol. 1) at 92. Johnson also testified that Duke's decision may have been driven by

the fact that, if Johnson's removal had been known earlier, the NCUC may not have approved

the Merger prior to July 8, 2012, also subjecting Duke to severe financial penalties.  The day

after Johnson's ouster, he communicated his thoughts to the legacy Progress directors:

> I was quite shocked by this turn of events and by the rationale, obviously.  I had
> seen most of the Duke directors **only one time** in the last year, and seen the lead
> director twice; **none of these setting [sic] related to my management or
> leadership behavior**, and none were remarkable.

38.     The fact that Johnson would not be CEO of Duke was disclosed at approximately

7:00 a.m. on July 3, 2012, in a Duke press release issued before the market opened.  In the press

release and during a follow-up conference call with analysts and investors, Rogers and Gray

continued to deliberately deceive investors and omitted material facts about the nature of

Johnson's departure.  Gray misleadingly stated that "Bill Johnson **has resigned**" as CEO "by

**mutual agreement** with the Board" and refused to provide any further details or comments.

Defendants failed to disclose that the "resignation" was actually a premeditated ouster of

Johnson sketched out by Duke long before the Merger closed.

39.     While Defendants rushed to get their version of the "resignation" out before the

July 4 holiday, over the next few days the truth about Defendants' conduct began to emerge.  In a

scathing letter published in the *Wall Street Journal* on July 5, 2012, former Lead Progress

Director John H. Mullin III ("Mullin"), who spearheaded many of the Merger negotiations from

the outset, called Duke's conduct a "***deceitful and pre-meditated*** contravention of good faith

negotiations" and "***a clearly premeditated*** contravention of one of the most central tenets of our

Agreement." Mullin also affirmed that "I do not believe that a ***single director*** of Progress would

have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim

Rogers, would remain as the CEO of the combined company."

40.     Other legacy Progress directors agreed.  One director told the *New York Times* on

July 6, 2012, that "I was surprised, shocked, and ***I felt misled***."  Another director confirmed that

"had we all known from the beginning that [Johnson as CEO] was not going to happen, we probably **would not have considered this merger.  It wasn't the right thing for all of us**." McKee Tr. at 90.

41.     As the full truth regarding Defendants' actions was revealed over several days, investors sold off millions of shares of Duke stock.  The Company's stock price declined $4.53 per share, dropping from a closing price of $69.84 on July 2 to $65.31 on July 9, 2012, only four trading days later.  The continuous and sustained drop over four successive trading days, on unusually high and accelerating volume, was the direct result of the revelation of truth regarding Johnson's ouster and Defendants' premeditated plan to remove him.  At the same time, Standard & Poor's ("S&P") downgraded Duke's credit rating and put the Company on "negative watch" due to the "abrupt change in executive leadership" and "***the lack of transparency associated with this process and with some board members*** . . . as significantly heightening regulatory risk for Duke Energy and weakening its consolidated business risk profile."

42.     Defendants' misconduct has also resulted in the resignation of three legacy Progress directors appointed to the new Duke board, and formal investigations by the NCUC and North Carolina Attorney General.  Duke quickly settled those investigations for more than $30 million in financial payments and mandatory corporate governance reforms intended to restore credibility and transparency to Duke, and equilibrium and fairness to Progress and shareholders. Most notably, as a result of Defendants' conduct, the NCUC effectively ordered Rogers to resign as CEO of Duke and forced him to issue an apology on behalf of the Duke board.  A search for a new Duke CEO is underway.

## III. JURISDICTION AND VENUE

43.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act, and §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

44.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act and §27 of the Exchange Act.

45.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Duke conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

46.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV. THE PARTIES

### A. Lead Plaintiffs

47.    By Court Order dated December 14, 2012, Amalgamated Bank, Gerald and Carolyn Friesen and Craig Bacino, as Trustee for the Janice and Craig Bacino Trust, were appointed Lead Plaintiffs in this action.

48.    Established in 1923, Amalgamated Bank is headquartered in New York City and is the largest union-owned bank in the United States, with over $3.8 billion in assets.  As set forth in the Certification filed previously on September 24, 2012, and as incorporated by reference herein, in connection with its motion for appointment as a lead plaintiff, Amalgamated Bank acquired Duke common stock and, as a result of the violations of the federal securities laws detailed herein, suffered damages in connection with the acquisition of that stock.

49.     Gerald and Carolyn Friesen are husband and wife and residents of Walla Walla, Washington.  As set forth in the Certification filed previously on September 25, 2012, and as incorporated by reference herein, in connection with their motion for appointment as a lead plaintiff, Mr. and Mrs. Friesen acquired Duke common stock in connection with the Merger exchange and offering pursuant to the Merger Registration Statement and, as a result of the violations of the federal securities laws detailed herein, suffered damages in connection with the acquisition of that stock.

50.     Craig Bacino, as Trustee for the Janice and Craig Bacino Trust, is a resident of Helena, Montana.  As set forth in the Certification filed in connection with its motion for appointment as a lead plaintiff, the Janice and Craig Bacino Trust acquired Duke common stock in connection with the Merger exchange and offering and pursuant to the Merger Registration Statement and, as a result of the violations of the federal securities laws detailed herein, suffered damages in connection with the acquisition of that stock.

**B.     Exchange Act Defendants**

51.     Defendant Duke is a diversified energy company with both regulated and unregulated utility operations.  Beginning with the Catawba Power Company in the early 1900s, the current Duke is the result of numerous mergers and acquisitions that have resulted in the largest electric power company in the United States.  Headquartered in Charlotte, North Carolina, Duke supplies, delivers and processes energy for customers in the United States and certain international markets.  As a result of the Merger with Progress, Duke now has over seven million customers and consolidated assets in excess of $100 billion.  During all relevant times, Duke's common stock was listed and traded under the ticker symbol "DUK" on the New York Stock Exchange ("NYSE"), which is an efficient market.

52. Defendant Rogers is currently Duke's CEO, Chairman and President. With the exception of approximately two hours on July 2, 2012, Rogers has been CEO and President of Duke since April 2006 and Chairman since January 2007. Prior to joining Duke, Rogers was Chairman and CEO of Cinergy Corporation ("Cinergy") which merged with Duke in April 2006.

53. During the Class Period, Rogers reviewed, approved and/or made the false and misleading statements set forth herein at ¶¶235-59 and/or had ultimate authority for each of those statements. In addition to reviewing, approving, making and/or having ultimate authority for the false and misleading statements, Rogers had the duty and opportunity to amend, update or correct misstatements and omissions by and on behalf of Duke and failed to do so.

54. As CEO and Chairman, Rogers was responsible for directing Duke's financial and business affairs. In communications with investors before and during the Class Period, Rogers repeatedly held himself out as knowledgeable about Duke's business, including the Merger, and in the Company's SEC filings Rogers touted his "expertise" in "the affairs of the Company and with its businesses." As set forth herein, Rogers was personally involved in all aspects of the Merger, including the Merger negotiations and communications with Johnson, the Duke board and investors regarding the status of the Merger.

55. In conjunction with each of Duke's financial reports filed with the SEC during 2011 and 2012, prior to the Merger, Rogers assured investors that he was "responsible for . . . maintaining disclosure controls and . . . designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant" was made known to him. At no time during 2011 or 2012, prior to the Merger, did Rogers ever assert that he was not aware of any material aspect of the Merger.

56.     Defendant Gray is and was during all relevant times Duke's Lead Director and Chair of Duke's Corporate Governance Committee.  Gray has been a director of Duke since 1997 and Lead Director since 2004.  Prior to joining Duke, Gray was a director of PanEnergy Corporation (a predecessor company of Duke) from 1994 to 1997.  Gray testified that her "overarching responsibility" was as a liaison with Duke's Chairman and CEO, Rogers.  Gray Tr. (Vol. 3) at 7.  As of 2012, Gray had served with Rogers on the Duke board for over 6 years.  As Lead Director, Gray had a significant role in selecting Duke board members appointed from 2004 to the present.

57.     During the Class Period, Gray reviewed, approved and/or made the false and misleading statements set forth herein at ¶¶235-59 and had ultimate authority for each of those statements.  In addition to reviewing, approving, making and/or having ultimate authority for the false and misleading statements, Gray had the duty and opportunity to update or correct misstatements and omissions by and on behalf of Duke and failed to do so.

58.     As Lead Director, Gray was responsible for communications with Rogers about all substantive business matters, including the Merger.  According to Duke's SEC filings prior to the Merger, Gray's qualifications for election as a director of Duke included her "business experience" and "in-depth knowledge of governance principles, which she utilizes on a variety of matters, including [] succession planning, executive compensation and corporate governance."  As set forth herein, Gray was personally involved in all substantial aspects of the Merger, including the undisclosed plan to oust Johnson as CEO following the Merger.  Gray was appointed as Lead Director of Duke at the same time Rogers became CEO of the Company and, during 2011, Gray received $273,553 in compensation from Duke.

59.     Defendant Manly was Duke's Executive Vice President, Chief Legal Officer, and Corporate Secretary at all relevant times. During the Class Period, Manly led the Office of the General Counsel and reviewed, approved and/or made the false and misleading statements set forth herein at ¶¶235-59 and had ultimate authority for each of those statements. In addition to reviewing, approving, making and/or having ultimate authority for the false and misleading statements, Manly had the duty and opportunity to amend, update or correct misstatements and omissions by and on behalf of Duke and failed to do so.

60.     As Chief Legal Officer and head of the Office of the General Counsel, Manly was responsible for directing Duke's legal, ethical and compliance functions, including responsibility for assuring that public statements by and on behalf of the Company were accurate and complete. As set forth herein, Manly was also personally involved in all substantial aspects of the Merger, including the undisclosed plan to oust Johnson as CEO of Duke following the Merger. Prior to his executive position at Duke, Manly had served as Chief Legal Officer of Cinergy under Rogers. Manly was made an Executive Vice President of Duke at the time Rogers became the Company's CEO. During 2011, Manly received $2,827,110 in compensation from Duke.

61.     Because of their positions, each of the Exchange Act Defendants had access to the adverse undisclosed information about Duke's business and operations, including the Merger and deliberations regarding Johnson's role as CEO of the Company following the Merger, *via* access to internal corporate documents, conversations and contact with other corporate officers and directors, attendance at meetings and *via* reports and other information provided to them.[4] Each

---

[4]     According to Duke executives, Duke held board meetings approximately five times per fiscal year. Based on limited documents produced to the NCUC, Rogers, Gray and Manly attended, at a minimum, Duke board meetings on the following dates: August 24, 2010; September 3, 2010; September 20, 2010; October 26, 2010; November 19, 2010; January 5, 2011; January 8, 2011; February 22, 2011; April 6, 2011; May 5, 2011; June 21, 2011; August 23, 2011; October 19, 2011; December 8, 2011; December 20, 2011; January 19, 2012; February

of the Exchange Act Defendants, by virtue of his or her high-level position, was directly involved in the operations of Duke at the highest levels and was privy to confidential information concerning the Company and the Merger. Their positions of control and authority as officers or directors enabled these Exchange Act Defendants to control the content of the SEC filings, press releases and other public statements of Duke during the Class Period. Accordingly, each of the Exchange Act Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the misrepresentations and omissions contained therein. Moreover, each of the Defendants had continuous and systematic contacts with the United States and North Carolina through Duke's conduct of its business and its Charlotte corporate headquarters.

62. During the Class Period, each of the Exchange Act Defendants substantially approved, participated in the preparation of, furnished information in connection with and had ultimately authority for Duke's SEC filings, press releases and public statements and engaged in conduct that made it necessary or inevitable that material misrepresentations would be made to investors on the basis of that conduct.

63. The Exchange Act Defendants were obligated to refrain from issuing Duke's false and misleading public filings and were prohibited from using the instrumentalities of interstate commerce or the mails to: (a) employ any device, scheme or artifice to defraud; (b) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engage in any act, practice or course of business which operates or would operate as a fraud upon any person. The Exchange Act Defendants' conduct violated the Exchange Act and

6, 2012; February 13, 2012; February 28, 2012; April 26, 2012; May 3, 2012; May 30, 2012; June 26, 2012; and July 2, 2012.

SEC regulations promulgated thereunder in connection with the purchase or sale of Duke securities.

64.     Each of the Exchange Act Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Duke securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Johnson's role as CEO of the combined company and their plan and determination to terminate him immediately following the Merger. Defendants' scheme deceived the investing public regarding Johnson's role as CEO, their plan to oust him, the effects of their conduct on the Merger outcome and the intrinsic value of Duke's securities, enabled the Company to register for sale and sell and/or exchange hundreds of millions of Duke securities in connection with the Merger and caused Lead Plaintiffs and other members of the Class to be damaged as a result of their acquisition of Duke securities at artificially inflated prices.

### C.     Securities Act Defendants

65.     Pursuant to the Merger Registration Statement and Prospectus Materials, on July 2, 2012, Duke registered, offered, issued and exchanged 257,867,000 million shares of Duke common stock for Progress's outstanding shares. Duke is statutorily liable under §§11, 12 and 15 of the Securities Act for the false and misleading statements and material omissions contained in the Merger Registration Statement and Prospectus Materials.

66.     Defendants Rogers and Gray, who are also Exchange Act Defendants, signed the Merger Registration Statement, were actively involved in soliciting investor approval of the Merger and effectuating the Merger, and are statutorily liable under §§11, 12 and 15 of the Securities Act for the false and misleading statements and material omissions contained in the Merger Registration Statement and Prospectus Materials.

67.     Defendant Good was the Group Executive and CFO of Duke when the Merger Registration Statement and Prospectus Materials were filed.  Good signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

68.     Defendant Young was the Senior Vice President and Controller of Duke when the Merger Registration Statement and Prospectus Materials were filed.  Young signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

69.     Defendant Browning was a director of Duke when the Merger Registration Statement and Prospectus Materials were filed and through July 2, 2012.  Browning signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.  Browning has been a director of Duke or its predecessor companies continuously from 1990 to present.  Rogers testified that he and Browning served on the boards of PSI Energy and Cinergy (two predecessors of Duke) from 1990 through 2006 (at which time Cinergy merged with Duke), and then on the Duke board from 2006 through present. Browning testified that he has known Rogers since the "mid-'80s" and considers Rogers a "good friend" and a "personal friend outside of being affiliated with [the Duke] board."  Browning Tr. at 38-39.  By 2012, Browning had served with Rogers as director of Duke (or one of Duke's predecessor companies) for over 22 years combined and served with Gray as director of Duke for over 6 years.

70.     Defendant Barnet has been a director of Duke since 2005 and has served on the board with Rogers for over 6 years and with Gray for over 7 years.  Barnet signed the Merger

Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

71.     Defendant Bernhardt has been a director of Duke since 1991 and has served on the Duke board with Rogers for over 6 years and with Gray for over 15 years.  Bernhardt signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

72.     Defendant DiMicco has been a director of Duke since 2007 and joined the Duke board shortly after Rogers became CEO.  DiMicco signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger. DiMicco has served on the Duke board with both Rogers and Gray for over 5 years.

73.     Defendant Forsgren has been a director of Duke since 2009 and has served on the Duke board with both Rogers and Gray for over 3 years.   Forsgren signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

74.     Defendant Hance has been a director of Duke since 2005 and has served on the Duke board with Rogers and Gray for over 7 years.  Hance signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

75.     Defendant Reinsch has been a director of Duke since 2009 and has served with both Rogers and Gray on the Duke board for over 3 years.   Reinsch signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

76.    Defendant Rhodes has been a director of Duke since 2001 and has served on the Duke board with Rogers for over 6 years and with Gray for over 11 years. Rhodes signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

77.    Defendant Sharp has been a director of Duke since 2007 and was a director of Cinergy from 1995 to 2006 prior to its merger with Duke. Sharp has served with Rogers as a director of Duke or its predecessors for over 15 years and with Gray for over 5 years. Sharp signed the Merger Registration Statement and was actively involved in soliciting investor approval of the Merger and effectuating the Merger.

78.    The Securities Act Defendants prepared, reviewed, approved and signed the Merger Registration Statement, which was then incorporated into the Prospectus Materials, and reviewed and/or approved of all later public filings that incorporated the false and misleading statements in the Merger Registration Statement and Prospectus Materials. Each Securities Act Defendant is statutorily liable under §§11, 12 and 15 of the Securities Act for the false and misleading statements contained in the Merger Registration Statement and Prospectus Materials. Each of the Securities Act Defendants did not possess reasonable grounds for the belief that the statements contained in the Merger Registration Statement and Prospectus Materials were true, not misleading and without omission of material facts, and/or failed to perform adequate due diligence.

**D.    Relevant Non-Party: Progress**

79.    Prior to the Merger, Progress was a public utility holding company and member of the Fortune 500 headquartered in Raleigh, North Carolina. Progress was formed by Carolina Power & Light Company's acquisition of Florida Progress Corporation and was primarily engaged in the regulated electric utility business and served more than 3.1 million customers.

Progress owned, directly or indirectly, all of the outstanding common stock of its utility subsidiaries, Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc., and Florida Power Corporation d/b/a Progress Energy Florida, Inc. Prior to the Merger, Progress common stock was listed and traded on the New York Stock Exchange ("NYSE") under the ticker symbol "PGN."

## V. FACTUAL BACKGROUND TO THE MERGER AND OUSTER OF JOHNSON

### A. Duke Approaches Progress Regarding a Strategic Business Combination

80. In late May 2010, a representative of Duke's financial advisor, J.P. Morgan Securities LLC ("JP Morgan") informed Duke's CFO that JP Morgan had an upcoming meeting with Progress Director Mark F. Mulhern ("Mulhern") to discuss general strategic matters. Duke decided that JP Morgan should gauge Progress's interest in exploring a possible deal. The JP Morgan representative later met with Mulhern and discussed the strategic rationale of a business combination. On June 1, 2010, Mulhern called JP Morgan and indicated that Progress was open to discussing a potential merger.

81. During this time, Progress was exploring possible deals with two other companies, referred to in the Merger Registration Statement as "Company A" and "Company B." Accordingly, Duke was competing with at least two other companies to convince the Progress board that it would make a superior merger partner.

82. On or about July 7, 2010, Rogers called Johnson regarding the possibility of a merger. The topic of Johnson becoming CEO of the combined company "arose immediately." Johnson Tr. (Vol. 1) at 17, 19. As former Progress Director Hyler confirmed, "from the first conversation [regarding a potential Duke/Progress merger] it was Bill Johnson, CEO, and Jim Rogers, Executive Chairman." Hyler Tr. at 149-50.

83.     One of the primary reasons for Duke's interest in Progress was to expand Duke's "regulated" electric utility business to provide more stability and predictability in Duke's earnings and dividend yield, both of which are traditionally important factors for utility investors. As Defendant Good explained during the January 10, 2011 conference call following the Merger announcement, "[h]istorically, Duke has had a business mix of approximately 75% regulated. After closing, that percentage increases to around 85%. The non-regulated businesses will continue to provide diversification for Duke Energy; however, they will comprise a lower portion of the overall business."

84.     Rogers also explained this important concept to shareholders during Duke's August 23, 2011 shareholder meeting to approve the Merger: "The portion of our company's earnings before interest and taxes coming from regulated operations is expected to increase from about 80% today to about 87% post-merger. That will likely mean even greater earnings stability which, in turn, will further bolster the continued stability of the dividend and the growth of it."

85.     Johnson later summarized the deal as follows:

In this transaction, essentially what was occurring is that Duke would acquire Progress, and this would make Duke's earnings **much heavier in regulated businesses**. So before the merger, Duke was about 75 percent regulated utilities; 25 percent, they have businesses offshore, they have renewable businesses, but they're apart from the regulated business.

When we were looking at the merger, it was obvious that we're going to have a much bigger regulated platform now. Eighty-seven (87), 88 percent of the earnings are going to come from the regulated businesses. If you look at that time, **Duke was under earning its return on equity** in every jurisdiction it was doing business in, and Progress historically has earned its return on equities.

And so my board was saying in this transaction we're going to take Duke stock for the [P]rogress shareholders. The business is going to be heavily focused on the regulated business. **We think you, Bill Johnson, know how to run the regulated businesses**. You've demonstrated your ability to earn the returns that the commissions have set. **This is a really important part of making sure that the**

*Progress shareholders are happy later as Duke shareholders. We want you to be the CEO because we like the way you run the regulated businesses*.

Johnson Tr. (Vol. 1) at 29-30.

86.     Accordingly, because Progress's business was nearly 99% regulated and Johnson was known for his operational success in that area of the business, Johnson's appointment as CEO was a material foundational element of the strategic rationale for the deal.  As Hyler later observed following Johnson's removal, "[w]e were told that the D[uke] Board wanted to become more 'Progress like', a grind it out regulated utility . . . *[w]ith CEO change now on a totally different path*."

87.     Duke also needed Johnson as the CEO and public face of the Merger because both Rogers and his presumed successor at Duke, Turner, were implicated in an investigation by the Indiana State Ethics Commission regarding Duke's Edwardsport, Indiana facility.  The ethical issues became public prior to the Merger Agreement and Turner resigned in December 2010.  In an article published by the National Legal Policy Center ("NLPC") in May 2011 entitled "Indiana Scandal Means More Heat for Duke Energy CEO Jim Rogers," the NLPC reported:

> Duke Energy CEO James Rogers faced *increasing questions about his leadership*, in part because of conflicts of interest with top company officials and the Indiana Utility Regulatory Commission. Now the state's Ethics Commission has fined a former top lawyer at IURC because he discussed a potential job with Duke while he participated in cases that would determine cost recovery for the utility's controversial Edwardsport coal gasification plant.

