# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:12-cv-00456-MOC-DSC
# (Consolidated with NO. 3:12cv474 and NO. 3:12cv624)

| | |
|---|---|
| MAURINE NIEMAN, et. al., | ) |
| | ) |
| Plaintiffs, | ) **MEMORANDUM AND RECOMMENDATION** |
| | ) |
| v. | ) |
| | ) |
| DUKE ENERGY CORPORATION, et. al., | ) |
| | ) |
| Defendants. | ) |

**THIS MATTER** is before the Court on "Defendants' Motion to Dismiss the Corrected Consolidated Amended Complaint" (document #68); as well as the parties' briefs and exhibits. See documents ##68-70.

This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1), and this Motion is now ripe for the Court's consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that the Motion to Dismiss be denied, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Accepting the factual allegations of the Corrected Consolidated Amended Complaint ("the Complaint") as true, this is a class action seeking damages and other relief for violations of the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act") arising from the merger of Defendant Duke Energy Corporation ("Duke") and

Progress Energy, Inc. ("Progress"). Lead Plaintiffs seek class certification on behalf of "all persons who acquired Duke securities pursuant to the false and misleading statements and omissions, as alleged [in the Complaint], and who were damaged thereby." ¶296.[1] Defendants are Duke and certain members of its Board of Directors and officers.

Plaintiffs allege that in July 2010, Duke CEO James Rogers approached Progress CEO William Johnson about a proposed merger. ¶¶6;82. In order to win support from Progress and its shareholders as well as from regulators, Rogers committed that Johnson would serve as Duke's CEO following a merger. ¶¶7-9;82;85. Taking the allegations of the Complaint as true at this stage in the proceedings, not "a single director of Progress would have voted for [the merger]" had Johnson not been named CEO. ¶¶39-40;209.

Before the Merger Agreement was signed in January 2011, Defendants had serious concerns about Johnson becoming CEO. ¶¶18-21;95-100. Defendants decided-but never publicly disclosed-that Johnson's appointment as CEO was a technicality necessary to get the merger approved. Defendants planned to remove Johnson once the merger was complete. Id. In a November 21, 2010 internal email to Rogers, Defendant DiMicco objected to Johnson serving as CEO for even a brief period. DiMicco wrote, "I was very disturbed by the view if it doesn't work out with [Johnson] we will make the change in 2 years or so. This needs to be done right from the beginning – he is either the right guy or he is not." ¶¶20;96. Defendant Browning, a Duke director, testified, "by the time we got to the point where we were going to sign the Merger Agreement there was clearly some concern as to whether [Johnson] was the right guy." ¶¶21;99.[2]

---

[1] All "¶_" references are to the Complaint (document #60).
[2] Unless otherwise indicated, references to testimony refer to hearings conducted by the North Carolina Utilities

On January 8, 2011, the Merger Agreement was signed. The Agreement mandated that "Duke's Board of Directors shall cause [Johnson] to be appointed as the President and Chief Executive Officer of Duke." ¶¶12;101. Duke's announcement to investors emphasized that "[w]hen the merger is completed...Johnson will become president and [CEO]." ¶¶13;108. Securities analysts lauded the decision to appoint Johnson as CEO, opining that it would "improve[] corporate governance" at Duke. ¶¶13;110. The Merger Agreement also provided that Progress could terminate the deal at any time "if Duke…breached or failed to perform in any material respect any of its representations ...." ¶¶12;102. Accordingly, the failure to appoint Johnson as CEO would subject Duke to a $675 million termination penalty. ¶¶12;222-23.

Defendants' opposition to Johnson continued to mount despite the mandatory provision of the Merger Agreement. In an April 4, 2011 email to Duke's directors, Rogers stated that "at this time we have a conflict" with Johnson and Progress's "tone/arrogance/lack of respect/inflated sense of capability." ¶¶21;114. Rogers' e-mail concluded with the warning that "[t]his email should not be shared with anyone." Id. During the same period, Defendant Gray, a Duke director, referred to Johnson's status as an "evaluation." ¶117-19.