88.     Johnson later testified that the Indiana investigation and Turner's resignation in 2010 "was a concern for the Progress board" and another basis for having Johnson serve as CEO. Johnson Tr. (Vol. 1) at 19.

## B.     Johnson Is Established as the CEO of the Combined Company

89.     On July 29, 2010 and August 2, 2010, after several meetings and calls with Rogers, Johnson met in person with Gray, Rogers and other Duke executives at two small group

dinners to discuss the potential Merger.  *See* Gray Tr. (Vol. 3) at 17; Browning Tr. at 43. According to Gray, at this point Johnson already was "settled on as the CEO for the combined company" and there was no discussion about other candidates.  Gray Tr. (Vol. 3) at 17-18.  Gray admitted the CEO position was "clearly an important topic" for the Merger.  *Id*. at 21.

90.     On July 29, 2010, Duke and Progress entered into a mutual confidentiality agreement, including an eighteen-month "standstill" provision.  As talks between the two companies heated up in the fall of 2010, the Progress board decided to cease discussions with Company A and Company B and focus on the possible combination with Duke.

91.     On September 16 and 17, 2010, the Progress board held a series of strategic meetings. In discussing the value of a combination with Duke, the "[b]oard members again observed that due to the importance they placed on the combined company's strategic focus on the regulated utility business, their support for a transaction would depend on alignment between the two boards and management teams on that strategy and on a corporate governance and organizational structure that would support that strategic focus."

92.     On September 26, 2010, Johnson and Rogers met to discuss a number of merger-related items, including "the role of Executive Chairman and CEO."  Defendant Good noted prior to the meeting that "***Jim and Bill have discussed this topic formerly***, and this will be a continuation of those discussions."  Materials prepared in connection with those discussions indicated that Johnson would be CEO and Rogers would be Executive Chairman of the combined company.

93.     On October 2, 2010, Rogers again met with Johnson and presented an illustrative outline that reflected a preliminary and non-binding exchange ratio in a range of 2.5 to 2.55 Duke shares for each share of Progress stock. The outline also reflected that Johnson would serve

as CEO of the combined company and the combined board would be composed of ten Duke directors and five from Progress. On October 5, 2010, the Progress board rejected Duke's offer regarding the exchange ratio and board composition as "not acceptable." Progress's demand on the exchange ratio was 2.60-2.65 Duke shares for every share of Progress. On October 6, Johnson conveyed Progress's rejection of the deal to Rogers. After further negotiations and several rejections by Progress, Rogers and Duke offered a share exchange ratio of 2.60. Progress again rejected Duke's offer. Ultimately, on January 7, 2011, Rogers and Duke capitulated to Progress's higher range and settled on a 2.6125 exchange ratio.

94.     On November 15, 2010, Johnson and Progress's Lead Director Mullin met with Rogers and Gray and discussed a range of topics, including business strategy and organizational design for the combined company, board composition and regulatory approval matters. Mullin also met with Gray privately and "conveyed the view of the Progress Energy board of directors regarding the business strategy of the combined company and a corporate governance and organizational structure that would allow Mr. Johnson the ability to execute that strategy."

95.     On or about November 19, 2010, Johnson participated in a meeting with Duke's full board. Duke's concerns regarding Johnson and opposition to him serving as CEO of Duke surfaced immediately. According to Gray, at that meeting, Johnson "describe[d] himself as being an individual who likes to learn, but not be taught. That was an expression that stayed with our board, and we watched for that to develop." *Id*. As *Bloomberg* later reported:

> On a personal level, Johnson struck some Duke board members as standoffish, according to Ann Maynard Gray, the lead director. In particular, she recalled that he said at one point: 'I am always ready to learn, although I do not always like being taught.'
>
> The expression, not the most obvious comment to make to one's potential bosses, is attributed to Winston Churchill. Gray, a former president of Capital Cities/ABC's Diversified Publishing Group, didn't get the reference. She later testified that Johnson's quip 'stayed with our board,' and not in a good way.

Gray also admitted that "one director was concerned after that meeting, and I can say that that comment stayed with me and I saw some reflections of it going forward." Gray Tr. (Vol. 3) at 19-20.

96.     Following the meeting with Johnson, Defendant DiMicco expressly questioned Johnson's "arrogance" and role as CEO and stated he was "disturbed" by the "view" that Duke could simply appoint Johnson as CEO (to get the Merger through) and remove him later:

> I have to tell you I was very disturbed by the view if it doesn't work out with Bill *we will make the change in 2 years or so*. *This needs to be done right from the beginning – he is either the right guy or he is not*. If he is not then it is a deal killer for me. There is a certain arrogance in his take it or leave it view of the deal with him as CEO or the deal is a bad deal and they don't do it! . . . If it is such a great deal then make their board and shareholders a direct offer without Bill as guaranteed the CEO slot. Let him go head to head with Jim Turner in the new company for the job!

97.     According to minutes of Duke's November 19, 2010 board meeting with Johnson, Defendants were well aware of the so-called "leadership issues" that Duke later cited as the singular reason they terminated Johnson: "the Board met with the Chief Executive Officer of Platinum [code name for Progress] to discuss a variety of matters, including an extensive discussion of [Progress's] nuclear operations and other issues that had been discussed in the due diligence session, as well as his view and vision for building long-term success for the combined company, and '*cultural' issues* associated with leadership, *leadership style* and communications with relevant stakeholders." Even as Defendants were agreeing to the terms of the Merger Agreement with Johnson as CEO, they had material concerns about his ability to serve in that role and viewed Johnson's CEO appointment as a transitory and revocable position necessary only to get the Merger approved.

98.     On or about December 7, 2010, certain Progress representatives attended a meeting with Rogers. A list of questions prepared by the Progress attendees for Rogers

illustrated the importance to Progress of Johnson's role as CEO and expressly inquired about any problems Duke had: "Is your Board receptive and supportive of Bill [Johnson] being the CEO? Any concerns or issues." At least two Progress directors (Hyler and McKee) testified that, prior to the Merger, the Progress directors only met with Rogers once, in December 2010, for approximately one hour. Hyler Tr. at 148-49. Rogers did not raise any concerns regarding Johnson's ability to be CEO of the combined company.

99. Notwithstanding the lack of any expressed concerns by Duke to Progress regarding the appointment of Johnson as CEO of the combined company, Duke continued to internally question Johnson's ability to serve as CEO prior to the execution of the Merger Agreement on January 8, 2011. Duke Director Browning acknowledged that, "[b]y the time we got to the point where we were going to sign the Merger Agreement [in January 2011], there was clearly some concern as to whether Bill was the right guy." Browning Tr. at 45.

100. According to Browning, Defendants' two purported issues with Johnson prior to signing the Merger Agreement were that Progress was a much smaller company relative to the combined Duke company and that Johnson had only three or four years of experience as a CEO. *Id.* at 46. Both of these facts, however, were widely known to Duke prior to ever approaching Progress about a merger and at the time Johnson's role as CEO became a material part of the agreement to merge. Indeed, as Johnson noted in January 2011, "Jim [Rogers] and I have worked together on a number of things over the last couple of years so *we know each other well*. We have spent a number of months together working on this and I think we have a very clear understanding of who is responsible for what."

C.     **Duke and Progress Execute the Merger Agreement**

101. On January 8, 2011, the boards of both Duke and Progress voted unanimously to approve the Merger Agreement. In order to complete the deal, and given the public and

regulatory benefit of identifying Johnson as CEO of the combined company, the Merger Agreement unambiguously provided that "Duke's Board of Directors shall cause [Johnson] to be appointed as the President and Chief Executive Officer of Duke" and that Rogers would be Chairman. Importantly, the Merger Agreement expressly acknowledged that "we are responsible for considering whether **additional specific disclosures** of material information regarding material contractual provisions are **required to make the statements in this document not misleading**."

102. The Merger Agreement provided that the parties could terminate the deal "at any time prior to the completion of the merger, whether before or . . . after the receipt of the necessary shareholder approvals" if, *inter alia*:

- **[T]he merger has not been completed by January 8, 2012**, provided that this right to terminate the merger agreement is not available to any party whose failure to perform any of its obligations under the merger agreement results in the failure of the merger to be completed by that date and provided that either party may extend the date on which this termination right would arise by up to an additional six months if the only unsatisfied conditions to completion of the merger are the receipt of required statutory approvals;

- either the Duke Energy shareholders or the Progress Energy shareholders do not give the approval required by the merger agreement for completion of the merger;

                    *       *       *

- the other party **breaches the merger agreement or fails to perform its obligations in any material respect**, which breach or failure to perform (a) would give rise to the failure of a condition to the terminating party's obligation to complete the merger and (b) is incapable of being cured or is not cured within 60 days following receipt of written notice from the non-breaching party of the breach or failure to perform.

103. Mr. Johnson's appointment as CEO was a material representation and material condition of the Merger.

104.    In connection with the Merger Agreement, Johnson and Rogers executed employment agreement "term sheets" with Duke concerning their post-merger employment (Johnson as CEO and Rogers as Executive Chairman).  Johnson's term sheet provided a term of **three years as CEO**, subject to nominal qualifying reasons for terminations. The entire Merger Agreement was later attached to the Merger Registration Statement and Prospectus Materials, forming an important part of Duke's overall disclosures to investors.

105.    On January 9, 2011, Gray e-mailed Johnson (copying Rogers), stating in pertinent part: "[y]esterday was indeed a thrilling day as both of our boards approve the transaction. Superlatives come to mind on this signing – brilliant, epic, historic, transforming – should I go on?  It will be rewarding work to accomplish the combination of these two admired companies which hold a great future **under your leadership as CEO**.  I look forward to working with you, your board members and your management.  **You may count on the support of our entire board in the months and years ahead**."  Rogers then forwarded the e-mail to Good and Manly, but not Johnson, stating "Great Touch!"

106.    On January 10, 2011, Duke and Progress issued a joint press release announcing that:

> Duke Energy (NYSE: DUK) and Progress Energy, Inc. (NYSE: PGN) announced today that both companies' boards of directors have unanimously approved a definitive merger agreement to combine the two companies in a stock-for-stock transaction. The combined company, to be called Duke Energy, will be the country's largest utility, with:
>
> •    Approximately $65 billion in enterprise value and $37 billion in market capitalization
>
> •    The country's largest regulated customer base, providing service to approximately 7.1 million electric customers in six regulated service territories North Carolina, South Carolina, Florida, Indiana, Kentucky and Ohio

- Approximately 57 gigawatts of domestic generating capacity from a diversified mix of coal, nuclear, natural gas, oil and renewable resources

- The largest regulated nuclear fleet in the country.

107.   The financial terms of the agreement provided that Duke agreed to pay 2.6125 shares of Duke in exchange for each share of Progress and assume $12.2 billion in Progress net debt.  The press release also noted that "[f]ollowing completion of the merger, officials anticipate Duke Energy shareholders will own approximately 63 percent of the combined company and Progress Energy shareholders will own approximately 37 percent on a fully diluted basis.  The combination is anticipated to be accretive to Duke Energy's adjusted earnings in the first year after closing."

108.   Under the heading, "Structure, Organization & Leadership," the press release stated in pertinent part:

> When the merger is completed, Rogers will become executive chairman of the new organization. In this role, Rogers will advise the CEO on strategic matters, play an active role in government relations and serve as the company's lead spokesperson on energy policy.
>
> **Johnson will become president and chief executive officer of the new company**.
>
> **Both Rogers and Johnson will serve on the board of directors of the combined company**, which will be composed of 18 members, with 11 designated by Duke Energy's board of directors and seven designated by Progress Energy's board of directors.

109.   During a joint conference call that same day, January 11, 2011, Rogers repeated that "[p]ost-closing, I will become Executive Chair and **Bill [Johnson] will become President and CEO responsible for running the new Duke energy**."  When pressed by an analyst about "[w]hat happens, who is really in charge . . . if there is a dispute," Rogers responded that "I would simply say that **Bill is going to be the CEO and he is going to be making the calls**" and "at the end of the day, **he is the CEO and makes the call**."

110.    Following the Merger announcement, securities analysts highlighted the importance of Johnson's role as CEO of the combined company. For example, on January 11, 2011, Bernstein Research analyst Hugh Wynne issued a report stating: "We believe the merger will also **reduce risk** by deepening and strengthening Duke Energy's management team. Jim Rogers . . . **will cede the position** of chief executive office to Bill Johnson, who is likely to maintain a stronger focus on operations. Progress' John McArthur will take over as head of regulated utilities, neatly filling the gap left by the departure of Duke's Jim Turner . . . . Finally, the separation of the positions of chairman and chief executive officer could, in our view, contribute to improved corporate governance."

### D.    Duke's Increasing Concerns Regarding Johnson Following the Merger Agreement

111.    According to Duke Director Browning, "sometime at either our February [2011] board [meeting] or our March [2011] board [meeting]" the Duke board was "getting feedback that **the integration process wasn't going as well as we had hoped it would go**. And we asked Jim to visit with Bill and visit the principal tenets of the merger and what we were looking for." Browning Tr. at 47-48. Browning stated that, pursuant to this request, Rogers met with Johnson at the "[e]nd of March, beginning of April in 2011." *Id.* at 48.

112.    Prior to the announcement of the Merger, integration planning of the two companies had been ongoing for many months. During Duke's January 10, 2011 conference call, Defendant Good noted that "we have already begun integration planning efforts" and "with the announcement of the merger integration planning process and the teams of the company, we will be going aggressively after integration as quickly as we can." In another Duke conference call on May 3, 2011, Rogers stated that "[c]urrently, integration planning teams consisting of

Duke and Progress employees are on track and preparing comprehensive analysis of both companies."

113.    On March 17, 2011, Duke filed the first iteration of the Merger Registration Statement with the SEC, including a preliminary joint proxy statement and Prospectus Materials, signaling the mutual intent of Duke and Progress to issue 264 million shares of Duke common stock to facilitate the 1-for-3 reverse stock split of Duke common stock in connection with the eventual Merger exchange with Progress shareholders.    This first iteration of the Merger Registration Statement repeatedly stated that Johnson would be CEO of the combined company.[5]

114.    On April 4, 2011, Rogers sent an e-mail to Good and other senior Duke executives with the subject, "***Merger status and potential issues***" stating in pertinent part:

> I talked with [Duke Lead Director] Ann [Gray] this morning and in the course of the conversation she ask [sic] about the integration.  After expressing my views (tone/arrogance/lack of respect/inflated sense of capability especially in light of their track record), ***she is properly concerned about a clash of cultures as I am***.
>
> I suggested that we address it at the board meeting.  I would like to set out every issue that appears ***at this time we have a conflict*** – model; what is in Raleigh etc etc.
>
> It is important that they have a clear point of view on these issues.  It will enhance my ability to address these issues as you all kick them to Bill and me to resolve.
>
> This email should not be shared with anyone.

115.    That same day, Duke and Progress filed a merger application with the NCUC, including: (i) a copy of the Merger Agreement containing provisions and exhibits stating that Johnson would be CEO of the merged company; and (ii) joint testimony of Rogers and Johnson stating that Johnson would be CEO of the merged company.  Duke also issued a press release

---

[5]    Defendants filed five subsequent amendments to the Merger Registration Statement on April 8, 2011, April 25, 2011, May 13, 2011, June 30, 2011 and July 7, 2011.  All of the amendments repeated the representations that Johnson would become the CEO of Duke following the Merger.

announcing the NCUC filing (as well as Merger-related filings with the FERC and Kentucky Public Service Commission).

116.     On April 29, 2011, Duke's board continued to raise significant concerns regarding Johnson.  In response to a letter from Rogers to Duke's board (the contents of which have not been disclosed), Duke Director Bernhardt, replied to Rogers:

> The board will be particularly interested in the first section that covers your talks with Bill [Johnson].  I think your list was 'spot on' in covering *issues that really had to be/must be addressed*, and I think you were forthright and straightforward as you express it in your letter.  After Bill has had more time to absorb/sleep on this, it would seem appropriate to ask him again for his reactions.  I realize you said he could contact you if he wanted to discuss it, and I know *at some point it is better not to stir up too much confrontation*, but it would seem appropriate that he acknowledge again to you that he is 'on board' and agrees with what you stated (correctly) as our board's intent.

117.     Regarding the same April 2011 letter from Rogers, Browning testified that "I do remember that Jim went to Raleigh, met with Bill, in his monthly board letter wrote us back, said he had those conversations with Bill about we, the [Duke] board, *our concern about integration, our concern about the vision for what was the new Duke as opposed to a bigger Progress or a bigger Duke*."  Browning Tr. at 49.

118.     On April 29, 2011, Rogers e-mailed Gray stating "Bill called and said he would like to meet with the board or a sub-set of the board.  He apparently didn't think that I was truly carrying the messages from the Board."   Gray responded: "Having Bill speak w[ith] the full board is the important thing, so however we can achieve that is fine.  I had intended to brief indep[endent] board members at exec sess [executive session] on BJ [Bill Johnson] evaluation and it w[ou]ld be helpful to do that before the session w[ith] him, I think."

119.     On April 30, 2011, Rogers e-mailed Manly, Good and Duke's Chief Information Officer and Chief Integration Executive, A.R. Mullinax ("Mullinax"), stating in pertinent part: "I talked with Ann about Bill's request and she suggested having him meet with the entire

board . . . . I believe we may want to do a working dinner where they can be briefed by AR [Mullinax] and the two of you as to where we are in the merger integration planning process. We also need to fully explain the issues, ***attitude of his team, attempts to re-trade and the apparent cultural differences***.  We need the board prepared for the meeting."  Mullinax responded:  "I am in total agreement that we should prep the board before Bill meets with them. Wed[nesday] can work, but we do need to set aside a working session for ourselves so we present a balanced story to the board."

120.    On May 3, 2011, Duke held a conference call at which Rogers noted that the Indiana Utility Regulatory Commission "ordered that the Edwardsport case be expanded to review interveners' ***allegations of fraud, concealment, and/or gross mismanagement*** with the burden of proof resting with the interveners.  The interveners will file testimony on July 14 [2011] and the hearing is scheduled to begin on November 3, [2011] after the hearing on the estimated cost increase."

121.    On May 20, 2011, Duke and Progress filed joint testimony of Rogers and Johnson with the NCUC in support of the companies' application for Merger approval.  Once again, the testimony affirmed that following the Merger, Johnson would be CEO and Rogers would be Chairman.

122.    On June 6, 2011, Bernhardt sent an e-mail indicating disagreement between Duke and Johnson regarding selling Duke's commercial operations. In response, Rogers wrote:  "If ***he had his way*** based on our discussions during the negotiations of the deal, my judgment is that he would sell all of DEI and our renewable business and our non-reg[ulated] generation in the Midwest.  His vision is that Duke would be an all regulated business.  I finessed his position with

the believe [sic], as I explained to him, that he would find that our commercial businesses have a very similar risk/reward profile as our regulated business. I am continuing to work the issue."

123. On June 20, 2011, Johnson met with Gray and other Duke directors to discuss Merger developments. Johnson testified that he recalled six topics of discussion for the meeting provided by the Duke board, including the definition of Duke maintaining a "substantial presence" in Raleigh, issues regarding Progress's Crystal River 3 nuclear facility and "how the integration was going and the view that the Progress team was trying to impose Progress practices, systems and everything else, on the Duke process." Johnson Tr. (Vol. 1) at 22-23; Johnson Tr. (Vol. 2) at 67. This was the last time Defendants raised the purported concern regarding Progress imposing its culture on Duke with Johnson, and was also his *last meeting with the Duke board prior to the July 2012 merger*. Johnson Tr. (Vol. 1) at 72-74, 91. Johnson testified that he repeatedly offered to meet with the Duke board and held all of the dates of Duke's board meetings on his calendar since the fall of 2011, but Rogers told him, "*No need to. Everything's fine. There's just no reason to come to the board*." Johnson Tr. (Vol. 2) at 33-34.

124. In truth, everything was not fine. Gray admitted that Duke did not meet again with Johnson after the June 2011 meeting because of the negative issues that arose during both the November 2010 and June 2011 meetings:

> Bill attended two board meetings at our invitation. We actually found that we were a little disappointed in the exchange that went on, and as I explained, what [] the issue was that came out of the first meeting. And at the second meeting *there was another issue*.
>
> And [] so actually, [] we decided other than if there was a specific question that we wanted Bill to deliver to us, that we really thought it would be *better for him not to come* to our ordinary, usual, every board meeting, just because the first two, in fact, *had not been* – had been moderately successful.

Gray Tr. (Vol. 3) at 25-26.

125.   Gray also testified that "[t]here was some discomfort that came out of those [meetings] and we – you know, we just kind of felt that not having him come to a board meeting, unless he specifically asked, until the deal had closed might be better for him.  It's hard to give guidance to a CEO of another corporation, especially when he had said, 'I like to learn, but I don't like to be taught.'"  *Id*. at 63.