On June 20, 2011, Johnson attended a Duke board meeting. Defendants complained that "the Progress team [was] trying to impose Progress practices, systems and everything else, on the Duke process." ¶¶23;123-26. After June 20, 2011, Johnson was excluded from Duke's board meetings until the merger was complete. Johnson was not told about Defendants' problems with him, nor was he asked to address any of their purported concerns. ¶¶24;123-26. When Johnson repeatedly offered to meet with the Duke board, Rogers assured him "No need to. Everything's fine. There's just no reason to come to the board." ¶¶24;123. While Defendants would later

---

Commission ("NCUC").
3

claim that Johnson's termination was due to his "leadership style" during the "six months" before the merger closed, Johnson testified that "I did not meet with, see, or speak to a Duke director, a Duke employee, a Duke manager, except for Mr. Rogers." ¶¶25;145. Thus, "there was no opportunity during that six months [leading up to the merger] for anybody to observe my cultural integration, my leadership skills, my ability to put the two companies together." Id.

Plaintiffs allege that despite their increasing opposition to Johnson, Defendants moved forward knowing they would remove him promptly after the merger. On July 7, 2011, Defendants filed the Registration Statement/Prospectus Materials. ¶¶14;127. The Registration Statement contained more than a dozen misleading representations regarding Johnson's long term role as CEO, including that (i) "Mr. Johnson will serve as the president and [CEO] of Duke," (ii) Johnson had "a three-year term of employment commencing upon the completion of the merger," (iii) Johnson's appointment was subject only to his "ability and willingness to serve" and (iv) "[i]n the event [Mr. Johnson] is unable or unwilling to serve in such capacity, the parties agreed in the merger agreement to confer and mutually designate a replacement." ¶¶131-32;134;236-42. Defendants forecast that Johnson would have a long-term role at Duke, "including developing the strategic plan for Duke," "communicating the vision and mission for Duke," "selecting the executive management team" and "driving the strategic financial and operational results…[and] representing Duke Energy to the public and investors." ¶¶134;241.

Based on these misrepresentations, Duke and Progress shareholders approved the merger on August 23, 2011. From July 2011 until the merger closed on July 2, 2012, Defendants repeated those false statements, issued misleading "Merger Scorecards" and incorporated the misleading Registration Statement in nearly forty SEC filings and prospectuses. ¶¶244;248.

Each false prospectus "urge[d] investors and shareholders to read the [false] Registration Statement, including the joint proxy statement/prospectus that is a part of the Registration Statement...because they contain important information." Id.

Johnson testified that following shareholder approval of the merger in early 2012, Rogers approached him "to renegotiate this deal. And I said we're not renegotiating the deal. That's [$]675 million." ¶¶27;148. Progress hired litigation counsel to "make sure [the] deal got done." ¶¶27;150. The gravamen of Plaintiffs' claims is that in May and June 2012, unable to change the terms of the merger without paying $675 million and facing a backlash from investors and regulators, Defendants held a series of meetings to execute their plan to remove Johnson immediately following the merger. ¶¶159-80. Defendant Gray later admitted during NCUC hearings that "our board felt that when you have a vote of no confidence, it's...not the type of shortfall that can be remediated." ¶¶29;166.

Defendants decided that they could not delay Johnson's removal following the merger because "it would be harmful and inappropriate to...leave it a period of time and address this issue later.... We felt we'd had enough indication of Bill's leadership style, which was contrary to ours." ¶¶30;167. As Defendant Browning later admitted, "my loss of confidence in Bill's ability to lead the team – for me, the toothpaste was out of the tube, and I couldn't figure out how to get it back in, whether I talked to [Johnson] or not." ¶¶30;168. Duke's board had not spoken with Johnson since June 2011. ¶¶124;123.

In May 2012, Defendants engaged outside counsel and a public relations firm. ¶¶30;159;163. On June 22, 2012, Defendant Gray e-mailed Defendants stating: "Please exercise extreme caution regarding any reference to the contingency plan as we work through our

committee and board meetings, the dinner and general presence in the hallways/elevators of headquarters. Our executive sessions will provide the only safe arena for reference of any kind." ¶170. On June 23-24, 2012, Defendants Gray and Browning officially secured Rogers' agreement to replace Johnson as CEO. Defendants then conducted a "dry run" and "test call" of the Duke board meeting at which Johnson would be removed. ¶¶32;176.