126.   Gray admitted that during the second meeting with Johnson in June 2011, there was "an issue about regulatory recovery of a certain asset, and it led to a discussion and perhaps a difference of opinion, and it led to the conclusion that the – his – his presence at the board meeting was [only] moderately successful."  *Id*. at 25, 90-91, 99.  Gray elaborated that there was "an exchange between [Johnson] and [Barnet] that some directors reacted not positively to," which "tempered our enthusiasm for the conduct of that meeting."  *Id.* at 90, 98-99.  Gray also explained that as early as June 2011, certain events related to Progress "caused us concern [about Mr. Johnson] over time, but we continued to believe in the strategic logic and long-term benefits of the merger."  *Id*. at 53.  In other words, as of June 2011, Defendants still wanted to close the Merger, but did not want Johnson to be CEO of the combined company.  In fact, Gray admitted that she had ***no contact whatsoever*** with Johnson during the six months leading up the Merger.  Gray Tr. (Vol. 3) at 50.

### E.   Duke Files the Misleading Merger Registration Statement and Prospectus Materials

127.   On July 7, 2011, the Securities Act Defendants filed the Merger Registration Statement on Form S-4/A with the SEC in connection with the Merger.  The Merger Registration Statement stated:

> Duke Energy has filed with the SEC a registration statement to register the shares of Duke Energy common stock to be issued to Progress Energy shareholders in connection with the merger. ***This document forms a part of that registration statement*** and constitutes a prospectus of Duke Energy, in addition to being a

proxy statement of Duke Energy for its special shareholder meeting and of Progress Energy for its special shareholder meeting.

128.    Prior to the filing, Duke filed two formal requests with the SEC, on June 30, 2011 and July 5, 2011, seeking "acceleration of effectiveness" of the Merger Registration Statement. In connection with these requests, Duke expressly acknowledged that "[t]he action of the Commission or the staff, acting pursuant to delegated authority, in declaring the filing effective, *does not relieve* the Registrant from its full responsibility for the adequacy and *accuracy* of the disclosure in the filing; and [t]he Registrant may not assert staff comments or the declaration of effectiveness as a defense in any proceeding initiated by the Commission or any person under the federal securities laws."

129.    Although the SEC ultimately declared the Merger Registration Statement (including its five amendments) "effective" on July 7, 2011, the Merger Agreement itself provided that the true effective date of the issuance, exchange and acquisition of shares registered in the Merger Registration Statement did not occur until the date the Merger closed and the new registered Duke shares first became available – July 2, 2012.   The Merger Agreement expressly stated "[t]he Merger shall *become effective* at such time as the Articles of Merger are duly filed with the Secretary of State of the State of North Carolina or at such later time as is specified in the Articles of Merger (the *time the Merger becomes effective* being hereinafter referred to as the '*Effective Time*')."   Regarding the filing of the "Articles of Merger," the Merger Agreement stated that "as soon as practicable *after* 10:00 a.m., local time, *on the Closing Date* the parties thereto *shall file* articles of merger."   The first date upon which investors could "acquir[e]" new Duke shares pursuant to the Merger Registration Statement and Prospectus Materials was July 2, 2012.

130.    The Merger Registration Statement contained numerous representations that Johnson would become the CEO of the combined company and would "serve" in that capacity following the Merger.  For example, in a section entitled "Questions and Answers About the Merger and the Special Meetings," the Securities Act Defendants stated the following:

Q:    What will Jim Rogers' role be with Duke Energy following completion of the merger?  What will Bill Johnson's role be?

A:    Duke Energy and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and *Mr. Johnson will serve as president and chief executive officer of Duke Energy following the completion of the merger*.

131.    The Merger Registration Statement also stated "[w]e provide additional information on the senior management of Duke Energy following the completion of the merger under the heading 'The Merger − Continuing Board and Management Positions,' beginning on page 112."  That section stated in relevant part:

The merger agreement provides that *Mr. Johnson will serve as the president and chief executive officer of Duke Energy* and Mr. Rogers will serve as the executive chairman of the board of directors of Duke Energy, in each case as of the completion of the merger and *subject to such individual's ability and willingness to serve*.

132.    The same provision also represented that "[i]n the event either Mr. Johnson or Mr. Rogers is *unable or unwilling to serve* in such capacity, *the parties agreed in the merger agreement to confer and mutually designate a replacement*."    Additionally, the Merger Registration Statement represented that "[m]embers of the Progress Energy board of directors noted that they viewed the strategic emphasis on the regulated utility business as critical to the value of the potential transaction," that the "organizational structure of the combined company . . . would have to support that strategy" and therefore, they "*viewed having Mr. Johnson as the chief executive officer of the combined company as an important element* in ensuring implementation of that strategy."

-46-

133. The Merger Registration Statement also represented that "[b]oth Mr. Rogers and Mr. Johnson would serve on the board of directors of Duke Energy upon completion of the merger, which at that time will be comprised of 18 members, with 11 members designated by Duke Energy and seven members designated by Progress Energy." The Securities Act Defendants also stated that "Messrs. Johnson, Yates, Lyash, McArthur and Mulhern are expected to assume new positions with Duke Energy effective upon completion of the merger. Thus, *we do not expect that these executives' employment will be terminated in connection with the completion of the merger*." The documents also stated that "pursuant to the Merger Agreement," Johnson would be co-chair (with Rogers) of a "*transition committee* to oversee integration planning, including, to the extent permitted by applicable law, consulting with respect to operations and major regulatory decisions."

134. In addition, the Merger Registration Statement included a summary and copy of the Merger Agreement (attached thereto as Annex A) attaching Johnson's employment agreement "term sheet" (as Exhibit C) which contained the "material terms of [Johnson's] employment with Duke *as the President and [CEO]*." The term sheet explicitly "provide[d] for a *three-year term of employment commencing upon the completion of the merger*." The Merger Agreement also attached (as Exhibit B) a document setting forth the roles and responsibilities of Johnson as CEO (and Rogers as Chairman) and the Merger Registration Statement contained detailed representations about Johnson's long-term duties, responsibilities and strategic role following the Merger closing:

> In his capacity *as president and chief executive officer*, *Mr. Johnson will have* all duties customary to such position, including *developing the strategic plan for Duke Energy*, developing and communicating the vision and mission for Duke Energy, developing public policy positions for Duke Energy, selecting the executive management team with the input of the executive chairman, *developing an annual budget* for approval by the Duke Energy board of directors, *driving*

*the strategic financial and operational results* of Duke Energy *and representing Duke Energy to the public and investors*.[6]

135.    The Merger Registration Statement also contained a section entitled: "Shared Strategic Vision and Governance" stating that

> The Progress Energy board of directors considered that Progress Energy and Duke Energy share a common strategic vision for the future of the combined company as a United States focused multi-regional regulated electric utility with related non-utility activities. The Progress Energy board of directors believes that the governance arrangements for the combined company provided for in the merger agreement will increase the likelihood of effective implementation of this strategic vision. These governance arrangements include: ***Mr. Johnson will be the president and [CEO] of the combined company***. Mr. Rogers will be the executive chairman of the board of directors of the combined company.

136.    As set forth in §VI.A., *infra*, these statements in the Merger Registration Statement and Prospectus Materials were false and misleading and omitted material facts.

**F.    Shareholders Vote to Approve the Merger Based on Representations that Johnson Would Be CEO**

137.    On August 23, 2011, Duke and Progress held special shareholder meetings to vote on the Merger-related proposals.  In remarks made to shareholders, Rogers represented that "[u]pon closing [of the Merger], ***Bill Johnson will assume the role of CEO***, and I will become executive chairman of the Board."  In connection with these meetings, Duke filed a Form 425 Prospectus with the SEC attaching a shareholder presentation regarding the Merger entitled, "Stronger as One."  The presentation included an organizational chart entitled, "Highly Experienced Leadership Team" that expressly identified Johnson as President and CEO of Duke (and Rogers as Executive Chairman).  Separately, the presentation incorporated the Merger Registration Statement and Prospectus Materials by reference and "urg[ed] investors and

---

[6]    The Merger Registration Statement advised Duke and Progress shareholders that a special meeting would be held on August 23, 2011 to vote on the Merger proposals.  It also included a letter from Defendant Manly, stating that Duke's board "unanimously recommends" that Duke shareholders vote "for" the Merger-related proposals.

shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement . . . because they contain important information."[7]

138.    The shareholder vote did not effectuate the Merger, however.  As set forth in ¶129, the effective date of the Merger was concomitant with the Merger closing.  The Merger closing was subject to numerous contingencies, contractual provisions and conditions precedent, including regulatory approvals from the FERC, the Nuclear Regulatory Commission, the NCUC, the South Carolina Public Service Commission and the Federal Communications Commission.[8] Other relevant conditions included:

- the absence of governmental action preventing the completion of the merger;

                                    *       *       *

- ***the truth and accuracy of the representations and warranties of the other party***, except where the failure to be true and accurate could not reasonably be expected to have a material adverse effect on such other party;

- the performance in all material respects of the other party's obligations under the merger agreement;

                                    *       *       *

- the receipt of all of the statutory approvals required to complete the merger, free of any condition that, if effected, would have a material adverse effect on the expected benefits for either company or cause a material reduction in the expected benefits for either party's shareholders and the absence of any other regulatory order that would have such effect; and

---

[7]    On the same day, Duke separately filed another Form 425 Prospectus entitled "Duke Energy and Progress Energy to Merge:  Creating the Leading U.S. Utility," which expressly referred to Johnson as President and CEO of Duke (and Rogers as Executive Chairman) and contained the same language set forth above encouraging shareholders to review the (false and misleading) Merger Registration Statement and Prospectus Materials.

[8]    The Kentucky Public Service Commission approved the Merger on August 2, 2011, based in part upon the Securities Act Defendants' statements contained in the Merger Registration Statement and Prospectus Materials.

- the absence since December 31, 2009 of any undisclosed change, event, occurrence or development that, individually or in the aggregate, has had or could reasonably be expected to have a ***material adverse effect*** on the other party.

139.     Additionally, the Merger Agreement provided that it "may be terminated at ***any time*** prior to the completion of the merger, whether before or (unless otherwise noted below) ***after*** the receipt of the necessary shareholder approvals, under the following circumstances," including "if the ***other party breaches the merger agreement or fails to perform its obligations in any material respect***, which breach or failure to perform (a) would give rise to the failure of a condition to the terminating party's obligation to complete the merger and (b) is incapable of being cured or is not cured within 60 days following receipt of written notice from the non-breaching party of the breach or failure to perform."

140.     On September 20-22, 2011, the NCUC held public hearings in connection with the Merger application, during which Rogers and Johnson testified repeatedly under oath that Johnson would be CEO of the combined company.  Johnson told the Commission: "I will become president and chief executive officer of the combined company." Rogers stated: "I will become executive chairman of the board of the combined company."  Rogers also confirmed the accuracy of an organizational chart showing the "roles and responsibilities" of the CEO and Chairman:  "[Question:] [I]s it accurate to say that Mr. Johnson would ***lead the new Duke Energy***, set the tone for the direction of the – the direction that the new company is going to take?  [Rogers:] ***That's correct***."

141.     During the September 2011 hearings, Duke's prepared testimony represented that the Merger would benefit investors: "As the largest U.S. utility, the combined company will be supported by substantial, diversified regulated earnings and cash flow.  The merger is expected to be accretive to earnings in year one with an attractive total shareholder return, supported by

the current Duke Energy dividend policy." Duke also cited specific factors recommending the Merger, including "synergies," a "favorable risk profile," "depth of talent and resources" and "strong investment-grade credit." Duke also stated that "[a]n important operational benefit of the merger is centralized management of the two companies' nuclear fleets."

142.    Notably, Duke also talked about its credit rating – an important factor in raising capital for large projects such as nuclear fleet repairs: "[t]he combined company will have a strong balance sheet and will, at a minimum, maintain its current credit ratings. The combination of these factors will benefit both debt and equity investors." NCUC Chairman Finley later noted that "[t]he Commission *was not informed* that efforts or discussions were underway to *change what had been represented to it* on and before September 20, 2011, with respect to Mr. Johnson's filling the role of president and CEO of [t]he New Duke before it issued its Order on June 29, 2012, nor before the July 2, 2012, board meeting at which Mr. Johnson's resignation was accomplished." Rogers Tr. (Vol. 1) at 9.

143.    On September 30, 2011, Duke and Progress received conditional merger approval from the FERC, subject to a mitigation plan to address the FERC's concerns regarding the combined company's potential market power. Johnson later testified that "[i]t was certainly the worst conditional approval I'd ever had. So what they said was we conditionally approve it, but you have to fix several market power issues, which we set about doing." Johnson Tr. (Vol. 1) at 37. On October 3, 2011, Duke filed an SEC Form 8-K and press release announcing the FERC's order, and on October 17, 2011, Duke and Progress submitted its proposed mitigation plan to the FERC.

**G.    Duke Unsuccessfully Tries to Back out of the Merger; Progress
         Retains Litigation Counsel**

144.    On December 15, 2011, the FERC informed Duke and Progress that their proposed mitigation plan was insufficient, and requested a new submission.  In the wake of the FERC's rejection, Duke and Progress mutually agreed to extend the termination date under the Merger Agreement to July 8, 2012, to allow time to address the FERC's mitigation order.

145.    While such an important regulatory order required the mutual cooperation and continuous communication between the two companies' leadership, Johnson later testified that "[f]rom December the 19th, 2011 until June 11th, 2012, with the exception of some social greetings and seeing people at meetings, *I did not meet with, see, or speak to a Duke director, a Duke employee, a Duke manager, except for Mr. Rogers*."  Johnson Tr. (Vol. 1) at 40.  As Johnson explained, "there was no opportunity during that six months for anybody to observe my cultural integration, my leadership skills, my ability to put the two companies together."  *Id*. at 41.  Duke's board intentionally avoided meeting with Johnson because it had already determined that Johnson would not be the long-term CEO of Duke following the Merger.  Defendants later used the FERC order as a pretext to remove Johnson.

146.    Following the FERC's rejection of the mitigation plan, Defendants made efforts to extricate themselves from the Merger Agreement.  *Id*. at 86-91.  Johnson testified: "Duke management had had a change of heart when they started looking at what the mitigation plan at FERC cost about whether they wanted to do this deal.  And I believe then, and I believe now, that they *explored every avenue to get out of this merger*."  *Id*. at 41-42.  First, as Johnson testified, Duke's estimate for the cost of complying with the FERC mitigation order was too high, "several multiples of ours.  Now, I don't know how you exactly get there, but what was

clear to me was that this was the beginning of an attempt to say burdensome regulatory effect" as a way to scuttle the Merger. *Id*. at 44.

147. Second, Johnson stated that Rogers began positing that the only way the parties could satisfy the FERC was to form a "regional transmission organization" ("RTO"), a time-consuming process that was not even mentioned in the FERC order and had been viewed negatively by Duke's regulators for a decade. Johnson stated: "I knew there was no chance of this, and you can't form an RTO between January [2012] and July 8th [2012]" and "that concerned me because *that's an effort to run out the clock* past July 8 [the deadline for closing the merger, which would terminate the deal]." *Id*. at 45.

148. According to Johnson, he finally agreed to discuss an RTO with the NCUC because "what Mr. Rogers said to me is if we can't get the RTO, *we're going to have to renegotiate this deal*. *And I said we're not renegotiating the deal*. *That's [$]675 million* [the potential breakup penalty]." *Id*. at 45. As Johnson expected, Duke's regulators rejected the RTO and "so we're back on the mitigation plan." *Id*. Unable to scuttle the deal, Duke began efforts to comply with the FERC mitigation order, but, as Johnson explained, "during this whole process what it seemed like to me is that *we're pulling them along and they are digging their heels in*." *Id*. at 45-46. Johnson elaborated, "having talked to the lawyers who were involved on the Progress side, there was a uniform reaction that we were having to drag them every step of the way." *Id*. at 51.

149. The third issue, according to Johnson, that signaled to him that Defendants were trying to get out of the Merger Agreement without paying a penalty was that he learned that Defendants were quietly disparaging the deal. He was told that "the Duke Investor Relations [t]eam was on Wall Street" and they were telling analysts "[t]here's great difficulty in closing

this transaction. We don't think – good chance it won't close, and here's our plan if it doesn't close. And by the way, *we're actually better off financially if it doesn't close*." *Id.* at 46-47.

150.    In response to Duke's conduct, in late January 2012, Johnson and Progress took the unusual step of hiring outside New York litigation counsel to "make sure that this deal got done." *Id.* at 48. Johnson characterized it as "a pretty big step to go hire outside litigation counsel in your deal." *Id.* at 87; Johnson Tr. (Vol. 2) at 46-47. Progress's retention of counsel was disclosed to Duke and its board around the same time.

151.    Later, when NCUC Chairman Finley asked Johnson whether Rogers was being candid with Johnson and/or denied trying to back out of the Merger, Johnson used an apt analogy:

> *So, you know, when you find a turtle – a turtle on a fence post, you can certainly assume it didn't get there by itself.* So you can draw inferences about what's happening from people's behavior or what's being said, so I don't know if he believed he was being candid or not. That's sort of beyond me. But the activities they were taking, the behaviors in the negotiation with the regulatory staff, to me, was a pretty clear signal that they had buyer's remorse.

Johnson Tr. (Vol. 1) at 87.

152.    Notably, on February 29, 2012, Duke's Board Associate, Debby Garrett, sent an e-mail to the Duke board regarding the board's digital record keeping system: "we plan to institute the following policy related to materials posted on BoardVantage. *Within 24 hours after a meeting occurs, it will be our policy to delete all annotations* (subject to any legal holds that may be active) from a meeting book and also to remove the book from the briefcase (pc and iPad), the new items (iPad) and the home page (pc). We also request that you *do not make any annotations* to a book after a meeting."

153.    On March 26, 2012, Duke and Progress submitted a revised mitigation plan to the FERC and requested approval by June 8, 2012 to allow time to close before the Merger

termination date (July 8, 2012). Rogers testified that, as of March 2012, he was "aware that individual members of the Duke Board had concerns" about Johnson. Rogers also admitted that he never suggested that the Duke board talk to Johnson about its concerns: "Q. Did you – when the board expressed concern to you, did you ever suggest they should ask Mr. Johnson to come talk with them? A. I think – I never made that suggestion." Rogers Tr. (Vol. 2) at 20. In response to the later purported criticisms of his leadership skills, Johnson testified, "[I]t seems odd to me that if these issues were burning issues, I never heard about them from anybody, never heard from the [Duke] board, never heard from [Rogers] . . . . If I'd have heard any of these things, I'd have done something about it." Johnson Tr. (Vol. 1) at 83.

154. Johnson also stated that on or about April 13, 2012, Rogers met with Wall Street analyst Greg Gordon of International Strategy & Investment Group LLC ("ISI"). Not coincidentally, two days later, on April 15, 2012, ISI issued a negative research report downgrading Progress stock from "hold" to "sell" due to purported risk that the Merger would not close. ISI stated that "there is a risk that the merger approvals are received before July 8 but they place increased costs on the transaction, causing a material reduction in the expected benefits of the deal for shareholders of DUK and PGN (a '*burdensome effect*' under the terms of the merger agreement) which *might allow either party to exit the deal*." The ISI report set a target price of $46-47 per share for Progress stock if the Merger failed to close, from a price of approximately $51 at the time.

155. ISI also issued a separate report on Duke the same day, entitled "The Merger with PGN Faces Several Regulatory Hurdles & May Not Close." ISI analyzed Duke as a "standalone" company assuming the Merger failed to close. Notably, the report recommended a Duke price target of $22 per share as a standalone company, but a *lower* target price of $21 per

share if the Merger closed, citing the potential "burdensome effect" clause of the Merger Agreement that potentially could allow termination of the deal. The report stated, "[r]elative to expectations at the time the merger was announced, we think it is possible that the costs DUK and PGN may be asked to bear to win regulatory approval from the FERC and the Carolinas *could rise to the point where DUK* might consider them a *'Burdensome Effect'* [and therefore terminate the Merger]."

156. As Johnson later characterized the reports: "[s]ell [Progress] because the merger's not going to close. And if it does, the Duke stock will be worth less than if it does close." Johnson Tr. (Vol. 1) at 49-50. Johnson likened these events to "*dropping an atomic bomb in your deal*." *Id.* at 49. In fact, Johnson stated that during a subsequent analyst conference on May 30, 2012 "[e]verybody who talked to me said what's Duke doing? Are they going to close this? Why are they trying to get out of the merger? So this was commonly discussed with me by members of the Wall Street community. And that's really what was happening during that six-month period [from January 2012 to July 2012]." *Id.* at 50.

157. On April 17, 2012, Johnson wrote a letter to the Progress board informing them of the negative developments instigated by Duke's meetings with Wall Street analysts:

> Our March 26 filing with FERC and the subsequent data request have prompted some questions from analysts about the likelihood of the deal closing. Duke has met with the majority of the sell-side analysts over the last few weeks, and *Duke appears to be indicating they are keeping their options open until all regulatory approvals and their associated costs are known*. Of special note are the two attached reports (one on Duke and one on Progress) issued this week by Greg Gordon at ISI. The *Wall Street Journal* also picked up Greg's report in an article today (attached). Based on feedback from the market, *it appears that speculators have fueled unusual volumes in our stock and are trying to capitalize on the negative sentiment associated with the merger closing*.

158.    Johnson later reflected on these events:  "[Duke] wanted the merger, then they didn't want it, then they couldn't get out of it, and then they didn't want to be stuck with me as the person who dragged them to it."  Johnson Tr. (Vol. 1) at 85-86, 87.