Plaintiffs allege that even as they implemented the final details of their plan, Defendants continued to issue false and misleading prospectus materials, regulatory filings and public statements assuring investors that Johnson would be CEO. ¶¶250-56. On June 28, 2012, Rogers and Johnson sat for an interview with the <u>Charlotte Observer,</u> discussing and promoting the merger, while Johnson's impending ouster remained under wraps. ¶¶33;255.

The merger closed on July 2, 2012. That same day, the Duke Board of Directors elected Johnson CEO and then removed him. Before the merger closed, Defendant Gray had sent Rogers a "test" e-mail to be sent to Johnson later stating: "Bill, I am in Charlotte and would like to meet with you at the company's headquarters following the executive session, so I would appreciate your waiting for me there. Ann." ¶182. The merger became effective at 4:02 p.m. ¶¶34;184. Johnson testified that "Rogers came to my office. We chatted about the merger, politics, all these things. At about 4:20 [p.m.], he said we have to go to the 4:30 [p.m.] board meeting. We can't be late for your election." ¶¶34;181. The board meeting lasted approximately twenty minutes. Johnson testified that "I'm elected CEO. Handshakes, pats on the back, congratulations all around. Two hours later I'm gone." ¶¶34;185.

After appointing Johnson as CEO, the board meeting continued with fifteen new directors, comprised of ten former Duke directors and five former Progress directors. Johnson

committee and board meetings, the dinner and general presence in the hallways/elevators of headquarters. Our executive sessions will provide the only safe arena for reference of any kind." ¶170. On June 23-24, 2012, Defendants Gray and Browning officially secured Rogers' agreement to replace Johnson as CEO. Defendants then conducted a "dry run" and "test call" of the Duke board meeting at which Johnson would be removed. ¶¶32;176.

Plaintiffs allege that even as they implemented the final details of their plan, Defendants continued to issue false and misleading prospectus materials, regulatory filings and public statements assuring investors that Johnson would be CEO. ¶¶250-56. On June 28, 2012, Rogers and Johnson sat for an interview with the <u>Charlotte Observer,</u> discussing and promoting the merger, while Johnson's impending ouster remained under wraps. ¶¶33;255.

The merger closed on July 2, 2012. That same day, the Duke Board of Directors elected Johnson CEO and then removed him. Before the merger closed, Defendant Gray had sent Rogers a "test" e-mail to be sent to Johnson later stating: "Bill, I am in Charlotte and would like to meet with you at the company's headquarters following the executive session, so I would appreciate your waiting for me there. Ann." ¶182. The merger became effective at 4:02 p.m. ¶¶34;184. Johnson testified that "Rogers came to my office. We chatted about the merger, politics, all these things. At about 4:20 [p.m.], he said we have to go to the 4:30 [p.m.] board meeting. We can't be late for your election." ¶¶34;181. The board meeting lasted approximately twenty minutes. Johnson testified that "I'm elected CEO. Handshakes, pats on the back, congratulations all around. Two hours later I'm gone." ¶¶34;185.

After appointing Johnson as CEO, the board meeting continued with fifteen new directors, comprised of ten former Duke directors and five former Progress directors. Johnson

left the Board meeting. Gray then made a motion to remove Johnson as CEO and re-install Rogers. ¶187. Over protests from the former Progress directors, Gray simply stated that Johnson was "not a good fit" and the other Duke directors remained silent. ¶¶33;188. Before a formal vote was taken, Gray sent the email requesting a meeting with Johnson. ¶194. Without hearing from Johnson, the former Duke directors voted in favor of terminating him. The former Progress directors voted against termination. ¶¶35;189.

Johnson testified that "there's a clear provision in the merger agreement that I was going to be the CEO. And had [Defendants] said before the closing that that wasn't going to be the case and the Progress board said, oh, no, we're going to hold you to that, then you have a breach of the merger agreement." ¶¶37;223. Johnson concluded, "Having been at a lot of board meetings and votes before, I believe that vote was predetermined before they got there." ¶¶36;190;193.