**H.    Defendants Solidify Their Undisclosed Plan to Oust Johnson**

159.    On May 3, 2012, according to Gray, Duke held a regular board meeting and an extended executive session with its attorneys from Wachtell, Lipton, Rosen & Katz ("Wachtell") to discuss the board's concerns regarding Johnson.  Gray Tr. (Vol. 3) at 31.  At the May 3, 2012 session, the board asked Gray to meet further with counsel and undertake a more formal analysis of the Board's options.  *Id.* at 72.  When asked to explain the meaning of the board's request, Gray admitted that Duke began to "focus on the fact that perhaps ***Bill was not going to be*** – we should ***seriously consider whether he's the right person to be CEO***."  *Id.* at 72-73.  Additionally, Gray admitted that Rogers was aware of the board's discussions regarding Johnson following the May 3, 2012 meeting.  Although she claimed that Rogers was not aware of the "process" or where the "focus" was headed, Rogers had been aware of the serious concerns regarding Johnson since as early as November 2010 and had been trying to scuttle the Merger and/or renegotiate the deal long before the May 2012 meetings.  *Id.* at 83.

160.    The next day, May 4, 2012, Duke held a conference call at which one analyst specifically asked Rogers whether he was still "committed" and excited about the Merger:  "[A] very simple question for you, just concerning the merger, I just want to make sure that you're still very committed and still very excited about this merger."  After responding that "[w]e are very committed to getting this merger across the goal line" and "I'm confident that we will and if you had to put a probability on it you'd say more likely than not we'll get it done," the analyst again pressed Rogers for an answer:  "And you're still as excited about it as you were when it was announced?"  Rogers' responded:  "Oh, I don't know at my age if I'm excited about much."

161.    During the same conference call, another analyst asked Rogers about the possibility of invoking the "burdensome effect" clause of the Merger Agreement to terminate the Merger without paying the breakup fee:  "If for some reason you guys saw a material reduction in the expected benefits of the merger, would you be able to call upon the burdensome effect clause in the merger agreement?  And how would it affect this – and would this allow you to avoid having to pay a breakup fee?"  Although Rogers knew Duke had been trying behind the scenes to implicate that provision, Rogers substantively avoided the question:  "Greg, you know that the merger agreement is clear on the burdensome effect provision, it's clear on the MAE [Material Adverse Event] provisions, it's clear on the reps and warranties.  And I think rather than me trying to opine with respect to how these provisions will operate, I would urge you to read them and draw your own conclusions as to what effect they would have under the scenario that you presented to us."

162.    During the approximately five-month period prior to this meeting, Duke's board had no opportunity to assess Johnson's leadership style or his impact on corporate culture because Duke and Progress put "pencils down" and halted merger integration work to focus on regulatory approvals and a new FERC mitigation plan.  Johnson Tr. (Vol. 2) at 32-35.  During a May 4, 2012 conference call, a Deutsche Bank analyst specifically asked about the ceased integration:  "Jim [Rogers], first on the merger.  I just noticed that you mentioned that you've restarted the integration process.  So I guess my question is, does that mean it's stopped and when was that and what changed and can you just provide some color on what you're referring to?"  Duke's CFO Good, took the question for Rogers:  "[A]t the time we received the FERC order in December [2011] we really put pencils down a bit, finishing up what was going to be required for legal day one, but really putting it on the shelf so that we could get focused on

running Duke and Progress separately at the beginning of the year . . . and now we believe we're getting to the point where we should start brushing off the legal day one work and restarting the integration."

163.    On May 17, 2012, Gray met with outside counsel and Manly to further discuss the board's strategy to prevent Johnson from becoming CEO of Duke.  On May 21, 2012, Gray held a conference call with the other two members of the Corporate Governance Committee (DiMicco and Browning).  Gray also stated that she had individual conversations with each of Duke's nine other directors in mid-May 2012 regarding their concerns.  Gray Tr. (Vol. 3) at 73. Unbeknownst to Johnson and the Progress board, by "late spring" Duke had already hired a public relations firm, Joele Frank, to assist in preparing for and responding to the fallout from their decision to remove Johnson.  The firm's founder has described her client philosophy as follows: "I am a big believer that the best defense is a good offense."

164.    On May 30, 2012, according to Gray, Duke's independent directors held a special executive session by telephone (joined by Manly and outside counsel and later joined by Rogers) in which they continued their ongoing discussion of concerns regarding Johnson and the strategy moving forward.  According to Gray, the board focused primarily on the three options:  (i) approach Progress prior to completion of the Merger and raise Duke's concerns; (ii) complete the Merger and defer consideration of any action for some period of time thereafter; or (iii) complete the Merger and consider taking action with respect to the CEO position immediately.

165.    With respect to the first option, Gray testified that "[w]e had an obligation to close the transaction once we got FERC approval, and we had an obligation as a clause of the merger agreement to appoint [Johnson] CEO.  These . . . two factors were obviating factors that we really – that **closed out this choice**."  Gray Tr. (Vol. 3) at 76-77.

166.     When pressed by NCUC Chairman Finley as to why Duke did not pursue the first

option, Gray admitted:

> I think our board felt that when you have a ***vote of no confidence***, it's – it's ***not
> the type of shortfall that can be remediated***.  You can't say, Bill, maybe you
> should do X or, you know, or don't do Y.  ***A vote of no confidence is, you know,
> really, a huge – you can't – you can't remediate a vote of no confidence, in our
> opinion.***  So when – when the board felt that way, there really didn't appear to be
> a reason [to raise concerns with Progress] because ***we couldn't remediate it***.

*Id.* at 77.

167.     Regarding the second option discussed at the May 30, 2012 meeting – complete

the Merger and defer consideration of any action – Gray explained that given the importance of

the integration and synergies after the Merger, "***it would be harmful and inappropriate

to . . . leave it a period of time and address this issue later***.  We'd also had, as we said, a long

runway during the approval process here.  ***We felt we'd had enough*** indication of Bill's

leadership style, which was contrary to ours." *Id*. at 79.  Rogers similarly stated, "I guess my

past experience in dealing with transitions like this, if you say, well, I'm going to wait six

months into it or I'm going to wait three months into it, all that does is create more disruption

within the organization."  Rogers Tr. (Vol. 2) at 30.

168.     When Browning was asked why the Duke board acted so quickly in terminating

Johnson without talking to Johnson or Progress, he responded that "[f]or me, the – my loss of

confidence in Bill's ability to lead the team – ***for me, the toothpaste was out of the tube***, and I

couldn't figure out how to get it back in, whether I talked to him or not.  It just – it – ***I just don't

see how it could happen*** in – for me in that point of the process."  Browning Tr. at 70.

169.     Even after the plan was put in place to remove Johnson, Defendants continued to

mislead investors and regulators.  In SEC filings, press release and public statements in June

2012, Defendants touted positive developments with the Merger, assured investors it was on

track in accordance with the Merger Agreement and failed to disclose the planning and determination to oust Johnson.

170.   On June 22, 2012, knowing their "plan" was in motion and needed to be kept concealed, Gray e-mailed the other Duke board members stating: "***Please exercise extreme caution regarding any reference to the contingency plan*** as we work through our committee and board meetings, the dinner and general presence in the hallways/elevators of headquarters. ***Our executive sessions will provide the only safe arena for reference of any kind***."

171.   On June 23, 2012, according to Gray, she spoke with Rogers via telephone to discuss the board's issues with Johnson.  Gray Tr. (Vol. 3) at 84.  Gray acknowledged that Rogers was aware that other directors had been expressing concerns and considering options with respect to the CEO position.  On June 24, 2012, Gray and Defendant Browning had dinner with Rogers and, according to them, asked Rogers if he was willing to step in as CEO and retain his role as Chairman.  According to Gray, "he said yes."  *Id.* at 85.

172.   On June 25, 2012, the NCUC held a "limited" focus hearing in connection with the Merger.  During subsequent hearings NCUC Chairman Finley recalled that "[a] lot of people showed up [to the June 25 hearing], a lot of interest in it."  Johnson Tr. (Vol. 1) at 99.  At that hearing, Duke failed to disclose any of the material facts and developments regarding Defendants' plan to remove Johnson as CEO and deliberately kept those facts concealed.  Finley later observed that, at the time of the June 25 hearing, the NCUC was "working hard on the assumption that what was represented to us in the hearing ***[was] accurate and ha[d] not changed***.  We're trying to meet what we assume[d] to be the desires of both companies to close this transaction by July 1 [2012].  ***And it appears that steps [were] being taken within the Duke leadership that [were] somewhat inconsistent with that***."  *Id.* at 98.

173.     When later questioned about Duke's apparent position that the selection, hiring, and termination of Johnson immediately after the Merger closed, was "beyond the purview" of the NCUC at that time, Gray provided the following excuse:

> The circumstances . . . did not allow us an opportunity, based on legal counsel and based on the fact that we did not have a vote, and the fact that any notification to you – we did not have a vote to do it earlier, and that ***any notification, as I understand it, to the Commission would have been a public*** filing so it was a very difficult decision.  We anguished over it for a long time.  ***As was said in the text, it was the least worst decision***.

Gray Tr. (Vol. 4) at 13-14.

174.     Defendants did not disclose the truth to the NCUC because that disclosure would have been "public" and therefore informed Progress (and investors) of Duke's true intent to oust Johnson following the Merger, thereby breaching the Merger Agreement.

175.     On June 26, 2012, the Duke board held an executive session at which, according to Gray, the board confirmed its May 30 determination that the "least bad option" was to "close the merger and consider action with respect to Mr. Johnson immediately thereafter."  Gray Tr. (Vol. 3) at 86.  According to Gray, "I think that directors had [] the feeling that [replacing Johnson immediately after the Merger] was the appropriate step, but until the vote was called, there was no decision.  We felt that until the vote had been called and the majority affirmed, that ***there was nothing to report***."  *Id*. at 86-87. But Duke already had more than a supermajority of the new Duke board (10 votes to 5 for Progress), knew it wanted Johnson out since before filing the Merger Registration Statement, and knew that it had already put in motion its plan to remove Johnson in May 2012, at the latest.

176.     E-mails amongst Duke executives, including Manly, show that on June 26, 2012, the same day as the Duke board meeting, the Exchange Act Defendants came up with a plan to conduct a "dry-run" or "test call" (for Duke's board only) 30 minutes prior to the first "official"

board meeting of the new Duke, at which time the Exchange Act Defendants knew Johnson would be installed as CEO and removed immediately thereafter. According to an e-mail to Duke's board, "this is to inform you that *we will conduct a 'dry-run' or 'test' call* at 4:00pm in advance of the 'official' [4:35 p.m.] call." In the materials provided to the legacy Progress directors, including Johnson, in advance of the first Duke board meeting after the Merger, they were not told of the "dry-run" (or the plan to terminate Johnson) and were informed only that the first board meeting of the new Duke would be brief and include rote resolutions already "contemplated in the Merger Agreement and have been discussed by [the Progress board]."

177. On June 27, 2012, nearly a week before the Merger closed, Duke hastily executed a new employment agreement for Johnson to formalize the term sheet signed in conjunction with the January 2011 Merger Agreement (which included a three-year term as CEO, subject to qualifying termination provisions). Johnson Tr. (Vol. 1) at 5. Evidence shows the agreement was rushed because the Exchange Act Defendants knew that Johnson would be terminated immediately after the Merger closing. Indeed, according to a Duke Compensation Committee document in early 2011, the original schedule was that "[a]t its first meeting *following the closing*, the Committee will be asked to recommend that the Board of Directors approve the amendment to Mr. Rogers' employment agreement and Mr. Johnson's employment agreement." Minutes of a December 7, 2011 Duke Compensation Committee meeting also confirm that Johnson's employment agreement was one of the items that "the committee would be asked to approve *upon or shortly following the closing* of the proposed merger."

178. Executing the employment agreement before the Merger allowed the Exchange Act Defendants to quickly formalize a technical requirement of the Merger Agreement – appointing Johnson as CEO – and then terminate him within hours of the Merger. Notably, the

terms of Johnson's employment agreement required Duke to provide written notice of any termination with a citation to the specific provision of the agreement that forms the basis for the termination. When asked by the NCUC if he was provided with such notice, Johnson stated "I've never seen it, no." Johnson Tr. (Vol. 2) at 31.

179.    On June 29, 2012, Duke filed a Form 8-K and its final Form 425 Prospectus with the SEC. The Form 425 Prospectus incorporated the (false) Merger Registration Statement and Prospectus Materials by reference and stated "***Duke Energy and Progress Energy urge investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement, as well as other documents filed with the SEC, because they contain important information***." (Emphasis in original.)

180.    That same day, Duke's Associate for the Board of Directors, Debbie Garrett, acknowledged to Defendant Manly, that Gray would be traveling to Charlotte: "Ann will confirm when she would like to travel." On Sunday, June 30, 2012, after Defendant Reinsch failed to connect to a scheduled conference call, Manly stated: "I got tied up in ***dry running*** stuff for [M]onday and [T]uesday and mistakenly assumed that everything was moved by a day." In response, Reinsch tellingly stated: "No problem, ***not like you are not dealing with enough drama!***"

## I.    The Merger Becomes Effective; Defendants Immediately Oust Johnson

181.    On the morning of July 2, 2012, Johnson took an early flight from Raleigh to Charlotte. The week before, he had been house hunting in Charlotte. As Johnson later recounted, "On July 2, I got up, put on a new tie my wife had given me for the occasion, went to Charlotte and had a meeting with the senior management group that went exceptionally well, I thought. We got the South Carolina approval about noon, congratulated each other." Johnson Tr. (Vol. 1) at 100. Notably, Rogers continued to deceptively conceal facts from Johnson (and

shareholders) until the very end. As Johnson testified: "Later in the day, Rogers came to my office. We chatted about the merger, politics, all these things. At about 4:20 [p.m.], he said we have to go to the 4:30 [p.m.] board meeting. We can't be late for your election." *Id*. at 100-01.

182. At approximately 1:49 p.m. on July 2, 2012, a few hours ***prior to*** the Merger closing, Gray sent Rogers an e-mail with the subject line "[t]est," which contained a draft of an e-mail to Johnson indicating that Gray wanted to personally meet with him following the board's first post-Merger meeting. The e-mail read, "***Bill, I am in Charlotte and would like to meet with you at the company's headquarters following the executive session, so I would appreciate your waiting for me there. Ann***."

183. Later that day, at 3:35 p.m., Johnson sent an e-mail to legacy Progress directors regarding the impending meeting of the new Duke board to be held at 4:30 p.m. that afternoon, the first such meeting following the Merger. Johnson's e-mail stated: "We do not have great visibility into the Board and governance processes and practices at Duke; ***as you know, we have been held at arm's length (or further) in this area***. Here is what we do know: today's meeting is largely an organizational meeting . . . . The agenda is set to last 45 minutes, and I don't think it will take that long." Johnson also referenced a post-Merger orientation program intended to get himself and the new Duke directors up to speed prior to an August 2012 board meeting and strategic retreat. A few days earlier, Johnson had raised the lack of transparency regarding the July 2 meeting in another e-mail. "We have had trouble penetrating the board process so far – talk about control needs – and have about as much insight as you do." Neither Johnson nor the legacy Progress board had any idea that Defendants planned to oust Johnson in the first meeting of the newly-constituted Duke board.

184. At 4:02 p.m. on July 2, 2012, immediately after the close of the market, the Merger became effective. At that time, Progress shareholders acquired 257,867,000 shares of Duke stock, effecting the exchange of previously held Progress shares.

185. At approximately 4:30 p.m., the new Duke board convened a meeting via conference call (attended by Johnson and Rogers). During the meeting, Johnson was officially appointed as CEO and Rogers became Executive Chairman pursuant to the Merger Agreement. As Johnson later recounted, the meeting took approximately 20 minutes which ended at approximately 5:00 p.m. "I'm elected CEO. Handshakes, pats on the back, congratulations all around. *Two hours later I'm gone*. I had no idea to expect this. My wife rarely buys me a new tie. This was a special day. It ended in a way that was a surprise." Johnson Tr. (Vol. 1) at 101.

186. During the meeting, none of the Defendants, including the 11 legacy Duke directors on the new board, disclosed their planned termination of Johnson. Notably, nearly eight months earlier, Duke amended its "Principles of Corporate Governance" which required that the Duke board "*will be fully informed of major proposals*," "[m]aterials will be distributed approximately *one week prior* to each Board meeting," and "[m]aterials will be brief but thorough." Defendants violated those principles and kept the new Duke board members (*i.e.*, legacy Progress directors) in the dark.

187. Immediately after appointing Johnson as CEO, the new Duke board held an executive session (without Rogers or Johnson). As soon as the meeting began, Gray made a motion (seconded by Browning), to remove Johnson as CEO and reinstall Rogers. McKee Tr. at 125. While Johnson was still in the elevator leaving the board meeting, he received the "test" e-mail from Gray stating that she wanted to meet with him after the executive session. The e-mail

was sent *before* the actual vote, confirming that the Exchange Act Defendants knew the vote was predetermined.

188.    For approximately an hour following Gray's motion, former Progress directors conveyed their shock and repeatedly questioned the decision and its timing.  Gray provided little information, and no other legacy Duke director spoke at all. According to former legacy Progress Director McKee, "[Gray] never elaborated further than '[h]e is not a good fit' for one hour." "I couldn't believe it.  I – I didn't know whether to cry or throw up."  *Id.* at 125-33.  McKee testified that the questions raised at the meeting by former Progress directors included the following:  "***So have you considered what the shareholders will think?*** . . . ***Have you looked carefully at the merger agreement and everything that was said there for the last 18 months about this?  Are you worried about shareholder suits?***"  *Id.* at 128-29.

189.    Despite the legacy Progress directors' protestations and requests for more time to digest the situation, the newly constituted Duke board called for a vote and all 10 legacy Duke directors at the meeting (Rogers was excluded) voted to remove Johnson and re-install Rogers as Duke CEO.  All five legacy Progress directors voted against the measure.  Gray acknowledged that the legacy Progress directors – "all of them" – were "shocked" by the proposal to remove Johnson.  Gray Tr. (Vol. 3) at 93, 95.  She also admitted that other than her, Duke's directors never substantively uttered a word.  *Id.*  Later when Gray was asked whether "it has ever happened to you, that you've been a participant in a board meeting and you didn't have information or know what you were about to vote on," she responded "I don't believe so."  *Id.* at 10.

190.    Handwritten notes taken at the July 2 executive session and produced to the NCUC confirm the distress and dismay of the legacy Progress directors. Former Progress

Director Saladrigas "fe[lt] like there was a scheme to do this" and stated that the Duke directors were "asking [the board] to make this incredibly difficult decision with no time to discuss or understand" and no "facts." Saladrigas also made clear that the Progress board "believed that having [Johnson] as CEO was part of what made the deal attractive" and that the board must "weigh[] potential damage and fallout" from Johnson's ouster. In Saladrigas's opinion, the "harm from making [the] decision far outweigh[ed] any damage that could come from giving [Johnson] a chance."

191.     McKee expressed her alarm because Johnson was "among the highest caliber" CEOs and she had "rarely seen such [a] high level of performance." McKee also questioned whether the "shareholder impact" had "been factored in." McKee and former Director Theresa M. Stone ("Stone") made clear that the Progress team is "extremely loyal to [Johnson]" thus the "odds of the team staying in place is extremely low" and we "[d]o not believe they will stay." McKee believed this dynamic "w[ould] be hard to overcome" and Duke "will regret this over the next several months." McKee and Stone also expressed that it was "not fair to [Progress] exec[utives] who signed with [the] expectation that [Johnson] would be CEO."

192.     The other Progress directors echoed the concerns about shareholder impact and the expected departure of Progress executives. They also raised the issue of the "regulatory impact" of replacing Johnson in this manner and "[i]mpact on [Progress] executives – they will leave." Stone presciently raised concerns about the reaction of "rating agencies and regulatory agencies." Stone also made clear that the Progress directors could not "support the decision" and would rather "give [Johnson] a chance and see how it goes." Certain directors asked that the board "not bring this to a vote." Gray rejected this request.

193.     Those same legacy Progress directors who attended the board meeting have since testified that it was clear that Duke's vote to remove Johnson was premeditated.  According to Hyler "it was obvious that the decision had been made." Hyler Tr. at 164.  Hyler also stated: "I think we were listened to, but not heard.  I think – I think, clearly, the decision had been made as to what was going to happen." *Id.* at 154-55.  McKee agreed and specifically disputed Gray's contention that the Duke board "had a preliminary view that Mr. Johnson wasn't the right one to be the CEO, but it's open to debate."  McKee Tr. at 133-135.  Johnson also testified that he thought the vote was "predetermined:"  "Oh, I believe [the legacy Duke directors] were fully briefed.  Having been at a lot of board meetings and votes before, I believe that vote was predetermined before they got there."  Johnson Tr. (Vol. 2) at 17-18.