At approximately 6:45 p.m., Defendant Gray and Defendants' outside counsel met with Johnson and told him "you're not the right man to be the CEO going forward.... The reason the board has made this decision is because of your leadership style." Id. Johnson was offered a separation agreement providing for $44 million in compensation, far more than the $18.2 million he would have received if he resigned pursuant to his contract. Johnson was told he had until 7:00 a.m. the next morning to accept the agreement. ¶¶196-98.

Before the stock market opened on July 3, 2012, Duke announced that Johnson had "resigned" as CEO "by mutual agreement" with the board. ¶¶38;200;257. During a follow-up conference call, Gray repeated those misleading statements and refused to provide any further details. ¶¶206;259. Over the next few days, Progress directors disclosed what they believed was

7

a preconceived plan to oust Johnson. A July 5, 2012 Wall Street Journal article by former Progress director John Mullin called Defendants' conduct a "deceitful and pre-meditated contravention of good faith negotiations" and "a clearly premeditated contravention of one of the most central tenets of our Agreement." ¶¶39;209. Plaintiffs allege that as a result of Johnson's removal and the misleading nature of Defendants' prior statements, Duke suffered multiple credit downgrades and underwent formal investigations by the NCUC and the state Attorney General. Duke settled those investigations for more than $30 million and mandatory corporate governance reforms. ¶¶41-42;208;213-16;218;220-34;284-87. Further, from July 3 to July 9, 2012, Duke's stock price fell $4.53 per share, resulting in a market loss of over $3.1 billion. ¶¶41;219.

Between July 24 and September 20, 2012, three class action Complaints were filed in the United States District Court for the Western District of North Carolina, all alleging securities violations against Defendants. On October 17, 2012, the Honorable Max O. Cogburn, Jr. consolidated those three cases. Document #35. On December 14, 2012, Judge Cogburn designated Lead Plaintiffs and Lead Counsel. Document #46.

On April 2, 2013, Defendants filed their Motion to Dismiss which has been fully briefed and is ripe for determination.

## II. DISCUSSION

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations

must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." Id.. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)). In other words, if after taking the complaint's well-pleaded factual allegations as true, a lawful alternative explanation appears a "more likely" cause of the complained of behavior, the claim for relief is not plausible. Id.

### B. Claims Under §§11 and 12(a)(2) of the Securities Act

Sections 11 and 12(a)(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act. Section 11 imposes liability on the issuer of a security, including every person who signed a registration statement, for any false statement or omission of a material fact in the registration statement. 15 U.S.C. §77k(a). Similarly, §12(a)(2) provides liability for any person who offers or sells a security by means of "a prospectus or oral communication...[that] includes an untrue statement of a material fact or omits to state a material fact." 15 U.S.C. §77l(a)(2). These claims are subject to a strict liability standard. A plaintiff "need only show a material misstatement or omission to establish a prima facie case" and "liability … is virtually absolute, even for innocent mistakes." Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

Because §§11 and 12(a)(2) sound in strict liability, and not fraud, they are only subject to Rule 8's notice pleading requirements. In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 403 (D. Md. 2004) ("the §11 and §12 claims are not based on allegations of fraud, and therefore Rule 9(b) does not apply to them").

Defendants' reliance on a release signed as a settlement of previous litigation is

10

misplaced.  See In re Progress Energy S'holder Litig., North Carolina Business Court 11 CVS 739.  That release was signed in 2011, well before Defendants ousted Johnson as CEO.  Under North Carolina law, a released claim must be "said to exist such that a party is capable of waiving it."  Fin. Services of Raleigh, Inc. v. Barefoot, 594 S.E. 37, 42 (N.C. Ct. App. 2004). Moreover, the previous litigation involved claims for breach of fiduciary duty involving the valuation of Progress and had no bearing on Johnson's role as CEO or any false statements in the Registration Statement.  See In re Lehman Bros. Sec. & ERISA Litig., 2012 WL 2478483 (S.D.N.Y. June 29, 2012) (claims not arising from identical factual predicate as settled claims are not waived).