**J.     Gray and Duke's Outside Attorney Unceremoniously Inform Johnson of His Removal**

194.     According to Johnson, three minutes after Duke's board went into executive session, but approximately one hour ***before*** the board voted to replace Johnson, Gray sent him an e-mail asking to meet with him in Charlotte.  Johnson testified that he thought it was to congratulate him on closing the deal.  After waiting for nearly two hours, at approximately 6:45 p.m., Gray arrived with Duke's outside attorney from Wachtell and immediately informed Johnson that "[t]he board has decided that you're not the right man to be the CEO going forward. We think [Rogers is] the right man to do this.  The reason the board has made this decision is ***because of your leadership style***."  *Id*. at 10-11.  According to Johnson, "I was stunned, and I said I'm stunned, I'm very surprised, something along those lines."  *Id*. at 11.  Johnson later noted that "what I find remarkable about this is that when I was terminated, ***I was given one reason***, which is your management – your ***leadership style***, and this has now ***morphed into five, six issues***, right?"  *Id.* at 68.  Those "issues" were simply pretexts to oust Johnson.

195.    When the NCUC Chairman later asked Johnson "[d]id she mention any of the other reasons that Mr. Rogers gave last week about other reasons that she gave in her statement that she has filed with this Commission this week?" *Id.* at 13. Johnson responded: "No. There was a single reason, and she said it twice, 'It's your leadership style.' I have noticed that additional issues keep popping up. They were not part of that conversation." *Id.* Johnson stated that he did not argue with Gray because "I've been around long enough and seen enough corporate events like this that there's no sense to argue." *Id.* He did note to Gray, however, that "I think this is going to make it very difficult to integrate the eastern half of the Carolinas into this company." *Id.* at 14.

196.    According to a July 3, 2012 e-mail from Johnson, after informing him of the board's decision, Gray "said there was no sense in discussing the Board discussion any further; the lawyer handed me a severance document and told me they wanted my resignation before 7 a.m.[] To ***induce that***, they provided some benefits that they said would ***not be available*** after the news of their decision broke."

197.    The separation agreement provided for ***$44 million*** in payments to Johnson. This amount was substantially more than Johnson would have been entitled to had he truly "resigned" or been properly terminated pursuant to the terms of his employment agreement. Indeed, according to the Merger Registration Statement, if Johnson had a "qualifying termination" within two years following the Merger, "***Mr. Johnson will be entitled to receive approximately $18,193,642***." Because Defendants simply ousted Johnson, however, and needed to secure his "resignation" (and release of claims against Duke), Johnson was given $44 million in separation payments, all paid for by shareholders. Notably, Rogers later testified about who was on the hook for the $44 million payment to Johnson: "I will assure you that none of these dollars will be

*– they will all be paid by the investors* and none will be charged to the customers of this state."

Rogers Tr. (Vol. 2) at 6.

198.    Johnson testified that he told Gray that he would consult with an attorney and Duke would have his answer by 7:00 a.m. the following morning.  Understandably, Johnson recalled a "pretty grim flight" back to Raleigh. He called his wife as soon as he got off the plane. "Before I could say I'd been fired, she congratulated me."  Johnson Tr. (Vol. 2) at 12.

199.    Following Johnson's termination, former legacy Progress directors expressed their thoughts in a protracted series of e-mails that continued late into the night of July 2, 2012:

- McKee stated that "I am shocked and very concerned about the long term prospects and have a lot of personal [soul] searching to do tonight."

- Hyler wrote that he was "really struggling with all this" and McKee responded, "We definitely are all struggling."

- Hyler stated, "Rob Jones just called me.  The news is out.  I told him I could not comment.  His comment was *'what a tragedy and there will be litigation as Bill being CEO was a part of what was sold to the Progress shareholders*.'  He wants to talk after the news is public.  I feel like I/we are in a really tough spot," to which McKee responded, "Same here.  He called me.  I said the same.  I agree. Jeff Jones [attorney at Hunton & Williams LLP] will be on the call with us tomorrow."

- McKee stated, "He [McArthur, former Progress General Counsel] is working with Bill.  They are shocked and surprised.  *[McArthur] apologized and said they didn't see it coming at all*.  Very sad and depressing to talk briefly with him."

200.    At 7:00 a.m. on July 3, 2012, before the market opened, Duke issued a press release and SEC Form 8-K that misleadingly stated in relevant part:

Appointment of Principal Executive Officer of Duke Energy

In connection with the Merger described in Item 2.01 of this Current Report on Form 8-K and pursuant to the terms of the Merger Agreement, effective as of the effective time of the Merger, William D. Johnson, the former Chairman, President and Chief Executive Officer of Progress Energy, was appointed as the President and Chief Executive Officer of Duke Energy.

\*        \*        \*

*Mr. Johnson subsequently resigned* as the President and Chief Executive Officer of Duke Energy.

*       *       *

Resignation of Mr. Johnson and Reappointment of Mr. Rogers

On July 3, 2012, Duke Energy announced that Mr. Johnson has resigned from all of his positions at Duke Energy and will no longer serve as President and Chief Executive  Officer of Duke Energy or as a member of Duke Energy's Board of Directors [], effective as of 12:01 a.m. on July 3, 2012 []. Also, on July 2, 2012, the Board reappointed Mr. James E. Rogers as President and Chief Executive Officer of Duke Energy, effective as of 12:01 a.m. on July 3, 2012.

201.    The press release failed to disclose the truth about what really happened to Johnson and was followed by a Duke conference call at 8:30 a.m., the scheduling of which was also not disclosed to former Progress directors.  According to an e-mail from legacy Progress Director McKee to Stone, "I read the same thing [about the Duke news conference]!  *Amazing. No one said a word!!*"

202.    At 6:53 a.m. on July 3, 2012, Johnson e-mailed former Progress Director (and new Duke Director) Harris DeLoach, stating: "[I] know you [are] uncomfortable as was I . . . hope some time to get chance to share thoughts."  DeLoach responded, "Bill, thanks for note, it was uncomfortable.  I wish it could have been handled differently for all stakeholders.  I do look forward to discussing with you at an appropriate time."  A meeting between the two was later scheduled for July 9, 2012.

203.    That same day at 8:07 a.m., former Progress Director Hyler wrote to McKee, Stone, Saladrigas and two other former Progress directors:

I hope all of you were able to sleep better than me.  Here is a stream of consciousness.  1.  I find it incredible that the *D[uke] directors would not listen to anything we said* or consider Bill's record as PGN CEO.  As a group we worked with him for years and know him.  *We were ignored*.  2.  Culture and fit were the primary reasons given for action.  For me, this begs the question, where does this leave the PGN directors in terms of cultural fit?  3.  We are where we are and *are members of a fractured Board*.  4.  *We now have a totally different CEO than*

*expected*.  More about this on the call.  5.  We were told that the D[uke] Board wanted to become more 'Progress like', a grind it out regulated utility.  6.  With CEO change now on a totally different path.  Look forward to talking in a few minutes.

204.    Also on July 3, 2012, former Progress Director Fred Tollison sent an e-mail to all of the former Progress directors stating, "***As a matter of conscience, I sold all my Duke Energy stock today***."  In the same e-mail thread, James E. Bostic, Jr. wrote to McKee, "Marie - I hope that you are as disappointed and shocked as we were!" to which McKee responded, "[t]otally shocked."

205.    At 9:17 a.m., Johnson sent an e-mail to McKee and others (names redacted) expressing his reaction to suddenly being removed.  "I was quite shocked by this turn of events and by the rationale, obviously.  I had seen most of the Duke directors only one time in the last year, and seen the lead director twice; none of these setting [sic] related to my management or leadership behavior, and none were remarkable.  I have a tangle of thoughts and emotions and wonder what I could have done to avert this situation – I certainly never expected it . . . . But now, as an unemployed man for the first time in more than three decades, I think I will go to the Beach."

206.    Defendants Gray and Rogers hosted a conference call with investors and analysts at 8:30 a.m. on July 3, 2012.  During the call, Rogers and Gray continued to mislead investors and omit material facts about Johnson's ouster.  Rather than explaining that Duke's board had decided to remove Johnson long before the Merger became effective, Gray stated that "Bill Johnson has ***resigned*** as President and Chief Executive Officer of the combined company by ***mutual agreement*** with the Board" and stated "we won't be commenting further on the Board's discussions with regard to Bill's resignation."

207.    Later during the conference call, an analyst pressed Rogers about the move:  "I want to know – there are a lot of people at Progress who were loyal to Bill.  How do you expect to retain or how do you plan on retaining the Progress team that you need in order to get the synergies to support those earnings targets?"  In an effort to assure investors, Rogers responded that "[w]e have had a ***deliberate and balanced process in the integration***" and "[w]e are not two teams today; we are one company and that is a very important point.  So we are going to make this happen together."

### K.    Fallout from the Disclosure of Defendants' Termination of Johnson

208.    On July 3, 2012, rating agency S&P placed Duke's debt on "watch for a possible downgrade" because of the "abrupt change in executive leadership," and placed Duke's "A-" rating on "CreditWatch Negative."  Also, S&P changed its outlook on Progress's debt that Duke assumed in the Merger from "positive" to "developing" and attributed such change to the "sudden shift in management."

209.    On July 5, 2012, the *Wall Street Journal* published a letter to the editor from former Progress Lead Director Mullin (who was not added to the combined Duke board post-Merger) assailing the "old Duke" directors for their conduct:

> As the former Lead Director of Progress Energy, I feel compelled to speak out on behalf of the former shareholders, employees, customers and communities served by Progress who are now all part of or are served by the 'new' Duke Energy.
>
> In negotiations with Duke leading to the merger our Board voted to accept a 'semi-merger of equals' transaction with the explicit agreement that the Progress CEO, Bill Johnson, would become the CEO of the combined company upon consummation of the merger. This was a critical element in the merger deliberations of our Board because we had confidence that Bill would successfully lead the combined companies to achieve the potential synergistic benefits of the combination. ***I do not believe that a single director of Progress would have voted for this transaction as structured with the knowledge that the CEO of Duke, Jim Rogers, would remain as the CEO of the combined company.***

After a long gestation period, the merger finally closed on July 2nd. As stipulated in the Merger Agreement, Bill Johnson became the President and CEO of the newly combined companies – for approximately 20 minutes!

Following a short organizational meeting, the newly constituted board, which contains a majority of 'old Duke' directors, went into executive session and voted to request the resignation of Bill Johnson and the retention of Jim Rogers as CEO of the newly combined company.

In my opinion, this can only be described as an ***incredible act of bad faith*** with regard to the undertakings of the Merger Agreement. I think it was ***a clearly premeditated contravention of one of the most central tenets of our Agreement***. In my opinion this is the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street and as a director of ten publicly traded companies and as a former Trustee of Putnam's numerous mutual funds.

As a non-continuing director of the combined company I now, along with similarly situated former directors of Progress, find myself without a constituency and without an ability to mount a challenge to what I believe is ***one of the greatest corporate hijackings in US business history.***

Consequently, this letter is being written in hopes that what I believe to be a ***deceitful and pre-meditated*** contravention of good faith negotiations will not go un-noticed in the 'court of public opinion.'

210.    On July 6, 2012, former Progress Director John Baker ("Baker"), while on vacation in Africa, wrote to McKee, "I just read the string of e-mails and ***feel like I have been kicked in the gut***. I cannot get to a phone until July 9. Please keep me up to date." Also on July 6, 2012, *Bloomberg* published an article entitled "Ex-Progress Directors Say Duke CEO Switch Was 'Deceit.'" This article provides, in relevant part:

Three former Progress Energy Inc. board members say they would have voted against Duke Energy Corp. (DUK)'s takeover had they known that Duke's chief executive officer would remain in charge of the combined companies.

***I wouldn't have voted for the deal,*** James Bostic Jr., who served on Progress's board since 2002, said in a phone interview today. I believed that Bill Johnson would be able to run the combined companies in a more efficient manner and offer a much stronger return to shareholders.

*            *            *

The surprise decision to change CEOs as its takeover closed was deceitful, according to John H. Mullin, who also served on Progress's board.

*     *     *

> ***There was information that Duke didn't share with us, and it may have changed the outcome,*** Alfred Tollison, another former Progress Director, said in a phone interview today. Duke may have fulfilled the letter of the agreement, but they didn't fulfill the spirit, he said, referring to Johnson occupying the CEO position for one day.

211. Former Progress Director Tollison, also told the *New York Times* that "I was surprised, shocked, and ***I felt misled***. I did not expect this from Duke Energy and am really disappointed with how this turned out." Similarly, legacy Progress Director McKee confirmed that, "I think had we all known from the beginning that [Johnson being CEO of the combined company] was not going to happen, we [the Progress board] probably ***would not have considered this merger. It wasn't the right thing for all of us***." McKee Tr. at 90. Hyler stated, "[c]ertainly, the notion of Bill being the CEO was very important to our [the Progress] board, again, thinking that he had the skills, along with our team, to combine with their team to bring about the savings." Hyler Tr. at 154, 159-60. Similarly, Johnson called this "a major factor in [the Progress board] agreeing to the merger, to put the merger in front of the shareholders." Johnson Tr. (Vol. 2) at 77.

212. According to an interview of former Progress Director Charles W. Pryor published in the *News & Observer*, "[w]e accepted a fairly small premium . . . . In return for that, we understood that going forward there would be a true value proposition in the merged company as a result of Bill Johnson being the CEO and managing the company to a different corporate strategy than Duke had. And, frankly, ***we feel betrayed*** in that regard."

213. On July 6, 2012, the NCUC and the North Carolina Department of Justice ("NCDOJ") initiated separate investigations into Duke's actions in connection with Johnson's removal. The NCDOJ issued a press release stating:

Attorney General Roy Cooper's office has issued a Civil Investigative Demand (CID) to Duke Energy in order to determine whether there were **misrepresentations or misstatements** made by Duke Energy and/or its' representatives to consumers or regulators in proceedings related to their request for a rate increase and their merger with Progress Energy and to determine whether there will be a detrimental effect on consumers. Standard and Poor's Financial Services placed Duke Energy on a watch list for potential credit downgrade in the wake of the merger and Cooper is concerned that this could lead to higher utility rates. The CID requests information and all communications from top company officials and directors during the time period leading up to and just after the merger.

214.    The press release included the following statement from North Carolina Attorney General Roy Cooper: "Despite our objection, Duke Energy said it needed a rate increase in order to protect its credit. ***Now this significant management change within hours after the merger has put the company on credit watch***, so we need to get to the bottom of this to make sure we protect consumers." The NCUC also stated its investigation would look into "why what the Commission understood was to occur based on the sworn testimony in the dockets did not occur, why the William D. Johnson's resignation occurred within hours of the close of the transaction and what ramifications or repercussions might result from these unexpected and unanticipated events with respect to this Commission's continued jurisdiction over Duke."

215.    The NCUC order noted that Rogers and Johnson had previously testified on May 20, 2011 that Rogers would be Chairman and Johnson would be CEO of the combined company. The order also noted that both executives testified under oath on September 20-22, 2011, and on June 25, 2012, and reaffirmed their May 20, 2011 testimony. The order concluded: "[t]he commission was not informed by the applicants (Duke Energy and Progress Energy) at any time prior to July 3 that Rogers would replace Johnson as president and CEO of Duke."

216.    As reported in the *News & Observer* "[i]n a parallel development stemming from the CEO switch, state Attorney General Roy Cooper on Friday said he was opening an investigation to determine whether Duke officials misrepresented facts about their CEO strategy

to improve the chances of getting their takeover of Progress Energy approved by the N.C. Utilities Commission, which was sensitive to the loss of a Fortune 500 corporate headquarters in Raleigh. Cooper said the CEO debacle also raises questions about whether Duke officials lied last year to win a 7 percent rate increase from the Utilities Commission."

217.    On July 9, 2012, *TheStreet.com* published an article regarding Johnson's removal entitled, "***Duke Energy Deceives Its Investors***," which stated, in relevant part:

> One of the cardinal rules in the utility industry is don't surprise your friends. ***Duke Energy (DUK) Chairman and CEO James Rogers just violated that rule***.
>
> After Duke's successful acquisition of Progress Energy last Monday, shareholders expected that Rogers would become executive chairman of the board and that Progress Energy's Bill Johnson would become Duke's president and CEO. But at 12:01 a.m. EDT Tuesday morning, just minutes into his new role as Duke's CEO, Johnson was allegedly forced out of the company by a Rogers-friendly board, and Rogers retook full control of the new Duke.
>
> Apparently, the last-minute decision came as a complete surprise to Johnson. It was also a surprise for Progress Energy's leadership team. ***Had Progress executives known about Rogers' plan for a management switch before the merger closed, in all likelihood, they would've suspended final approvals***.
>
> ***It couldn't have been a surprise to Rogers***. Duke is a big company and cannot spin on a dime. Rogers' plans had to have been socialized with critical board members ***well before the merger***. (The new board is composed of 11 former Duke and seven former Progress members.)
>
> It appears as though Rogers and his carefully selected board members were deceptive and withheld critical information from fellow board members, shareholders, executives and regulators. Worse, it appears as though the Rogers-controlled board members disregarded their fiduciary responsibilities to all shareholders, including the former Progress shareholders.
>
> There is also the issue of corporate culture. ***As the industry learned from one of Rogers' former employers, Enron, corporate culture starts from the top***. If deceptive maneuvers and ambush tactics are adopted and rewarded by senior executives, that culture will find its way down the corporate ladder and become a fixture throughout Duke's organization. ***That type of management style is not what most shareholders, regulators or the public expect of a nuclear utility***.
>
> Public trust and confidence is an essential ingredient for successful utility operations. The public's trust is imperiled when utility management is engaged in

deceit. It's further imperiled when a management team's reputation with state and federal regulators is soiled, and Rogers' coup d'état has already attracted unfavorable regulatory attention.

According to *Bloomberg*, North Carolina's Attorney General opened an investigation to determine if Duke lied to get merger approval and win a rate increase. In addition, Standard & Poor's put Duke on negative credit watch after the firm learned about 'the abrupt change in executive leadership.'

Adding to the regulatory concerns are the outspoken concerns raised by Progress Energy's board members. John Mullin was one of those members, and he writes in *The Wall Street Journal*:

The surprise decision to change CEOs as its takeover closed **was deceitful**. I do not believe that a single director of Progress would have voted for this transaction with the knowledge that Jim Rogers would remain as the CEO of the combined company.

**Duke Energy is damaged. The question is how bad and can it be fixed.**

218.    On July 9, 2012, Morningstar Equity Research downgraded Duke's "stewardship rating" from standard to "poor" because of "concerns about the independence of Duke's board of directors, its ability to integrate Progress Energy, and succession uncertainty."  The report noted "[t]his follow[ed] the board's decision on June 27 to finalize a contract with Progress CEO, with Chairman Johnson to become Duke's new CEO, only to seek Johnson's resignation just hours after the merger closed on July 2."  Morningstar reaffirmed its downgrade following Rogers' July 10, 2012 testimony before the NCUC and again following Gray's July 20, 2012 testimony. Morningstar also expressed concern that "Duke management and its board ha[d] angered regulators and [we]re certain to face strained relationships and increased regulatory risk."

219.    As a result of the disclosures that Johnson would no longer serve as CEO and the relevant truth regarding Defendants' planning and determination to oust him, Duke's stock price fell from a close of $69.84 on July 2, 2012 at the time the Merger became effective, to $65.31 on July 9, 2012, a sharp drop of $4.53 per share on unusually heavy volume.

220.    The repercussions of Defendants' actions, and the disclosure of those actions, continued after July 9, 2012.  On July 10, 2012, UBS analyst Jim von Riesemann downgraded Duke from "Buy" to "Hold," citing uncertainty related to the NCUC investigation and "execution risk."  That same day, Duke announced that former top Progress executives Mark Mulhern (Executive Vice President and Chief Administration Officer), John McArthur (Executive Vice President of Regulated Utilities), and Paula Sims (Chief Integration and Innovation Officer) had resigned from Duke in the wake of Johnson's removal.  Duke's press release quoted Rogers as stating in pertinent part: "[w]hile we encouraged the entire team to maintain their roles, John, Mark and Paula requested to step down and we wish them well."

221.    As part of the NCUC's investigation, it called a number of Duke and Progress executives and directors to testify.  On July 10, 2012, Rogers testified before the NCUC.  In this proceeding, NCUC Chairman Finley opened by giving his recollection of the events immediately preceding the Merger, from the Commission's perspective:

> The Commission re-opened the hearing in the dockets on a limited basis on June 25, 2012.
>
> The Commission understood that the parties wished to close the business combination by July 1, 2012, and pursuant to the agreement between them that if the closing did not occur by July 8, 2012, either party was free to walk away from the transaction without financial penalty.
>
> In an effort to comply with the applicants' conveyed wishes, the Commission issued its Order approving the business combination, with conditions and code of conduct on June 29, 2012. At that time the Commission **had not been made aware** of any discussions or decisions concerning changes in the representations with respect to the individual that would hold the position of president and CEO of The New Duke and issued its Order on the understanding, based on the sworn testimony it had received, that **that individual would be William D. Johnson**.

222.    During the hearing, after noting the "magnitude" of the failure to disclose the decision to remove Johnson, Commissioner Beatty told Rogers, "***don't you see how that might affect the credibility at least of the company with this Commission***?"  Rogers' response was that

"*[i]t was really nothing we could communicate to this Commission*."  Rogers stated before the NCUC: "I wish we could have given the Commission prior notice, but *corporate decisions are announced when they are made, not when they are being contemplated*."  Rogers Tr. (Vol. 1) at 26, 59.  NCUC Chairman Finley later had a very different assessment during his questioning of Johnson:

> Is not a more plausible explanation that Duke couldn't reveal its contemplated action, *i.e.*, it *couldn't be transparent* because had it done so, A, it probably would have resulted in an *unwillingness of this Commission to grant its approval* by July 8, thus *likely subjecting Duke to the $675 million penalty*; or B, *subjecting Duke to the $675 million penalty for failing to comply with a material term of the merger agreement*?