Section 11 establishes liability for any materially untrue statement or omission in "any part of the registration statement, when such part became effective."  15 U.S.C. §77k(a).  The Merger Agreement mandated that the "Effective Time" of the issuance, exchange and acquisition of shares pursuant to the Registration Statement was July 2, 2012-the date the new registered Duke shares first became available.  ¶¶129;235.  In Form 425 prospectuses filed through June 29, 2012, Defendants incorporated the Registration Statement by reference.  ¶244.

The Supreme Court has rejected the argument that board of directors deliberations are not material until the board takes official action.  Basic, Inc. v. Levinson, 485 U.S. 224, 233 (1988) (rejecting a proposed bright-line test that "preliminary merger discussions do not become material until 'agreement-in-principle' as to the price and structure of the transaction has been reached").  See also In re Jiffy Lube Sec. Litig., 772 F. Supp. 258, 260 (D. Md. 1991); In re Gulf Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 747 (S.D.N.Y. 1989) (events still contingent upon board approval may be sufficiently material to warrant disclosure).

11

Applying those legal principles to the facts here, Plaintiffs have sufficiently pled their Section 11 claim. As detailed above, Plaintiffs allege ample facts, many supported by documentation and/or testimony, establishing that Defendants' statements regarding Johnson's role as CEO were false when the Registration Statement was initially filed. Plaintiffs have pled facts establishing that Defendants had mounted significant yet undisclosed opposition to Johnson prior to July 2011. Plaintiffs have also sufficiently pled Defendants' determination that Johnson's position as CEO was transitory and necessary only to gain the merger's approval.

In short, the one hundred and twenty-eight page Complaint contains well-pleaded facts which taken as true show that Plaintiffs are entitled to relief on their Section 11 claims. Accordingly, the undersigned respectfully recommends that Defendants' Motion to Dismiss this claim be denied. Iqbal, 556 U.S. at 678.

Plaintiffs have adequately pled their §12(a)(2) claim. Section 12(a)(2) imposes liability on any person who "offers or sells a security" for making material misrepresentations or omissions in any "prospectus or oral communication" used to solicit the sale of the security. 15 U.S.C. §77l(a)(2).

Prior to the merger's closing on July 2, 2012, Defendants had a duty to correct the Registration Statement to reflect any significant changes in their positions. Gallagher v. Abbott Labs., 269 F.3d 806, 810 (7th Cir. 2001) ("registration statement and prospectus for a new issue of securities must be accurate when it is used to sell stock, and not just when it is filed"); SEC v. Manor Nursing Ctrs., 458 F.2d 1082, 1095 (2d Cir. 1972) ("developments which materially alter the picture presented in the registration statement must be brought to the attention of public investors"); Gulf Oil/Cities Serv., 725 F. Supp. at 748 (noting the existence of a duty to

12

correct registration statement, "[w]hen objectively verifiable factors cause a significant change in a party's attitude toward a merger – a 'sharp break from...prior public positions'"); In re Alliance Pharm. Sec. Litig., 279 F. Supp. 2d 171, 185-87 (S.D.N.Y. 2003).

The individual Defendants' argument that they are not "sellers" within the meaning of the statute is premature. Royal, 351 F. Supp. 2d at 402 (whether a person is a statutory seller under §12(a)(2) is a question of fact not appropriately decided on a motion to dismiss). SEC Rule 159A provides that an issuer, such as Duke here, is a §12(a)(2) statutory seller. 17 C.F.R. §230.159A.

For these reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss Plaintiffs' Section 12(a)(2) claim be <u>denied</u>.

### C. Claims Under §10(b) of the Exchange Act

A plaintiff pleads a §10(b) claim by alleging: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrix Capital Mgmt. Fund L.P. v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009).