Johnson Tr. (Vol. 2) at 22.  Johnson responded:  "That is exactly how I read through the provisions of the merger agreement."  *Id.*  Johnson also noted, "[t]he condition was they would make me CEO. The expectation was that it would be more than 20 minutes or two hours."  *Id*. at 16.

223.     Johnson also observed that "there's a clear provision in the merger agreement that I was going to be the CEO.  And had they [the Duke board] said before the closing that that wasn't going to be the case and the Progress board said, oh, no, *we're going to hold you to that, then you have a breach of the merger agreement*."  Johnson Tr. (Vol. 1) at 22, 92.  Johnson also testified that Duke's decision may have been driven by the possibility that, if Johnson's removal had been known earlier, the NCUC would not have approved the Merger prior to July 8, which also would have subjected Duke to financial penalties.  NCUC Chairman Finley also asked Johnson "if Duke took action to interfere with or slow down the regulatory process at FERC, NCUC, or the Public Service Commission of South Carolina, that might have triggered the $675 million penalty in the merger agreement, right?"  Johnson responded: "That's correct."  *Id*. at 92.

224.     When asked by the NCUC whether he felt that Duke should have disclosed their plan to "alter[] one of the primary factors of the deal, which was that you would be the CEO," Johnson answered, "I believe I would have tried to tell somebody what was going on.  Again, sitting here, it's easy to say that, but *you rarely get in trouble telling the truth*."  *Id.* at 99-100. "What should have been brought here [to the NCUC] and brought to the attention of somebody was the plan to do something with the CEO, which was one of the terms of the agreement . . . there had to be a better way to do this than the one that occurred."  Johnson Tr. (Vol. 2) at 57.

225.     During the hearing on July 10, 2012, NCUC Chairman Finley reminded Rogers that he had previously assured the Commission that "Mr. Johnson would lead the New Duke Energy, set the tone for the direction of the – the direction that the new company is going to take."  Rogers Tr. (Vol. 1) at 6.  When asked whether Rogers believed that Johnson knew he would be fired, Rogers testified that he was "not in a position to say what was in his [Johnson's] mind."  *Id*. at 21.  When pressed by Chairman Finley, Rogers ultimately relented that he did not "have any reason to believe [Johnson] didn't think he would be [CEO]."  *Id*. at 22.

226.     In response to Rogers' assertion to the NCUC that Duke had the right to terminate Johnson, Chairman Finley aptly observed:  "But what's troublesome is it's true.  Your board can fire the CEO just like Berkshire Hathaway can fire Warren Buffett as far as that's concerned, but *in this particular context, there's a different set of rules that should apply here when this was an important feature of this merger* when we listened to what you said about what was going to happen.  And we relied upon it."  Rogers Tr. (Vol. 2) at 7.

227.     On July 10, 2012, following Rogers' testimony before the NCUC, the *Wall Street Journal* reported that:

In his testimony, **Mr. Rogers repeatedly implied that Duke was the better performer**. But utilities are judged by their ability to earn an 'allowable return,' or the maximum profit permitted by regulators. **In 2011, Progress earned that amount in each of its states, while Duke didn't achieve that goal in any state where it operated. Indeed, improving Duke's performance was one goal of the merger**.

228. On July 15, 2012, the *Charlotte Observer* published an article on the fallout from

Johnson's termination.

During the 18 months that Progress Energy and Duke Energy were waiting for regulatory approval for their $32 billion merger, one Progress director made a point of forwarding the board's annual performance review of CEO Bill Johnson to a counterpart on the Duke board. John Mullin III, a businessman in Virginia, thought that Duke's lead director, Ann Maynard Gray, would benefit from seeing the evaluation of the chief executive who had been tapped to lead what was destined to become the nation's largest utility. 'He got very high scores,' Mullin said. 'We were very proud of Bill. I thought she and the Duke board would be as well.'

Which is why former Progress directors were shocked when Duke's board announced just hours after the merger was completed on July 2 that Johnson had resigned by 'mutual agreement,' and that Jim Rogers had been reinstated as CEO. Shock turned to incredulity last week when Rogers testified before the N.C. Utilities Commission that an accumulation of factors – including Johnson's 'autocratic' style and mismanagement of Progress's stable of nuclear reactors – prompted the newly constituted Duke board to send Johnson packing. Progress's nuclear woes, which **emerged before the utilities agreed to merge** and escalated as the utilities sought regulatory approval, **are well known**.

But former directors of Progress say they're mystified by the criticism of Johnson's management style. They say Johnson's ability to get along with all employees is one of the strengths underscored in his evaluation. They awarded Johnson a $1.2 million bonus last year, his largest since becoming CEO in 2007, despite the deteriorating nuclear performance.

'He was a good listener to his employees all the way to the shop floor,' said Alfred C. Tollison Jr., who served on the Progress board for six years. 'He spent a lot of time in the field, listening to what employees thought and giving them firsthand his thoughts and views. Bill is a great gatherer of information and he uses that to make decisions.'

Rogers' testimony did nothing to change the Progress directors' conviction that Johnson was railroaded, the victim of what Mullin decried as 'the most blatant example of corporate deceit that I have witnessed during a long career on Wall Street.' James E. Bostic Jr., a Progress director, said of Rogers' account of how

the Duke board viewed Johnson's management style: '*It was just phony stuff they made up*.'

229. On July 17, 2012, Duke filed vociferous objections to the NCUC's order requiring further hearings and testimony, calling it, *inter alia*, "procedurally deficient." Later NCUC Chairman Finley asked Gray rhetorically: "You filed a statement with us, and you made a notation that our procedures here are unprecedented. Would you [] acknowledge that dismissal of a new [] CEO within 20 minutes of his appointment is also unprecedented?" Gray Tr. (Vol. 3) at 10.

230. On July 26, 2012, S&P put Duke's credit rating on "watch" and downgraded its credit rating from A- to BBB+, citing Johnson's forced removal and stating, "We view the *lack of transparency* associated with this process and with some board members . . . as *significantly heightening regulatory risk* for Duke Energy and weakening its consolidated business risk profile."

231. On July 27, 2012, former Progress Directors Stone and Baker resigned from the new Duke board. Stone's resignation letter stated in pertinent part:

> *I am deeply disappointed in the corporate governance practices of Duke Energy Corporation* . . . as evidenced by the meeting of the Company's Board of Directors on Monday, July 2, 2012 (the 'Meeting') and the ensuing events. I do not believe I can contribute effectively as a Director in this environment.
>
> *No notice had been given to the six Progress independent directors who had joined the combined company Board that a change in the CEO position would be an agenda item at that Meeting*; *and no written materials had been, or were, provided at the Meeting to support removing Bill [Johnson]*; nor were any materials provided to support the election of Jim. In response to numerous comments and questions by the Legacy Progress Directors on the reason for Bill Johnson's removal, *the sole reason, given repeatedly by Ms. Gray was Bill's leadership style*.
>
> During this executive session, The Legacy Progress Directors commented forcefully and positively on their experience with Bill's effectiveness at Progress as well as his leadership roles in key utility industry organizations and on their confidence in his strong qualifications for the CEO position in the combined

company. The Legacy Progress Directors also expressed strong concerns that the precipitous CEO switch *would create significant negative fallout among shareholders, regulators, rating agencies, employees* and the recently elected impressive combined senior management team which has been chosen by mutual agreement of Progress and Duke. Concern was also expressed about the likely negative perception that would be created of Duke's corporate governance processes.

It would be difficult not to conclude that the Legacy Duke Directors had come to the Meeting *having made a decision* to remove Bill and that Ms. Gray was going through the technical requirement to execute the decision to remove Bill by bringing the matter to a vote *knowing that the Legacy Duke Directors would carry the vote* through their majority position.

The Legacy Duke Directors, with Ms. Gray as their spokesperson, gave no reasons other than perceived leadership style. Subsequent to the announcement of Bill's removal, additional concerns about Bill have been expressed by Legacy Duke Board members. However, *none of those concerns was raised for discussion* with the Legacy Progress Board Directors either in the *eighteen months* between the signing of the merger agreement and its closing or in the Meeting of July 2, where he was removed.

From the outset of the merger negotiations, it was understood between Progress and Duke that Mr. Rogers should not be the CEO of the combined company.

232. Baker's resignation letter stated that actions by the legacy Duke directors "have revealed serious issues in Duke's corporate governance practices and procedures," and that he could not "effectively serve as a member of the Board in light of these issues."

233. On September 20, 2012, *Bloomberg* published an article entitled, "Duke Chief Answers Critics After Coup at Biggest Utility." The article stated: "[n]ever accused of modesty, Rogers refers to himself as a 'CEO statesman.'" The article also included a quote from Rogers stating: "*Life is about making stuff up as you go*," Rogers said. "You're constantly taking a story line, *changing the narrative*, looking at it from all different perspectives." The article also stated that "[Rogers'] detractors describe Rogers as a slippery self-promoter" and quoted Jim Warren, executive director of North Carolina Waste Awareness and Reduction Network ("NC WARN"), a nonprofit in Durham, as saying "he's more concerned about public relations and

image than anything else" and that Johnson's ouster "***looks like part of the pattern we've seen from Rogers for a long time***: ***Progress and the utility commission got taken so Rogers could get his merger***."

234.     On November 13, 2012, the *Charlotte Observer* reported that Duke officials met with the SEC in connection with Johnson's removal in late October 2012 after the federal regulator "requested more information about the circumstances surrounding the firing of Bill Johnson."

## VI.   SECURITIES ACT VIOLATIONS

### A.     The Merger Registration Statement Contained False and Misleading Statements and Omitted Material Facts in Violation of §11 of the Securities Act

235.     The Securities Act Defendants filed the Merger Registration Statement on July 7, 2011.  As set forth in ¶129, although the SEC declared the document "effective" on that date, the Merger Agreement provided that the true effective date of the issuance, exchange and acquisition of shares registered in the Merger Registration Statement did not occur until the date the Merger closed, July 2, 2012, when the new registered Duke shares first became available.  Until July 2, 2012, shareholders could not exchange their Progress shares or acquire shares of the new combined Duke pursuant to the Merger Registration Statement.

236.     The Merger Registration Statement contained more than a dozen false and misleading representations that Johnson would become CEO of the combined company and would actually "serve" in that capacity following the completion of the Merger.  For example, in a "Questions and Answers About the Merger and the Special Meetings" section of the Merger Registration Statement, the Securities Act Defendants stated the following:

> Q:     What will Jim Rogers' role be with Duke Energy following completion of the merger?  What will Bill Johnson's role be?

A:     Duke Energy and Progress Energy have agreed that Mr. Rogers will serve as executive chairman of the board of directors of Duke Energy and *Mr. Johnson will serve as president and chief executive officer of Duke Energy following the completion of the merger*.

237.    The Merger Registration Statement also represented that Johnson's appointment as CEO was subject only to his "ability and willingness" to serve:

The merger agreement provides that *Mr. Johnson will serve as the president and chief executive officer of Duke Energy* and Mr. Rogers will serve as the executive chairman of the board of directors of Duke Energy, in each case as of the completion of the merger and *subject to such individual's ability and willingness to serve*.

238.    The same provision represented that "[i]n the event either Mr. Johnson or Mr. Rogers is unable or unwilling to serve in such capacity, *the parties agreed in the merger agreement to confer and mutually designate a replacement*."

239.    Additionally, the Merger Registration Statement represented that "[m]embers of the Progress Energy board of directors noted that they viewed the strategic emphasis on the regulated utility business as *critical to the value of the potential transaction*," that the "organizational structure of the combined company . . . would have to support that strategy" and therefore, they "*viewed having Mr. Johnson as the chief executive officer of the combined company as an important element* in ensuring implementation of that strategy."

240.    The Merger Registration Statement also represented that "[b]oth Mr. Rogers and Mr. Johnson *would serve on the board of directors* of Duke Energy upon completion of the merger, which at that time will be comprised of 18 members, with 11 members designated by Duke Energy and seven members designated by Progress Energy."    The Securities Act Defendants also stated that "Messrs. Johnson, Yates, Lyash, McArthur and Mulhern are expected to assume new positions with Duke Energy effective upon completion of the merger. Thus, *we do not expect that these executives' employment will be terminated in connection with the*

*completion of the merger*."   The documents also clearly stated that Johnson would lead the transition of the new Duke as co-chair (with Rogers) of a "*transition committee* to oversee integration planning, including, to the extent permitted by applicable law, consulting with respect to operations and major regulatory decisions."

241.   Additionally, the Merger Registration Statement included a term sheet reflecting the "material terms of [Johnson's] employment with Duke *as the President and [CEO]*" which "provides for a *three-year term of employment commencing upon the completion of the merger*."   The Merger Agreement also represented the roles and responsibilities of Johnson as CEO (and Rogers as Chairman) and the Merger Registration Statement contained detailed representations about Johnson's *long-term* duties, responsibilities and strategic role following the Merger closing:

> In his capacity as *president and chief executive officer*, *Mr. Johnson will have* all duties customary to such position, including *developing the strategic plan for Duke Energy*, developing and communicating the vision and mission for Duke Energy, developing public policy positions for Duke Energy, selecting the executive management team with the input of the executive chairman, *developing an annual budget* for approval by the Duke Energy board of directors, *driving the strategic financial and operational results* of Duke Energy *and representing Duke Energy to the public and investors*.

242.   The Merger Registration Statement also represented that Progress and Duke "share a common strategic vision for the future of the combined company" and that the Progress board "believes that *the governance arrangements for the combined company* provided for in the merger agreement will increase the likelihood of effective implementation of this strategic vision. These governance arrangements include: *Mr. Johnson will be the president and [CEO] of the combined company*."

243.   The foregoing statements were materially untrue and misleading and omitted the following material facts:

(a)    The Securities Act Defendants and Duke's board had internally determined since at least November 2010 (eight months prior to the filing of the Merger Registration Statement) that there were serious and irreconcilable concerns regarding Johnson's role as CEO; opposed the Merger Agreement's requirements that Johnson actually serve as CEO of Duke following the Merger; adopted the view that Johnson's appointment as CEO was merely a technicality of the Merger Agreement that could be circumvented by terminating him following the Merger or shortly thereafter; and substantially determined following the June 2011 meeting with Johnson that he should not serve as CEO and President of Duke;

(b)    Johnson's appointment as CEO was not subject only to his "ability and willingness to serve" but was subject to the Securities Act Defendants' approval of his "leadership style" and their determination that they could remove Johnson immediately following the Merger to technically comply with the requirements of the Merger Agreement;

(c)    The Securities Act Defendants had no plan "to confer and mutually designate a replacement" CEO as required by the Merger Agreement and had adopted the position that they could unilaterally terminate Johnson immediately after the Merger closed, without conferring with Progress or "mutually" determining a replacement;

(d)    The Securities Act Defendants had not addressed their purportedly serious irreconcilable concerns regarding Johnson, or their view that they could remove him following the Merger, with Johnson, Progress's board, the NCUC or any other regulatory authority;

(e)    Johnson's role as CEO would not be a "three-year term of employment commencing upon the completion of the merger" and he would not have the "all duties customary to such position" including purported long-term responsibilities such as "developing public policy positions," "developing an annual budget," "driving the strategic financial and

operational results" and "representing Duke Energy to the public and investors" because the Securities Act Defendants had solidified by June 2011 that Johnson was not the right person to become CEO and they could remove him either immediately or shortly after the Merger closed.

244.    In addition to the actionable representations and omissions set forth above, between July 7, 2011 and July 2, 2012,  the effective date of the Merger and acquisition of new Duke shares pursuant to the Merger Registration Statement, the Securities Act Defendants publicly and continuously filed with the SEC nearly 40 false and misleading Forms 8-K, Form 425 Prospectuses and "Merger Scorecards" that referenced the misleading Merger Registration Statement and Prospectus Materials, including the numerous misleading statements regarding Johnson's role as CEO, and "***urge[d] investors and shareholders to read the Registration Statement***, including the joint proxy statement/prospectus that is a part of the Registration Statement . . . because *they contain important information*."[9]

245.    Each of these additional filings was false and misleading and omitted material facts, for the same reasons set forth above.  In addition, the Securities Act Defendants violated their obligation to amend and/or update the Merger Registration Statement to include material facts regarding the adverse developments and Duke's opposition to Johnson's role as CEO and their determination to remove him.  Indeed, in the "Undertakings" section of the Merger Registration Statement, the Securities Act Defendants agreed to, *inter alia*,:

---

[9]    The Securities Act Defendants' actionable Form 425 Prospectus filings incorporating the Merger Registration Statement by reference and the false statements therein, were filed on the following dates: July 13, 2011; July 18, 2011; July 19, 2011; July 28, 2011; August 2, 2011; August 3, 2011; August 8, 2011; August 10, 2011; August 11, 2011; August 23, 2011; August 24, 2011; September 2, 2011; September 6, 2011; September 7, 2011; October 3, 2011; November 3, 2011; December 5, 2011; December 16, 2011; January 9, 2012; February 16, 2012; February 17, 2012; February 22, 2012; March 26, 2012; May 4, 2012; May 8, 2012; May 17, 2012; June 11, 2012; June 25, 2012; and June 29, 2012.  In addition, Duke filed false and misleading Forms 8-K containing the same language on the following dates: July 18, 2011; September 2, 2011; October 3, 2011; December 6, 2011; January 9, 2012; March 26, 2012; May 8, 2012; June 11, 2012; June 25, 2012; and June 29, 2012.

[F]ile, during any period in which offers or sales are being made, a post-effective amendment to this registration statement: (i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933, as amended (the 'Securities Act'); (ii) *to reflect in the prospectus any facts or events arising after the effective date* of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, *represent a fundamental change in the information set forth in the registration statement*.

246.     Additionally, the express terms of the Merger Agreement stated that Duke was "responsible for considering whether *additional specific disclosures* of material information regarding material contractual provisions are *required to make the statements in this document not misleading*."   The Securities Act Defendants violated these provisions and the requirements to amend or update the false Merger Registration Statement by continuing to file, as late as June 29, 2012 (three days before the Merger became effective), numerous SEC Form 8-K and Form 425 Prospectuses that expressly referenced and urged investors to read the false and misleading Merger Registration Statement, including the statements regarding Johnson's role as CEO.

**B.     The Prospectus Materials Contained False and Misleading Statements and Omitted Material Facts in Violation of §12(a)(2) of the Securities Act**

247.     The materially false and misleading Merger Registration Statement and related filings expressly stated that "*we are using this document as a prospectus* for Progress Energy shareholders because Duke Energy is offering shares of its common stock to be issued in exchange for shares of Progress Energy common stock in the merger."   These Prospectus Materials contained the same untrue statements regarding Johnson's role as CEO, and omitted the same material facts necessary to make those statements not misleading, as set forth in ¶243, *supra*.

248.     From July 7, 2011 to the closing date of the Merger on July 2, 2012, the Securities Act Defendants filed, updated or incorporated by reference the misleading Prospectus Materials in nearly 40 filings with the SEC, including the Form S-4/A, Forms 8-K, Form 425 Prospectuses

and "Merger Scorecards." Each of these public filings and Prospectuses incorporated the misleading Merger Registration Statement and Prospectus Materials by reference, including the representations regarding Johnson as CEO, and expressly "*urge[d] investors and shareholders to read* the Registration Statement, *including the joint proxy statement/prospectus* that is a part of the Registration Statement . . . *because they contain important information*." The Securities Act Defendants' final false and misleading Form 425 Prospectus prior to the Merger was filed on June 29, 2012. Each of these filings, as specified in n.9, *supra*, including the Form 425 Prospectuses and Forms 8-K, constituted solicitations and offers in connection with the Merger and were false and misleading for the same reasons as set forth in ¶243, *supra*.

249. In addition, the Securities Act Defendants violated their duty to disclose and/or duty to update or amend the Prospectus Materials from July 7, 2011 to June 29, 2012, to include the material adverse facts set forth in ¶243 prior to the Merger closing when the new Duke shares in the Merger offering became available for acquisition or exchange on July 2, 2012.

## VII. EXCHANGE ACT VIOLATIONS

### A. The Exchange Act Defendants' False and Misleading Statements and Material Omissions During the Class Period

250. June 11, 2012 Statements: The Class Period commences on June 11, 2012, less than two weeks after the Exchange Act Defendants effectively put in motion the plan to complete the Merger and remove Johnson as CEO. On that date, Duke issued a press release and filed a Form 8-K and Form 425 Prospectus announcing that the FERC had conditionally approved the Merger and stating that this was "a positive development in enabling the companies to close their proposed merger by the targeted date of July 1, 2012." The Form 8-K and Form 425 Prospectus further stated that Duke and Progress were "work[ing] to secure final merger-

related approvals from the North Carolina Utilities Commission" and that "[t]he companies continue to target July 1, 2012 for the closing of the merger."