To plead falsity, a plaintiff must "(1) specify the statements that…were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." Lefkoe v. Clothiers, 2007 U.S. Dist. LEXIS 98777, at *17 (D. Md. Sept. 10, 2007); 15 U.S.C. §78u-4(b)(1)(B).[3] Under Rule 10b-5, when a defendant "does

---

[3] Defendant Gray argues she was not a "maker" of any allegedly false statement. Plaintiffs' allegations that as Lead Director and Duke spokesperson, Gray either directly made or had ultimate authority over the false and misleading statements are sufficient at this stage of the proceedings.

make a disclosure, voluntary or required, there is a duty to make it complete and accurate." Libon v. Infineon Techs., AG, 2006 U.S. Dist. LEXIS 76430, at *20 (E.D. Va. Aug. 7, 2006).

In the Complaint, Plaintiffs have alleged in detail the Defendants' false and misleading statements, including the speaker, timing and context of each statement. See ¶¶250-59. Plaintiffs have also alleged facts and "circumstances that, drawing reasonable inferences in their favor, would render their claims [of falsity] plausible." McIntire v. China Mediaexpress Holdings, Inc., 2013 WL 752954, at *14 (S.D.N.Y. Feb. 28, 2013) (holding "Plaintiffs are not required to 'prove' the falsity of the alleged misrepresentations" at the pleading stage).

The materiality requirement is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011). "A corporation's consideration of a major change in corporate form can be material even if there is only a probability that the change will occur or if it is merely contingent upon future events." PPM Am. v. Marriott Corp., 853 F. Supp. 860, 868-70 (D. Md. 1994). For the purposes of this Motion, the materiality of Johnson being retained as CEO is clearly established.

Scienter is adequately pled by alleging a strong inference of knowing misconduct or reckless failure to disclose the truth. Ottman v. Hanger Orthopedic Grp., 353 F.3d 338, 343 (4th Cir. 2003). To evaluate allegations of scienter, the court: (1) accepts all factual allegations in the complaint as true; (2) considers the allegations collectively, not "in isolation"; and (3) entertains only those plausible opposing inferences that can be "rationally drawn from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). A strong

inference of scienter is alleged "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Id. at 324.

Plaintiff's allegations in this case support a cogent inference that Defendants concealed from investors their plan to remove Johnson as CEO from investors. The allegations in the Complaint include the May 3, 2012 Duke board meeting where Defendants worked with outside counsel on the plan to remove Johnson; Defendants' retention of a public relations firm to deal with the anticipated fallout from Johnson's ouster; Defendants Gray and Manly's May 17, 2012 meeting with outside counsel about removing Johnson;[4] the May 30, 2012 board meeting where Defendants confirmed their plans; as well as numerous internal communications in May and June 2012 evidencing that Johnson's ouster was planned in advance.

The Complaint also alleges facts showing that Defendants were aware that they would jeopardize the merger and subject themselves to a $675 million penalty if their plan to oust Johnson was made public. See In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 641-50 (E.D. Va. 2000) (motive together with allegations of knowledge establish a strong inference of scienter).

To plead loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005). The Fourth Circuit has held that loss causation is adequately alleged where there is "sufficient specificity" to "enable the court to evaluate whether the necessary causal link exists." Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 186 (4th Cir. 2007). Plaintiffs have

---

[4] Defendant Manly argues Plaintiffs have not sufficiently alleged his "culpable participation." However, his alleged participation in this meeting is sufficient at this stage of the proceedings to establish that he actively participated in Johnson's ouster.

identified the disclosures on July 3 and July 5-6, 2012 that revealed Defendants' actions in ousting Johnson and the $4.53 per share drop in Duke's stock price that followed those disclosures.

For these and the other reasons stated in Plaintiffs' brief, the undersigned respectfully recommends that Defendants' Motion to Dismiss Plaintiffs' §10(b) claims be <u>denied</u>.

### III. **RECOMMENDATION**

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that "Defendants Motion to Dismiss the Corrected Consolidated Amended Complaint" (document #68) be **DENIED.**

### IV. **NOTICE OF APPEAL RIGHTS**

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen (14) days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Wells</u>, 109 F.3d at 201; <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to

counsel for the parties; and to the Honorable Max O. Cogburn, Jr.

      **SO RECOMMENDED AND ORDERED.**

Signed: July 25, 2013

David S. Cayer
United States Magistrate Judge