251. The June 11, 2012 filing was signed by Manly, the press release quoted Rogers directly and both documents were reviewed, approved and issued under the ultimate authority of Manly, Rogers and Gray. In addition to the statements above, the Press Release and a "Merger Scorecard," which represented the "Status of Merger Filings" (as of June 11, 2012)" and was attached to the Form 8-K, both incorporated the false and misleading Merger Registration Statement and Prospectus Materials by reference and "*urge[d] investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement, as well as other relevant documents filed with the SEC, because they contain important information*." (Emphasis in original.)

252. June 19, 2012 Statements: On June 19, 2012, Duke publicly filed "Reply Comments" with the NCUC stating that no new regulatory hearings were necessary before the Merger was completed. The Reply Comments were reviewed, approved and issued under the ultimate authority of Manly, Rogers and Gray. In response to assertions by NC WARN, a nonprofit group opposed to the Merger, that "certain events have occurred since the [prior] hearing in this matter which necessitate the filing of additional testimony and hearing," the Duke filing stated "this is not the case" and the "'*facts relevant*' *to the merger . . . do not change*." *See also* Johnson Tr. (Vol. 1) at 55-57. In addition, the Reply Comments stated that Duke's filings with the FERC "fully and completely address all issues associated with the FERC order. Accordingly, the FERC order approving the merger *eliminates uncertainty*; it does not create uncertainty." Regarding cost issues surrounding Crystal River 3, Duke represented that "[Crystal River 3] was not operating at the time of the hearing. *All parties were aware of the issues*

*associated with this plant at that time*.  Thus this is *not a new issue* associated with any events occurring since the [September 2011] hearing."

253.  June 25, 2012 Statements:  On June 25, 2012, Duke representatives publicly testified at a hearing before the NCUC regarding the Merger.  During the public testimony, the Duke representatives addressed concerns and inquiries regarding the Merger, but did not identify any changes to the terms of the Merger or uncertainties associated with complying with any of those terms.  NCUC Chairman Finley later recalled that "[a] lot of people showed up [to the June 25 hearing], a lot of interest in it."  Johnson Tr. (Vol. 1) at 99.

254.  Also on June 25, 2012, Duke publicly filed a Form 8-K and Form 425 Prospectus, announcing that all conditions set forth by the FERC for the Merger had been accepted, Duke and Progress were "work[ing] to secure final merger-related approvals from the North Carolina Utilities Commission" and that "[t]he companies continue to target July 1, 2012 for the closing of the merger."  The June 25, 2012 filing was signed by Manly, and reviewed, approved and publicly filed under the ultimate authority of Manly, Rogers and Gray.  In addition to the statements above, a "Merger Scorecard" which represented the "Status of Merger Filings (as of June 25, 2012)" was attached to the Form 8-K and Form 425 Prospectus and incorporated the false and misleading Merger Registration Statement and Prospectus Materials by reference and "*urge[d] investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement, as well as other relevant documents filed with the SEC, because they contain important information*." (Emphasis in original.)

255.  June 28, 2012 Statements:  On June 28, 2012, Rogers and Johnson participated in a joint interview published in the *Charlotte Observer* entitled, "Duke Energy Execs Discuss

What's Next."   Rogers spoke extensively about the Merger and in response to the question "[w]hat are the biggest challenges going to be in the first couple of years?"   Rogers responded that "the cultures are different and so we have to work to bring the two cultures together to become one culture."   When Rogers and Johnson were asked "is this the **same deal** you envisioned 18 months ago?" Johnson answered "[y]es" and Rogers failed to disclose any of the known material facts surrounding the plan to remove Johnson and Rogers' agreement to take his place.

256.   June 29, 2012 Statements:   On June 29, 2012 Duke publicly filed another Form 8-K and Form 425 Prospectus.   The June 29, 2012 filing announced that "the North Carolina Utilities Commission approved the merger between Duke Energy Corporation and Progress Energy, Inc."   The Form 8-K and Form 425 Prospectus was signed by Manly, and reviewed, approved and publicly filed under the ultimate authority of Manly, Rogers and Gray.   In addition to the statements above, a "Merger Scorecard" attached to the filing representing the "Status of Merger Filings (as of June 29, 2012) "incorporated the false and misleading Merger Registration Statement and Prospectus Materials by reference and "*urge[d] investors and shareholders to read the Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement, as well as other relevant documents filed with the SEC, because they contain important information*."   (Emphasis in original.)

257.   July 3, 2012 Statements:   At 7:00 a.m. on July 3, 2012, prior to the opening of the market, Duke issued a press release entitled "Duke Energy, Progress Energy Complete Merger." In pertinent part, the press release stated that "the newly constituted board of directors has appointed Jim Rogers as president and chief executive officer of the combined company, effective immediately. Rogers will also maintain his responsibilities as chairman of the

company's board. ***Bill Johnson has resigned as president and chief executive officer of the combined company, by mutual agreement***." The press release quoted both Rogers and Gray, including Gray's assertion that "Bill Johnson has been instrumental in helping us close the merger with Progress Energy, and we wish him well in his future endeavors," and was reviewed, approved and issued under the ultimate authority of Rogers, Gray and Manly.

258.     On July 3, 2012, Duke also publicly filed a Form 8-K signed by Manly and reviewed, approved and issued under the ultimate authority of Manly, Rogers and Gray. In pertinent part, the Form 8-K stated that Johnson "was appointed as the President and Chief Executive Officer of Duke Energy" and "***subsequently resigned as President and Chief Executive Officer of Duke Energy***." The Form 8-K further stated that "[i]n connection with Mr. Johnson's ***resignation***, on the Effective Date [July 2, 2012], Mr. Johnson and Duke Energy entered into a separation and settlement agreement."

259.     At 8:30 a.m. on July 3, 2012, Duke hosted a public conference call with analysts and investors during which Rogers and Gray both made statements about the completion of the Merger. During the conference call, Gray stated that "Bill Johnson has ***resigned*** as President and Chief Executive Officer of the combined company ***by mutual agreement with the Board***." In response to analyst questions regarding the "resignation" of Johnson, Rogers stated that "***[w]e have had a deliberate and balanced process in the integration***" and Gray stated that "I [will] not be commenting further on the Board's deliberations."

### B.     Reasons Why the Exchange Act Defendants' Statements Were False and Misleading When Made

260.     The Exchange Act Defendants' statements on June 11, June 19, June 25, June 28 and June 29, 2012, as set forth in ¶¶250-56, were materially false and misleading when made and failed to disclose the following material facts:

(a) The Exchange Act Defendants and Duke's board had internally determined since at least November 2010 that there were serious and irreconcilable concerns regarding Johnson's role as CEO; opposed the Merger Agreement's requirements that Johnson actually serve as CEO and President of Duke following the Merger; adopted the view that his appointment as CEO and President was merely a technicality of the Merger Agreement that could be overcome by terminating him following the Merger; and substantially determined following the June 20, 2011 board meeting that Johnson should not serve as CEO and President of Duke;

(b) As of no later than May 30, 2012, and as a result of the known purported concerns with Johnson and the opposition to Johnson serving as CEO of Duke following the Merger, the Exchange Act Defendants and Duke board had set in motion a plan to block or remove Johnson from becoming CEO and President of Duke immediately following the Merger;

(c) In violation of the Merger Agreement and statements made in the Merger Registration Statement and Prospectus Materials, the Exchange Act Defendants intended to have Johnson removed from the position of CEO and President of Duke immediately following the Merger; and

(d) Neither the Exchange Act Defendants nor Duke's board had addressed their purportedly serious irreconcilable concerns regarding Johnson, or their plan to remove him following the Merger, with Johnson, Progress's board, the NCUC or any other regulatory authority, and the Duke board had not even met with Johnson since June 2011 due to their intention to violate the Merger Agreement and prevent him from becoming CEO and President of Duke.

261.    In addition to the reasons set forth in ¶260 the Exchange Act Defendants' statements on July 3, 2012, as set forth in ¶¶257-59, were materially false and misleading when made because the Exchange Act Defendants failed to disclose the following material facts:

(a)    Johnson did not voluntarily "resign" by "mutual agreement" but was forced out by Gray, Rogers and the legacy Duke directors in a premeditated ouster less than two hours after the Merger closed;

(b)    The vociferous objections and opposition of the entire Progress legacy board who, in violation of Duke's policies, were not told about the plan (or any concerns regarding Johnson) prior to the first combined Duke board meeting; and

(c)    Johnson was given less than 13 hours or until 7:00 a.m. on July 3, 2012 to sign a forced severance agreement which paid him $44 million, a sum entirely borne by shareholders, and millions of dollars more than he would have been entitled to had he legitimately resigned or properly been fired, in exchange for Johnson's release and agreement not to legally contest the Exchange Act Defendants' improper actions.

C.    **The Exchange Act Defendants' Scienter**

1.    **Knowledge or Reckless Disregard**

262.    As set forth herein, during the Class Period, and since May 2010, each of the Exchange Act Defendants was personally and intimately involved in the Merger, including the negotiations and discussions regarding Johnson's role in the combined company after the Merger, and the concerns with Johnson becoming CEO and President and the planning and determination to oust Johnson immediately after the Merger.   Each of the Exchange Act Defendants personally participated in meetings and communications regarding the ouster of Johnson, and Johnson's ouster could not have been completed without the consent and active involvement of each of the Exchange Act Defendants.   Particularly given the magnitude of the

Merger, their positions at Duke and their longstanding role in the Merger discussions, there are no material facts regarding the opposition to Johnson becoming CEO and President of Duke, as set forth in the Merger Agreement, and the planning and determination to remove Johnson from the positions of CEO and President, that were not known by each of the Exchange Act Defendants.

263.    In addition to the evidence set forth herein regarding the Exchange Act Defendants' knowledge, and direction, of the planning and determination to remove Johnson from the positions of CEO and President immediately after the Merger, prior to and during the Class Period, each of the Exchange Act Defendants held themselves out to investors and regulators as knowledgeable about the Merger and the integration of Duke and Progress. Each of these Exchange Act Defendants personally made or directed communications with investors and the public and never stated that they were unaware or could not know any material facts regarding the Merger and the integration of Duke and Progress.

264.    Prior to and during the Class Period, Rogers, Gray and Manly were in near constant communication, through meetings, telephone calls and e-mail, regarding the Merger and, in particular, regarding the planning and determination to remove Johnson from the positions of CEO and President immediately after the Merger.

## 2.    Motive to Commit the Fraud

265.    As set forth herein, the Exchange Act Defendants were motivated to acquire Progress in order to expand Duke's regulated electricity business and provide more stability and predictability in Duke's earnings and dividend yield. In order to get the directors and shareholders of Progress to vote in favor of the Merger, the Exchange Act Defendants had to agree that Johnson would become CEO and President of Duke. The understanding that Johnson would become CEO and President of the combined company was also a critical factor in

achieving regulatory approval, as Duke was tarnished by numerous ethical and operational scandals. Accordingly, the Merger Agreement provided that Johnson would become CEO and President of Duke after the Merger and that material fact was repeatedly confirmed and emphasized in the Merger Registration Statement and Prospectus Materials and in numerous subsequent public statements to investors and regulators.

266. Had the Exchange Act Defendants publicly disclosed their opposition to Johnson, and their planning and determination to remove him from the positions of CEO and President after the Merger, they would have breached a material provision of the Merger Agreement and risked regulatory disapproval of the Merger. Moreover, the Exchange Act Defendants' breach of the Merger Agreement would have terminated the Merger and subjected Duke to severe financial penalties, including a potential $675 million termination penalty. As NCUC Chairman Finley stated after the truth was disclosed:

> Is not a more plausible explanation that Duke couldn't reveal its contemplated action, *i.e.*, it ***couldn't be transparent*** because had it done so, A, it probably would have resulted in an ***unwillingness of this Commission to grant its approval*** by July 8, thus ***likely subjecting Duke to the $675 million penalty***; or B, ***subjecting Duke to the $675 million penalty for failing to comply with a material term of the merger agreement***?

Johnson Tr. (Vol. 2) at 22.

### 3. Defendants' Manufactured *Post Hoc* Excuses and Pretexts for the Ouster of Johnson

267. After initially (falsely) stating that Johnson had resigned immediately after the Merger by "mutual" consent with the Duke board, and in response to the outrage of investors and regulators as the truth emerged, the Exchange Act Defendants manufactured a list of excuses and pretexts to justify the removal of Johnson as CEO and President of Duke. During the NCUC hearings, Chairman Finley summarized these purported reasons as follows: (i) Crystal River 3 and lack of transparency, (ii) Progress's nuclear program, (iii) corporate "culture" issues, (iv)

"autocratic" style, and (v) Progress's financials.  Johnson Tr. (Vol. 1) at 53.  Chairman Finley

then asked Johnson:  "Which of these concerns, Mr. Johnson, were expressed to you and, if so,

when were they so expressed?"  Johnson responded: "***None of these concerns were expressed to***

***me as concerns the board had about me or my handling of any of these issues***."  *Id.* at 53.  He

later expounded: "I disagree with all of them . . .  [b]ut it seems odd to me that if these issues

were burning issues, I never heard about them from anybody, never heard from the board, never

heard from [Rogers]."  *Id.* at 83.  Gray admitted that Duke did not even attempt to raise these

issues with Johnson or the Progress board during the six months prior to the Merger closing.

Gray Tr. (Vol. 3) at 55-56, 60, 62-63.

268.    Even if true, all of these concerns would have arisen and pre-dated the start of the

Class Period and only serve to demonstrate that Defendants knew, but failed to disclose, the truth

about the planning and determination to remove Johnson from the positions of CEO and

President.

269.    Crystal River 3:    Contrary to Gray's and Rogers' claims that there were

"transparency" issues regarding Crystal River 3, those issues were well-known, highly

transparent and repeatedly disclosed in Duke's own filings long before the Class Period.  Indeed,

the Merger Registration Statement provided detailed disclosures regarding the risks and issues

surrounding Crystal River 3, including the two "delaminations" or cracks that occurred (and

were disclosed) in ***September 2009 and March 2011***:

> The scope of necessary repairs of the delamination at Progress Energy's Crystal
> River Unit No. 3 Nuclear Plant could prove more extensive than is currently
> identified, the costs of repair and/or to purchase replacement fuel and power
> during the outage at the plant could exceed Progress Energy's estimates and
> insurance coverages or may not be recovered through the regulatory process,
> and/or such repairs could prove not to be feasible, the occurrence of any of which
> could adversely affect the combined company's results of operations or financial
> condition.

Duke was fully aware of the issues and represented to shareholders that it "*believed that these risks were manageable* as part of the ongoing business of the combined company."

270.    Duke was also fully aware of the issues surrounding Progress's insurance claims submitted to NEIL (the nuclear industry's insurer) related to repairs of Crystal River 3 long before the Class Period.  In fact, during a Duke conference call in August 2011, Rogers was specifically asked about the "uncertainty regarding the claim at NEIL" for Crystal River 3 and to "assess the impact that might have on Duke's shareholders vis-à-vis the combination."  Rogers' response betrays the purported lack of transparency:  "I think what's important to know is that Progress has provided updates to the NRC and the Florida PSC on the status of Crystal River 3.  More detailed engineering and construction analysis needs to be completed by Progress, and they are currently undertaking those responsibilities . . . . *We're continuing to monitor all of this very closely*."

271.    These same purported Crystal River 3 cost and NEIL issues were also discussed during the September 2011 NCUC hearings – Johnson stated that the repair estimates were $900 million to $1.3 billion and "we believe the majority or maybe all of that is covered by insurance."  Johnson Tr. (Vol. 2) at 141.  Johnson also testified that "*of course, I told Mr. Rogers everything I knew about [the NEIL issue] every step of the way*."  Johnson Tr. (Vol. 1) at 63.  In fact, Johnson testified that "*a year ago* [July 2011] *we allowed Duke to put a Duke employee on the Crystal River 3 team so they'd have access to everything in realtime whenever they wanted*."  *Id*. at 56, 63.

272.    Although Gray alleged that Crystal River 3 issues known by May 2, 2012 were "honestly, to me – to me personally, was the tipping point"  (Gray Tr. (Vol. 3) at 80), she admitted that she had no personal knowledge whether it was Johnson's (or Rogers') failures and

never even attempted to talk to Johnson about the issues: "[Question:] *You never sought to speak with Mr. Johnson or anyone with Progress* to determine whether or not the information you were receiving was accurate or to let them know that you were concerned about the timeliness and the transparency. Is that right? A. *I did not*." *Id*. at 56.

273.    In stark contrast to Gray's and Rogers' testimony that Crystal River 3 was a serious and allegedly new issue as late as May 2, 2012, Duke represented to regulators under oath on June 19, 2012, that there were no new issues with Crystal River 3 since the September 2011 NCUC hearings: "[Crystal River 3] was not operating at the time of the [September 2011] hearing. *All parties were aware of the issues associated with this plant at that time.  Thus this is not a new issue* associated with any events occurring since the [September 2011] hearing."

274.    NCUC Commissioner Beatty noted the inconsistency between Duke's June 2012 comments that "*no additional hearing and testimony was needed*" on issues relating to Crystal River 3, and Defendants' later representations that the purported "reason for the change in leadership" was Crystal River 3, even though "the board as – at least as early as May, middle of May [2011], had concerns about Crystal River 3 and how it was handled."  Rogers Tr. (Vol. 2) at 57.  Johnson also testified that he offered to attend the June 2012 Duke board meeting to talk about Crystal River 3, but Rogers told him there was no need.

275.    NCUC Chairman Finley noted in his questioning of Johnson that "[t]he facts with respect to the generator replacement and the delamination have been widely known in the industry and in the press in Florida, North Carolina, and South Carolina;  right?"  Johnson confirmed:  "[t]hose *facts relating to Crystal River are widely known*.  You know, as a public company we have a large amount of disclosure obligations to the SEC, to commissions, to all kinds of regulatory bodies.  This is a well-known issue in the industry.  I would say *there's*

*probably nothing in the industry and nothing in disclosure that's more well known than Crystal River 3.*" Johnson Tr. (Vol. 1) at 15.

276.    Johnson also testified that "during [Duke's] due diligence process, all the issues [including Crystal River 3 and Progress's nuclear performance] were discussed or investigated, were well known, were documented."  He also stated "I did not fail to inform anybody about anything" and "[t]here was never any indication or hint that there was something inappropriate that we were doing, that we weren't considering risks appropriately, any of that."  *Id*. at 64.  When asked if there were any other "transparency issues" with Duke, Johnson stated, "[i]n short, no."  *Id*. at 66.  NCUC Chairman Finley later noted the irony in Duke's accusations regarding Johnson's transparency:

> As far back as six months [prior to July 2, 2012], the whole Duke board was coming to question whether you would be the CEO, and in May [2012], the board leader met with Mr. Rogers and expressed the board's reservation to him.  On June 23, [2012], the old board deliberated with a view to remove you and asked Mr. Johnson to serve as CEO.  At the same time, Duke representatives were working to close, but these deliberations about the CEO were not revealed to you, to the old Progress board, or to us, the regulators, and these deliberations were not revealed at least to part of the team working on the close.  ***Would you agree or would you disagree that that is not a very good example of transparency***?

Johnson agreed:  "I had the exact same reaction to the allegation of lack of transparency from me when all these things were obviously – not obviously, but known about me, thought about me, and never communicated to me.  And the same is about the information they had.  It was never communicated to you."  Johnson Tr. (Vol. 2) at 21.

277.    There was no material change in the status of the Crystal River 3 facility during the Class Period, and all facts about the facility were known by the Exchange Act Defendants and Duke's board long before the Class Period.

278.    <u>Progress's nuclear program</u>:  In uncontradicted testimony provide by Johnson, he stated: "I told [Duke] *in November 2010*, at that board meeting we talked about the performance

of the Progress nuclear fleet" and that meeting was "the only time" the issue was discussed. Johnson Tr. (Vol. 1) at 53, 71. Minutes from that meeting corroborate Johnson's testimony and reflect "an extensive discussion of [Progress's] nuclear operations." Indeed, the Merger Registration Statement contained numerous disclosures regarding risks associated with Progress's nuclear fleet and no new risks or problems were identified to Johnson prior to the Merger or disclosed to Progress or Duke shareholders. There was no material change with Progress's nuclear program during the Class Period and all facts about that program were known by the Exchange Act Defendants and the Duke board long before the Class Period.

279.    Corporate "culture" issues and Johnson's "autocratic" leadership style:    The Exchange Act Defendants' and the Duke board's purported concerns with Johnson's "autocratic" leadership style and corporate "culture" issues arose by the Company's November 2010 board meeting with Johnson and well before the Class Period. Indeed, according to minutes of Duke's November 19, 2010 board meeting with Johnson, the board specifically discussed Johnson's "view and vision for building long-term success for the combined company, and '*cultural*' *issues* associated with leadership, *leadership style* and communications with relevant stakeholders." Also, as set forth in ¶¶33, 217, Defendants were well aware of any culture issues in April 2011 when Rogers informed Duke executives that he was as "properly concerned about clash of cultures as [Gray] is." The Duke board, however, deliberately failed to meet with Johnson at any time after June 2011 to either observe his leadership style or any potential problems with corporate culture issues. As Johnson testified, "during the last six months there was *no opportunity for anybody other than Jim Rogers – no employee of Duke, no director, no manager, to observe me or my style. There was no opportunity to report on my view of cultural difference or cultural behavior*." Johnson Tr. (Vol. 1) at 75-76.

280.    In fact, any purported "culture" issues would have been known long before the Class Period because the integration of the two companies had begun in earnest even before the announcement of the Merger Agreement in January 2011, and was already in its final stages as of the September 2011 NCUC hearings.  During those hearings, Johnson confirmed: "We're in the *last part* of designing the new organization, so how many positions you have, where they are, those kind of things.  So we're in the organizational design process.  Should finish sometime in the next month."

281.    There was no change in Johnson's leadership style, or the cultural differences between Duke and Progress during the Class Period, and all facts about Johnson's leadership style and corporate culture were well known by the Exchange Act Defendants and Duke's board by no later than May 30, 2012.

282.    <u>Progress's financial results</u>:  Progress released its financial results for the quarter ending March 31, 2012, on May 3, 2012 and subsequently filed a Form 10-Q with the quarterly results on May 8, 2012.  The press release reaffirmed Progress's earnings guidance for the remainder of 2012.  No subsequent financial results were disclosed, publicly or to the Exchange Act Defendants, and no change was made to Progress's earnings guidance prior to July 2, 2012.  Moreover, Johnson has testified that in the six months prior to July 2, 2012, the Duke board never spoke with him about Progress's financial results.  Johnson Tr. (Vol. 1) at 54.  Indeed, Johnson testified:  "*[w]e never talked about autocratic style, culture, Progress financials, any of those*."  *Id*.  Gray admitted when questioned after the truth came to light that she never discussed the issue with Johnson or anyone at Progress: "Q. And, again, when these reports came in to you, the financial earnings statements and so forth, did the board ever consider requesting to

meet with Mr. Johnson or any of the [] senior executives at [] Progress to discuss those concerns. A. No." Gray Tr. (Vol. 3) at 60.

283.    There was no change in Progress's financial results during the Class Period, and all facts about Progress's financial results were known by the Exchange Act Defendants and Duke's board long before the Class Period.

### 4.    The NCUC and North Carolina DOJ Settlements; Rogers and Manly Forced Out

284.    The Exchange Act Defendants' quick settlements with the NCUC and North Carolina DOJ following the disclosure of the truth, as well as the terms of those settlements, are additional indicia of scienter.

285.    On November 29, 2012, Duke entered into a settlement agreement with the NCUC in connection with its investigation into Johnson's removal.  Due to false statements "in the merger application and in testimony before the Commission by Johnson and Rogers, [where] Duke and Progress represented to the Commission that, effective upon the closing of the merger, Johnson would be the President and CEO of the combined company and Rogers would be the Executive Chairman of the Board of the combined company," the settlement required Duke to, *inter alia*:

- replace Rogers as Chairman, President and CEO;

- replace Manly as General Counsel and Keith Trent as Executive Vice President for Regulated Utilities;

- "maintain at least one thousand (1000) employees, including the President of Duke Energy North Carolina, and the Senior Vice President of Carolinas Delivery Operations, in Raleigh for at least five (5) years;"

- create and maintain a "Regulatory Policy and Operations Committee (RPOC) of the Board to meet with and discuss activities and actions with the Commission;"

- "retain the former General Counsel of Progress [John MacArthur] to advise Duke for two (2) years on regulatory and legislative matters in North Carolina;"

-107-

- "create a CEO and Board Member Search Committee (CEOBM) composed of four (4) legacy Duke and four (4) legacy Progress board members;"

- with one exception, ensure that "[a]s current Duke board members reach mandatory retirement age of 71 during the next three years consistent with Duke's current governance principles, those directors will rotate off the Board;"

- only appoint as Chairman, President and CEO or board members persons "reviewed and recommended to the Board by the CEOBM;"

- "issue a statement of acknowledgement to the Commission that its activities have fallen short of the Commission's understanding of Duke's obligations under its regulatory compact that frame the duties for a regulated utility in this state;"

- "pay all fees and expenses billed by" the Commission's outside counsel; and

- ensure that "no part of any amount paid by Duke to William Johnson, John McArthur, Paula Sims, or Mark Mulhern will be charged to Duke's North Carolina retail ratepayers."

286.    On December 11, 2012, as part of Duke's settlement, Duke filed a public statement, signed by Rogers on behalf of the Duke board.  The statement read in pertinent part: "Although we do not admit or acknowledge any illegal or improper acts, as provided under the terms of the Settlement Agreement, we acknowledge to the Commission that our activities on this matter have fallen short of the Commission's understanding of Duke Energy's obligations under its regulatory compact that frame the duties for a regulated utility in the State of North Carolina."  Immediately following the filing of the letter, Duke sent another letter to the NCUC stating that it had mistakenly submitted a "draft."  The only change to the original was the addition of the words "apologize and" to the phrase "we acknowledge."  Following receipt of this statement, the NCUC issued an order accepting the settlement agreement and closing its investigation.

287.    On December 3, 2012, Duke reached a settlement agreement with the North Carolina DOJ in connection with its investigation into Johnson's removal.  In order to secure the Attorney General's agreement not to object to Duke's settlement with the NCUC and to

discontinue its "[i]nvestigation against Duke and any individuals acting on behalf of Duke," Duke agreed, among other things, to:

- "comply with . . . the Commission's applicable rules and regulations pertaining to the provision of truthful and complete information to the Commission;"

- ensure that the Regulatory Policy and Operations Committee of the Duke Board of Directors formed pursuant to Duke's settlement with the NCUC meets periodically with the Attorney General;

- "retain an independent entity to survey its employees regarding merger integration and post – merger operations," and report the results to the Attorney General within two years; and

- pay $250,000 to the Attorney General's office to defray fees and expenses related to the post-merger investigation.

## VIII.  LOSS CAUSATION

288.    During the Class Period, Duke's stock price was artificially inflated due to the Exchange Act Defendants' deceptive conduct, false and misleading statements and material omissions regarding Johnson's role as CEO and President of the combined company and the Exchange Act Defendants' undisclosed plans and determination to remove him following the Merger.  As set forth herein, Johnson's appointment as CEO and President was both a material term of the Merger Agreement and a critical element in obtaining approval for the Merger from shareholders, the Progress board and regulatory agencies.  Had the Exchange Act Defendants disclosed the truth about their material concerns with Johnson and their plan to oust him immediately following the close of the Merger, Duke's stock price would have declined substantially and/or traded at lower levels than it did.

289.    Indeed, from July 3, 2012 to July 9, 2012, in response to the disclosures that Johnson would no longer serve as CEO and the relevant truth regarding the Exchange Act Defendants' planning and determination to oust him, Duke's stock price declined $4.53 per share on unusually heavy trading volume.  By July 9, 2012, Duke's stock price was trading at $65.31

per share, down from a Class Period high of $71.13 on July 2, 2012 only four trading days earlier. Analysts and media outlets attributed the decline to the revelations regarding the Exchange Act Defendants' scheme and Johnson's ouster. *See* ¶41.

290. The artificial inflation in Duke's stock price during the Class Period was not removed in a single precipitous stock price decline following the July 3, 2012 disclosure of Johnson's replacement. Rather, the stock price declined continuously over the course of four successive trading days, on rapidly accelerating volume, as the full relevant truth regarding Johnson's ouster began to leak out.

291. For example, the Exchange Act Defendants' announcement on July 3, 2012 falsely characterized Johnson's forced termination as a "resignation" by "mutual agreement" of the parties and failed to disclose material facts regarding the Exchange Act Defendants' planning and determination to forcibly remove Johnson. Indeed, during the July 3, 2012 conference call following the announcement, Gray and Rogers attempted to blunt the stock price impact of the disclosure by refusing to answer analysts' questions regarding the true reasons for Johnson's "resignation." *See* ¶259.

292. Accordingly, as demonstrated in the charts below, as the truth about the planning and determination to oust Johnson entered the market through numerous disclosures on and in the days following July 3, 2012, including, *inter alia*, (i) former Progress Director Mullin's letter to the *Wall Street Journal* on July 5, 2012; (ii) disclosures in press articles on and around July 6, 2012; and (iii) announcements of the NCUC and North Carolina DOJ investigations late in the day on Friday, July 6, 2012, Duke's stock price declined continuously and precipitously over four trading days – July 3, 2012 through July 9, 2012. This stock price decline, and the damages

it caused to Duke investors, was the result of the disclosure of the relevant truth regarding Johnson's ouster.



293.    The decrease in the price of Duke stock was a proximate result of, and substantially caused by, the Exchange Act Defendants' deceptive conduct, false and misleading statements and material omissions during the Class Period.

## IX.    DEFENDANTS ARE NOT ENTITLED TO THE PROTECTIONS OF THE PSLRA'S SAFE HARBOR PROVISION

294.    The statutory "safe harbor" provided for forward-looking statements under certain circumstances does not apply to any of the misleading statements alleged in this Complaint.  The statements pleaded herein were not specifically identified as forward-looking statements when made and the statements concerned purported historical facts and representations about Duke's

and the Merger's present status to which the statutory safe harbor does not apply. None of the historic or present tense statements made by any Defendant were assumptions underlying or relating to any projection or statement of future economic performance.

295. Even to the extent any statement is characterized as forward-looking, the statutory safe harbor would not apply because Defendants knew the statement was false or misleading. Moreover, none of the false and misleading statements alleged herein were accompanied by meaningful cautionary statements. Any purported disclosures that accompanied Defendants' false and misleading statements were generic and unparticularized boilerplate that failed to provided any meaningful cautionary information.

## X.    CLASS ACTION ALLEGATIONS

296. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who acquired Duke securities pursuant to the false and misleading statements and omissions, as alleged herein, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, directors and officers of Duke and their families and affiliates.

297. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Prior to the Merger, Duke had more than 1.3 billion shares of common stock outstanding, owned by thousands of persons and, at the time the Merger became effective, Duke issued 257,867,000 new shares of common stock to effect the exchange with Progress shareholders.

298. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (i) whether the federal securities laws were

violated by Defendants' acts as alleged herein; (ii) whether statements made by Defendants to the investing public failed to disclose and/or misrepresented material facts about the business, operations and management of Duke, including Johnson's role as CEO of the Company following the Merger; and (iii) to what extent the members of the Class have sustained damages, and the proper measure of damages.

299.　Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages as a result of Defendants' conduct.

300.　Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.　Lead Plaintiffs have no interests which conflict with those of the Class.

301.　A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.　APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD OF THE MARKET DOCTRINE

302.　At all relevant times, the market for Duke's securities was an efficient market for the following reasons, among others:

- Duke stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- As a regulated issuer, Duke filed periodic public reports with the SEC and the NYSE;

- Duke regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Duke was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.　Each of these reports was publicly available and entered the public marketplace.

303.     As a result of the foregoing, the market for Duke's securities promptly digested current information regarding Duke from all publicly available sources and reflected such information in Duke's stock price.  Under these circumstances, all acquirers of Duke's securities during the Class Period suffered similar injury through their acquisition of Duke's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I
## VIOLATIONS OF §11 OF THE SECURITIES ACT
## AGAINST THE SECURITIES ACT DEFENDANTS

304.     Lead Plaintiffs repeat and reallege the Securities Act allegations as if fully set forth herein.  This claim is not based on and does not sound in fraud.  For purposes of this Count, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

305.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

306.     The Merger Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading.

307.     Duke is the registrant and, as such, is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions contained the Merger Registration Statement.

308.     The Securities Act Defendants issued, caused to be issued, and/or signed the Merger Registration Statement and Prospectus Materials issued in connection with the Merger with Progress on July 2, 2012 and authorized the continuous public references to the Merger Registration Statement in numerous SEC filings up and until the Merger closing.

309.     The Securities Act Defendants named in this Count were responsible for the contents and dissemination of the Merger Registration Statement.  Each of the Securities Act

Defendants named in this Count signed or authorized the signing of the Merger Registration Statement.

310.     None of the Securities Act Defendants named herein possessed reasonable grounds for the belief that the statements and omissions contained in the Merger Registration Statement were true and without omissions of any material facts and were not misleading.

311.     Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Merger Registration Statement at the time they acquired Duke securities on or about July 2, 2012.

312.     By reason of the conduct herein alleged, each of the Securities Act Defendants violated, and/or controlled a person or entity who violated, §11 of the Securities Act.

313.     Lead Plaintiffs acquired Duke stock pursuant to and/or traceable to the Merger Registration Statement.

314.     As a direct and proximate cause of the Securities Act Defendants' violations of §11 of the Securities Act, Lead Plaintiffs and the Class have sustained damages.  At the time of their acquisition of Duke stock, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the conduct alleged herein.  Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time Lead Plaintiffs filed this Complaint.  Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Lead Plaintiffs and the Class.

## COUNT II
## VIOLATIONS OF §12(a)(2) OF THE SECURITIES ACT
## AGAINST THE SECURITIES ACT DEFENDANTS

315.     Lead Plaintiffs repeat and reallege the Securities Act allegations set forth above as if set forth fully herein.  This Count is based solely on claims of strict liability and/or negligence

under the Securities Act. For purposes of this Count, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

316.    The Securities Act Defendants were sellers and offerors and/or solicitors of purchasers of the Duke securities offered pursuant to the Merger Registration Statement and Prospectus Materials. The Securities Act Defendants issued, caused to be issued, and/or signed the Merger Registration Statement and Prospectus Materials issued in connection with the Merger with Progress on July 2, 2012. The Prospectus Materials were used to induce investors, such as Lead Plaintiffs and the other members of the Class, to acquire Duke securities in connection with the Merger offering and exchange.

317.    The Prospectus Materials contained untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading. The Securities Act Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus Materials and in investor presentations and road shows to promote the Merger. The Securities Act Defendants, individually and/or acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus Materials. By means of the defective Prospectus Materials, the Securities Act Defendants participated in the offer and exchange of shares of Duke stock to Lead Plaintiffs and other members of the Class.

318.    The Prospectus Materials contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Securities Act Defendants named in this Count were obligated and owed a duty to make a reasonable and diligent

investigation of the statements contained in the Prospectus Materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. None of the Securities Act Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus Materials were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

319.    The Securities Act Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Materials as set forth above and/or should have updated investors regarding material information necessary to make the Prospectus Materials not misleading.

320.    Lead Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus Materials at the time they acquired Duke securities on or about July 2, 2012.

321.    By reason of the conduct alleged herein, the Securities Act Defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiffs and the other members of the Class who acquired Duke securities pursuant to and/or traceable to the Prospectus Materials sustained substantial damages. In addition, Lead Plaintiffs and the other members of the Class who hold such shares have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to Duke. Class members who have sold their shares seek damages to the extent permitted by law.

## COUNT III
## VIOLATIONS OF §15 OF THE SECURITIES ACT
## AGAINST THE SECURITIES ACT DEFENDANTS OTHER THAN DUKE

322.    Lead Plaintiffs repeat and reallege the Securities Act allegations set forth above as if set fully herein.  For purposes of this Count, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

323.    This Count is brought pursuant to §15 of the Securities Act against the Securities Act Defendants excepting Duke.

324.    Each of the Securities Act Defendants other than Duke was a control person of Duke by virtue of his or her position as a director and/or senior officer of Duke which allowed each of these Defendants to exercise control over Duke and its conduct in connection with the Merger.

325.    Each of the Securities Act Defendants was a participant in the violations of §§11 and 12 of the Securities Act alleged in Counts I and II above, based on their having signed or authorized the signing of the Merger Registration Statement and filing or authorizing the Prospectus Materials, and having otherwise participated in the process which allowed the Merger to be completed.

## COUNT IV
## VIOLATIONS OF §10(b) OF THE EXCHANGE ACT
## AND RULE 10b-5 AGAINST THE EXCHANGE ACT DEFENDANTS

326.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

327.    During the Class Period, the Exchange Act Defendants disseminated or approved and had ultimate authority for the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

328.    The Exchange Act Defendants also: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

329.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Duke securities.  Lead Plaintiffs and the Class would not have acquired Duke securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' false and misleading statements.

330.    As a direct and proximate result of these the Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Duke securities during the Class Period.

**COUNT V**
**VIOLATIONS OF §20(a) OF THE EXCHANGE ACT**
**AGAINST ROGERS, GRAY AND MANLY**

331.    Lead Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

332.    During their tenures as officers and/or directors of Duke, Rogers, Gray and Manly were controlling persons of Duke within the meaning of §20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Duke, these Defendants had the power and authority to cause Duke to engage in the conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the content of Duke's public

statements and filings described herein made by Duke, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

333.    Rogers, Gray and Manly participated in Duke board meetings and conference calls, reviewed the Merger Agreement and voted to approve the Merger, signed or approved the Merger Registration Statement and solicited approval of the Merger through the Duke board's recommendation to vote in favor of the Merger, which appeared in the Merger Registration Statement and Prospectus Materials.

334.    In their capacities as senior corporate officers and/or directors of Duke, and as more fully described herein, Rogers, Gray and Manly participated in the misstatements and omissions set forth above. Indeed, these Defendants had access to non-public information regarding Johnson's role as CEO and President of Duke and their plan and determination to remove him from this role.

335.    As a result, Rogers, Gray and Manly, individually and as a group, were control persons within the meaning of §20(a) of the Exchange Act.

336.    As set forth above, the Exchange Act Defendants violated §10(b) of the Exchange Act. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Rogers, Gray and Manly are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Duke is liable to Lead Plaintiffs and the other members of the Class.

337.    This claim is brought within the applicable statute of limitations.

338.    By reason of the foregoing, Rogers, Gray and Manly violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiffs as Class representatives;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissionary measure of damages; and

E.     Such equitable and injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.


Dated:  January 29, 2013                                  Respectfully Submitted,

                                        /s/ Dhamian A. Blue
                                        Dhamian A. Blue
                                        Daniel T. Blue, Jr.
                                        Daniel T. Blue, III
                                        BLUE STEPHENS & FELLERS LLP
                                        205 Fayetteville Street, Suite 300
                                        Raleigh, North Carolina 27601
                                        dab@bluestephens.com
                                        danblue@bluestephens.com
                                        dtb3@bluestephens.com
                                        Telephone: (919) 833-1931
                                        Facsimile: (919) 833-8009
                                        N.C. State Bar No. 31405 (DAB)
                                        N.C. State Bar No. 5510 (DTB, Jr.)
                                        N.C. State Bar No. 27720 (DTB, III)

                                        Liaison Counsel for Lead Plaintiffs

                                        /s/ Eli R. Greenstein
                                        Ramzi Abadou (pro hac vice)
                                        Eli R. Greenstein (pro hac vice)
                                        Stacey M. Kaplan (pro hac vice)
                                        Jennifer L. Joost
                                        Erik D. Peterson (pro hac vice)

-121-

KESSLER TOPAZ MELTZER
& CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
rabadou@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com
jjoost@ktmc.com
epeterson@ktmc.com
Telephone: (415) 400-3000
Facsimile: (415) 400-3001


*/s/ David J. George*
Paul J. Geller (*pro hac vice*)
David J. George (*pro hac vice*)
Elizabeth Shonson (*pro hac vice*)
ROBBINS GELLER RUDMAN
& DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
pgeller@rgrdlaw.com
dgeorge@rgrdlaw.com
kbarber@rgrdlaw.com
eshonson@rgrdlaw.com
arees@rgrdlaw.com
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

- and -

Tor Gronborg (*pro hac vice*)
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
tgronborg@rgrdlaw.com
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Counsel for Lead Plaintiffs*

-122-

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 29, 2013.

*/s/ Dhamian A. Blue*
Dhamian A. Blue

# Mailing Information for a Case 3:12-cv-00456-MOC-DSC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  rabadou@ktmc.com,knguyen@ktmc.com,arobles@ktmc.com

- **Steven M. Bierman**
  sbierman@sidley.com,emalin@sidley.com,jlu@sidley.com

- **Dhamian A. Blue**
  dab@bluestephens.com,kathryn@bluestephens.com

- **Paul Jeffrey Geller**
  e_file_fl@rgrdlaw.com,pgeller@rgrdlaw.com,swinkles@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David J George**
  dgeorge@rgrdlaw.com

- **Eli R. Greenstein**
  egreenstein@ktmc.com

- **Tor Gronborg**
  torg@rgrdlaw.com

- **Joseph P. Guglielmo**
  jguglielmo@scott-scott.com,efile@scott-scott.com

- **Debbie Weston Harden**
  dharden@wcsr.com,shanley@wcsr.com

- **Geoffrey M Johnson**
  gjohnson@scott-scott.com

- **Stacey M. Kaplan**
  skaplan@ktmc.com

- **Gary Vance Mauney**
  garymauney@lewis-roberts.com,plp@lewis-roberts.com,mtc@lewis-roberts.com,dwr@lewis-roberts.com

- **L. Bruce McDaniel**
  mcdas@mcdas.com,kbwatt@mcdas.com

- **William Everett Moore , Jr**
  bmoore@gastonlegal.com,mcarpenter@gastonlegal.com,selliott@gastonlegal.com,mrcarpenter@gastonlegal.com

- **Erik D. Peterson**
  epeterson@ktmc.com

- **James Avery Roberts , III**
  jimroberts@lewis-roberts.com,mrl@lewis-roberts.com,debbiewhaley@lewis-roberts.com,kmc@lewis-

roberts.com

- **David A. Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Jennifer Sarnelli**
  JSARNELLI@GARDYLAW.COM

- **Elizabeth A Shonson**
  eshonson@rgrdlaw.com

- **Stephen J Teti**
  steti@scott-scott.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

Case 3:12-cv-00456-MOC-DSC   Document 60   Filed 01/29/13   Page 128 of 128