# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

No. 3:12-cv-00456-MOC-DSC
(Consolidated with Nos. 3:12-cv-00474 and 3:12-cv-00624)

| | | |
|---|---|---|
| MAURINE NIEMAN, | ) | <u>CLASS ACTION</u> |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OF LAW IN SUPPORT |
| | ) | OF LEAD PLAINTIFFS' MOTION FOR |
| vs. | ) | FINAL APPROVAL OF CLASS ACTION |
| | ) | SETTLEMENT AND APPROVAL OF PLAN |
| DUKE ENERGY CORPORATION, et al., | ) | OF ALLOCATION |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ............................................................1

II.     FACTUAL BACKGROUND .............................................................4

III.    THE PROPOSED SETTLEMENT SATISFIES FED. R. CIV. P. 23(e) AND
        SHOULD BE APPROVED IN ALL RESPECTS ...............................................5

        A.      The Fourth Circuit's Standards Governing Class Action Settlements....................6

        B.      The *Jiffy Lube* Factors Support Approval of the Settlement..................................7

                1.      An Analysis of the *Jiffy Lube* Fairness Factors Demonstrates That
                        the Settlement Is Fair and Warrants Final Approval ..................................7

                        a.      The Posture of the Case at the Time the Settlement Was
                                Proposed and Whether the Facts Were Well-Developed................7

                        b.      The Circumstances of the Settlement Negotiations .......................10

                        c.      The Experience of Lead Counsel in Securities Litigation ............12

                2.      An Analysis of the *Jiffy Lube* Adequacy Factors Demonstrates
                        That the Settlement Is Adequate and Warrants Final Approval ...............13

                        a.      The Relative Strength of Plaintiffs' Case and Existence of
                                Difficulties of Proof or Strong Defenses .......................................14

                        b.      The Anticipated Duration and Expense of Litigation ...................18

                        c.      The Solvency of Defendants and Likelihood of Recovery of
                                a Litigated Judgment ....................................................................19

                        d.      The Degree of Opposition to the Settlement.................................20

IV.     THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE ..............20

V.      THE COURT SHOULD AFFIRM ITS CERTIFICATION OF THE
        SETTLEMENT CLASS FOR SETTLEMENT PURPOSES ...........................................22

VI.     NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS
        OF RULE 23, THE PSLRA AND DUE PROCESS.........................................................23

VII.    CONCLUSION..................................................................................................25

Case 3:12-cv-00456-MOC-DSC   Document 95   Filed 05/23/15   Page 2 of 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ................................................................................14

*Anselmo v. West Paces Hotel Grp., LLC*,
    No. 9:09-cv-02466-DCN, 2012 U.S. Dist. LEXIS 164618 (D.S.C. Nov. 12, 2012)...............12

*Boyd v. Coventry Health Care, Inc.*,
    299 F.R.D. 451 (D. Md. 2014)................................................................................10

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)................................................................................................6

*Decohen v. Abbasi, LLC*,
    299 F.R.D. 469 (D. Md. 2014)................................................................................9

*Deem v. Ames True Temper, Inc.*,
    No. 6:10-cv-01339, 2013 U.S. Dist. LEXIS 72981 (S.D. W.Va. May 22, 2013) ....... 12-13, 19

*DeWitt v. Darlington Cnty.*,
    No. 4:11-cv-00740-RBH, 2013 U.S. Dist. LEXIS 172624 (D.S.C. Dec. 6, 2013) .........5, 6, 12

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)..............................................................................................23

*Faile v. Lancaster Cnty.*,
    No. 0:10-cv-02809-CMC, 2012 U.S. Dist. LEXIS 189610 (D.S.C. Mar. 8, 2012)..................6

*Flinn v. FMC Corp.*,
    528 F.2d 1169 (4th Cir. 1975) ..............................................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014)..........................................................................................17

*Henley v. FMC Corp.*,
    207 F. Supp. 2d 489 (S.D.W. Va. 2002) ................................................................19

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-cv-02509-LHK, 2015 U.S. Dist. LEXIS 26635 (N.D. Cal. Mar. 3, 2015)..................12

*In re Jiffy Lube Sec. Litig.*,
    927 F.2d 155 (4th Cir. 1991) ...................................................................... *passim*

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ..........................................................................24

*In re MicroStrategy, Inc. Sec. Litig.*,
150 F. Supp. 2d. 896 (E.D. Va. 2001) ...................................................................................23

*In re MicroStrategy, Inc. Sec. Litig.*,
148 F. Supp. 2d 654 (E.D. Va. 2001) ........................................................................... *passim*

*In re The Mills Corp. Sec. Litig.*,
265 F.R.D. 246 (E.D. Va. 2009) ................................................................................... *passim*

*In re NFL Players' Concussion Injury Litig.*,
MDL No. 2323, 2015 U.S. Dist. LEXIS 52565 (E.D. Pa. Apr. 22, 2015) ...........................12

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)...................................21

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
MDL No. 2328, 2014 U.S. Dist. LEXIS 178989 (E.D. La. Dec. 31, 2014)............................12

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
No. 06 Civ. 5173 (RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008) ........................... 19-20

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)...................................................................................21

*In re Wachovia Corp. ERISA Litig.*,
No. 3:09cv262, 2011 U.S. Dist. LEXIS 155045 (W.D.N.C. Oct. 24, 2011) .................... 20-21

*Kirven v. Cent. States Health & Life Co.*,
No. 3:11-2149-MBS, 2015 U.S. Dist. LEXIS 36393 (D.S.C. Mar. 23, 2015) ............... *passim*

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
No. 1:08cv1310, 2009 WL 3094955 (E.D. Va. Sept. 28, 2009)................................................5

*McDaniels v. Westlake Servs., LLC*,
No. ELH-11-1837, 2014 U.S. Dist. LEXIS 16081 (D. Md. Feb. 7, 2014)........................17, 18

*Muhammad v. Nat'l City Mortg., Inc.*,
No. 2:07-0423, 2008 WL 5377783 (S.D. W. Va. Dec. 19, 2008) ...........................................7

*Rowles v. Chase Home Fin., LLC*,
No. 9:10-cv-01756-MBS, 2012 U.S. Dist. LEXIS 3264 (D.S.C. Jan. 10, 2012) ............. 17-18

*S.C. Nat'l Bank v. Stone*,
749 F. Supp. 1419 (D.S.C. 1990).............................................................. 5, 12-13, 18, 25

*Smith v. Toyota Motor Credit Corp.*,
No. WDQ-12-2029, 2014 U.S. Dist. LEXIS 141402 (D. Md. Oct. 2, 2014) ...................10, 18

-iii-

*Strang v. JHM Mortg. Sec. Ltd. P'ship*,
   890 F. Supp. 499 (E.D. Va. 1995) .................................................................................7, 9, 11

*Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*,
   No. 3:08-cv-00271-JFA, 2012 U.S. Dist. LEXIS 86474 (D.S.C. June 22, 2012) ........... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)....................................................................................................23

*Whitaker v. Navy Fed. Credit Union*,
   No. RDB 09-cv-2288, 2010 U.S. Dist. LEXIS 106094 (D. Md. Oct. 4, 2010) ........................9

*Yates v. Municipal Mortgage & Equity LLC*,
   744 F. 3d 874 (4th Cir. 2014) ...............................................................................................15

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ................................................................................................. *passim*

4 Newberg on Class Actions § 11.41 ..........................................................................5

4 Newberg on Class Actions § 11.51 ........................................................................10

Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action
   Settlements: 2014 Review and Analysis* (Cornerstone Research 2015) ...................................13

-iv-

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), Lead Plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund and LongView LargeCap 500 Index VEBA Fund, Gerald Friesen, Carolyn Friesen and Craig Bacino, individually and as Trustee for the Janice and Craig Bacino Trust (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation.[1]

## I.     PRELIMINARY STATEMENT

Pursuant to the terms of the Stipulation, Lead Plaintiffs, through their counsel, have obtained $146,250,000 in cash for the benefit of the Settlement Class, in exchange for the dismissal of all claims brought in this Action and a full release of claims against the Released Parties.[2]  The proposed Settlement is an excellent result for the Settlement Class.  If approved, the Settlement would be the largest federal securities class action settlement in North Carolina, one of the top five securities class action recoveries in the Fourth Circuit and one of the top 100 securities class action recoveries in history.  Joint Decl., ¶6.  Indeed, after the initial disclosure of the Settlement, Duke University securities law specialist Professor James Cox, remarked that "$146 million [recovery] is *off the charts*."  Dalesio, Emery P., *Duke Energy Settles Lawsuit Over Post-Merger Ouster of its CEO in 2012 for $146 Million*, Assoc. Press, Mar. 10, 2015.

The Settlement was reached after two years of hard-fought litigation and is the fruit of well-informed, arm's-length settlement negotiations among experienced and knowledgeable

---

[1]  Capitalized terms that are not otherwise defined herein shall have the meanings contained in the Stipulation of Settlement dated March 5, 2015 (ECF No. 92) (the "Stipulation") and the Joint Declaration of Eli R. Greenstein and Tor Gronborg in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses (the "Joint Declaration" or "Joint Decl."), submitted herewith.  Unless otherwise noted, all emphasis is added and internal citations and footnotes are omitted.

[2]  The "Released Parties" are: the Settling Defendants or Defendants and their Related Parties (as those terms are defined in the Stipulation at ¶1.30 and ¶1.29, respectively).

-1-

counsel, facilitated by a highly experienced and respected mediator, the Honorable Layn R. Phillips (Ret.).  Joint Decl., ¶¶4-5.  As discussed below and in the Joint Declaration, the Settlement was the result of Lead Plaintiffs' and Lead Counsel's intensive litigation efforts against formidable opponents representing one of the largest energy companies in the United States.  To achieve this result, Lead Counsel conducted a detailed, comprehensive investigation into Lead Plaintiffs' claims and reviewed and analyzed thousands of pages of informal discovery.  This discovery included reviewing and analyzing over 2,000 pages of transcripts of testimony, hundreds of regulatory filings and thousands of pages of documents produced to numerous government agencies regarding a highly complex Merger between two Fortune 500 companies.  Lead Counsel also worked closely with economic experts to review and analyze issues relating to loss causation and damages and engaged in extensive and contested motion practice before successfully negotiating this Settlement.  *Id.*, ¶¶59-60.  These same experts assisted Lead Counsel in developing the Plan of Allocation for the Net Settlement Fund.

At every stage of the Action, Defendants asserted aggressive defenses to nearly every element of Lead Plaintiffs' claims.  Had the Settlement not been reached, Lead Plaintiffs and the class would have faced substantial hurdles in proving their case, particularly with respect to overcoming multiple legal and factual defenses regarding issues of falsity, materiality, disclosure duties, motive, scienter and loss causation, as well as establishing full damages at trial.  Lead Plaintiffs also would have faced risks in securing class certification and overcoming Defendants' challenges under Rule 23.  Indeed, courts in this Circuit have repeatedly recognized that "[w]hile all cases carry the potential for uncertain verdicts, securities cases in particular are complex and difficult to prove."  *See, e.g.*, *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255-57 (E.D. Va.

2009). Thus, the substantial risks involved in continued litigation, when measured against the benefit of the present Settlement, overwhelmingly support approval of this Settlement.

The reaction of the Settlement Class thus far also supports the Settlement. Pursuant to the Court's March 25, 2015 Preliminary Approval Order (ECF No. 93), the Court-approved Claims Administrator, Gilardi & Co., LLC ("Gilardi"), has mailed 440,953 copies of the Notice and Proof of Claim (together, the "Claim Package") to potential Settlement Class Members and nominees.[3] As ordered by the Court and set forth in the Notice, requests for exclusion from the Settlement Class and any objections to the Settlement, the Plan of Allocation and/or the request for attorneys' fees and expenses are due to be received no later than June 8, 2015. To date, not a single objection has been received and only 54 requests for exclusion have been submitted to Gilardi—none submitted by or on behalf of an institutional investor. Joint Decl., ¶84; *see also* Sylvester Decl., ¶14. In addition, the Settlement is fully supported by all four Lead Plaintiffs, including Amalgamated Bank—the type of large, sophisticated institutional investor favored by Congress when passing the Private Securities Litigation Reform Act of 1995 ("PSLRA").[4]

Lead Plaintiffs and their counsel firmly believe that the $146,250,000 Settlement is eminently fair, reasonable and adequate, easily satisfies the standards of Rule 23, and provides a tremendous result for the Settlement Class. Accordingly, Lead Plaintiffs respectfully request that the Court grant final approval of this Settlement, and deem the Plan of Allocation a fair and reasonable method for distributing the Net Settlement Fund to the Settlement Class.

---

[3] *See* Declaration of Carole K. Sylvester (the "Sylvester Decl."), ¶¶3-10, attached as Exhibit 4 to the Joint Declaration.

[4] *See* Declarations of Amalgamated Bank Executive Vice President and General Counsel Deborah Silodor on behalf of Amalgamated Bank; Gerald and Carolyn Friesen and Craig Bacino, attached as Exhibits 1 through 3 to the Joint Declaration.

-3-

## II.    FACTUAL BACKGROUND

This Action involves the July 2012 Merger of Duke and Progress, which created the largest public electric utility company in the United States.  ECF No. 60, ¶¶3, 20.  In particular, Lead Plaintiffs alleged that in order to win support from Progress and its shareholders, as well as regulators, Defendants represented throughout the relevant time period that Progress CEO William D. Johnson would serve as CEO of the combined entity following the Merger.  *Id.*, ¶¶7-9, 82, 85.  Unbeknownst to investors, however, Defendants allegedly had serious concerns about Johnson becoming CEO and planned to remove him as soon as the Merger closed.  *Id.*, ¶243.

The Merger became effective at 4:02 p.m. on July 2, 2012.  *Id.*, ¶34.  Just thirty minutes later, Duke's Board elected Johnson as CEO.  *Id.*, ¶34.  By 6:45 p.m. that same day, however, the Board informed Johnson that it had voted to remove him as CEO, and to replace him with Rogers, Duke's CEO prior to the Merger.  *Id.*, ¶194.  Thereafter, from July 3, 2012 to July 9, 2012, in response to news regarding Johnson's ouster as CEO, Duke's stock price declined $4.53 per share on unusually heavy trading volume, damaging Lead Plaintiffs and the class.  *Id.*, ¶288-93.

The initial complaint in this Action was filed on July 24, 2012.   Joint Decl., ¶19.  Following their appointment, Lead Plaintiffs filed the operative Complaint bringing claims under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  *Id.*, ¶35.  To avoid repetition, Lead Plaintiffs respectfully refer the Court to the accompanying Joint Declaration for a detailed discussion of the procedural history of the Action.  *Id.*, ¶¶18-60.[5]

---

[5]  In addition to the Joint Declaration, Lead Plaintiffs are also submitting their Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Fee Memorandum").  The Joint Declaration and Fee Memorandum are incorporated by reference herein.

**III.** **THE PROPOSED SETTLEMENT SATISFIES FED. R. CIV. P. 23(E) AND SHOULD BE APPROVED IN ALL RESPECTS**

"Courts greatly favor the settlements of cases and allowing litigants to achieve their own resolution of disputes." *DeWitt v. Darlington Cnty.*, No. 4:11-cv-00740-RBH, 2013 U.S. Dist. LEXIS 172624, at *11 (D.S.C. Dec. 6, 2013). This judicial policy in favor of settlement is particularly strong in class actions and other complex litigation. *See Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08cv1310 (AJT/JFA), 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009) ("there is an overriding public interest in favor of settlement, particularly in class action suits"); *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources").[6]

Thus, "[a]lthough the district court has broad discretion in approving a settlement of a class action case, there is a 'strong presumption in favor of finding a settlement fair.'" *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *11. Moreover, in determining whether a proposed settlement is "fair, reasonable, and adequate," under Rule 23(e)(2), the Court must recognize that "[s]ettlements, by definition, are compromises which 'need not satisfy every single concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits.'" *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, No. 3:08-cv-00271-JFA, 2012 U.S. Dist. LEXIS 86474, at *30-31 (D.S.C. June 22, 2012). In other words, a "settlement fairness hearing is not a trial, and the court should defer to the evaluation and judgment of experienced trial counsel in weighing the relative strengths and weaknesses of the parties' respective positions and their

---

[6] *See also* 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.41, at 87-88 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy . . . . By their very nature, because of the uncertainties of outcome, difficulties of proof, and length of litigation, class action suits lend themselves readily to compromise.").

-5-

underlying interests in reaching a compromise."  *DeWitt*, 2013 U.S. Dist. LEXIS 172624, at

*11;[7] *see also Faile v. Lancaster Cnty.*, No. 0:10-cv-02809-CMC, 2012 U.S. Dist. LEXIS

189610, at *12 (D.S.C. Mar. 8, 2012) ("absent fraud, collusion or the like, [the] court should be

hesitant to substitute its own judgment for that of counsel").[8]

### A.  The Fourth Circuit's Standards Governing Class Action Settlements

In *Jiffy Lube*, the Fourth Circuit set forth a bifurcated analysis to guide district courts in

analyzing and deciding whether to approve a proposed settlement of a class action, using certain

factors in considering a settlement's "fairness" and other factors in considering a settlement's

"adequacy."  *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001); *In

re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).   In assessing a settlement's

fairness—an inquiry focused on whether the proposed settlement was reached as a result of

good-faith bargaining at arm's-length and without collusion—the factors to be considered are:

> (1) the posture of the case at the time settlement was proposed, (2) the extent of
> discovery that had been conducted, (3) the circumstances surrounding the
> negotiations, and (4) the experience of counsel in the area of securities class
> action litigation.

*Jiffy Lube*, 927 F.2d at 159.  In assessing a settlement's adequacy—an inquiry focused on the

substantive terms of the proposed settlement and, in particular, whether the settlement

consideration provided to class members is sufficient in light of the risks and costs of continued

litigation—the factors to be considered are:

---

[7]  *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a
proposed compromise by weighing the plaintiff's likelihood of success on the merits against the
amount and form of relief offered in the settlement.  They do not decide the merits of the case or
resolve unsettled legal questions.").

[8]  *See also Mills*, 265 F.R.D. at 255 ("Counsel are highly experienced in the field of securities
class action litigation . . . . [Their] decision to settle the case is the product of thorough
exploration and deliberation and as such, 'their representations to the court that the settlement
provides class relief which is fair, reasonable and adequate should be given significant
weight.'").

-6-

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expenses of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*Id*. As demonstrated herein and in the accompanying Joint Declaration, the Settlement represents an excellent result for the Settlement Class and clearly satisfies the factors enumerated in *Jiffy Lube*. Accordingly, it is the considered judgment of Lead Plaintiffs and their experienced securities class action counsel that the Settlement represents a fair, reasonable and adequate resolution of the Action and warrants this Court's final approval.

**B.      The *Jiffy Lube* Factors Support Approval of the Settlement**

**1.      An Analysis of the *Jiffy Lube* Fairness Factors Demonstrates That the Settlement Is Fair and Warrants Final Approval**

**a.      The Posture of the Case at the Time the Settlement Was Proposed and Whether the Facts Were Well-Developed**

The first *Jiffy Lube* fairness factor focuses on the posture of the litigation at the time settlement was reached. *See, e.g.*, *Mills*, 265 F.R.D. at 254; *Muhammad v. Nat'l City Mortg., Inc.*, No. 2:07-0423, 2008 WL 5377783, at *8 (S.D. W. Va. Dec. 19, 2008). The central inquiry for the Court is whether plaintiffs and their counsel have "sufficiently developed the case such that they can appreciate the merits of the claims." *Id*. at *3. As *Jiffy Lube* itself made clear, this factor can support the fairness of the settlement regardless of whether formal discovery has been conducted. 927 F.2d at 159 (fairness factors satisfied even though settlement was reached prior to any formal discovery due to "informal discovery, substantial concessions made by both sides [and] the experience of plaintiffs' counsel").[9]

---

[9]   *See also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) (finding settlement fair six months after complaint was filed because plaintiffs conducted "sufficient informal discovery and investigation to fairly evaluate the merits of [the] defendants' positions during settlement negotiations").

Here, as in *MicroStrategy*, "although this settlement came early on—prior to the completion of formal discovery—it is clear that plaintiffs 'have conducted sufficient informal discovery and investigation to . . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations.'" 148 F. Supp. 2d at 664-65. In particular, Lead Counsel conducted a substantial and far-reaching investigation into the claims in this Action including, *inter alia*, reviewing and carefully analyzing: (i) the massive record of Duke's and Progress's SEC filings over a period of more than 40 months including voluminous merger registration documents, proxy filings, prospectus materials, Form 425 and Form 8-K filings and prospectus and proxy materials detailing the status of the Merger; (ii) over 200 analyst reports covering the Merger, in part, to evaluate and develop the materiality and loss causation theories; (iii) thousands of pages of Duke and Progress conference call transcripts, press releases and media coverage regarding Duke, Progress and the Merger; and (iv) thousands of pages of documents filed with the North Carolina Utilities Commission ("NCUC") and other multi-state government agencies leading up to the close of the Merger, including over 1,500 pages of testimony and legal filings from Duke and its officers and directors before the NCUC. Joint Decl., ¶¶24-28. Additionally, Lead Counsel consulted with economic experts on loss causation and damages in order to develop and refine the allegations and further understand the strengths and weaknesses of the case. *Id.*, ¶¶59-60.

Following Duke's announcement of Johnson's termination, numerous government agencies, including the NCUC and the North Carolina Department of Justice, initiated investigations into legal and regulatory concerns. Although none of these agencies considered or investigated possible violations of securities laws, they did provide Lead Counsel with a robust evidentiary record, including testimony from Defendants and Duke insiders, from which to

assess their claims and potential securities fraud theories of liability.[10]  This comprehensive discovery record provided Lead Plaintiffs with direct insight into the facts at issue here, including the Duke Board's interactions with, assessment and impression of Johnson, the Board's internal communications and deliberations regarding Johnson, and the Board's detailed plans regarding Johnson in the days leading up to the Merger closing.  Joint Decl., ¶¶51-56. Lead Counsel's analysis of this ample evidence was not only crucial in opposing Defendants' motion to dismiss, but also allowed Lead Counsel to adequately assess the strengths and weaknesses of the case and the credibility of Defendants and potential third-party trial witnesses before reaching the Settlement.  *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 480 (D. Md. 2014) (factor supported settlement despite the fact that the litigation "had not proceeded beyond the motion to dismiss" because "[t]he record shows that the parties have engaged in informal discovery, assuring sufficient development of the facts to permit an accurate assessment of the merits of the case."); *Whitaker v. Navy Fed. Credit Union*, Civ. No. RDB 09-cv-2288, 2010 U.S. Dist. LEXIS 106094, at *6 (D. Md. Oct. 4, 2010) ("though the parties began negotiating before lengthy formal discovery, they had already been through two rounds of motion-to-dismiss briefing and had conducted the related internal investigations that precede formal discovery"); *Strang*, 890 F. Supp. at 501 (same).

Because this Action involves a unique fact pattern and unusually complex legal issues underlying multiple federal securities statutes, Lead Counsel also conducted extensive research

---

[10] In particular, Lead Counsel analyzed over 650 pages of transcripts and audio files, including testimony by Defendants Browning, Gray and Rogers, as well as Johnson and legacy Progress directors E. Marie McKee and James B. Hyler.  Lead Counsel also analyzed over 5,000 pages of documentary discovery, including internal e-mails from Duke and Progress personnel regarding key issues in this Action, executive employment contracts and term sheets, detailed settlement agreements and extensive commentary resulting from the government investigations, filings and hearing transcripts in related litigation and relevant documents from the Florida Public Service Commission and the Federal Energy Regulatory Commission.  Joint Decl., ¶¶29-31.

-9-

before filing the Complaint to determine exactly which theories of securities liability to allege (and how best to allege them). Joint Decl., ¶¶32-34. Thereafter, the Parties thoroughly briefed and vetted these legal issues during two rounds of extensive briefing on Defendants' motion to dismiss. *Id.*, ¶¶38-50. The settlement negotiations stretched over eight months and included detailed mediation briefing and presentations by counsel. *Id.*, ¶¶63-69. These statements and presentations, and discussions regarding specific evidence and expected testimony, focused on the strengths and weaknesses of the case. Thus, Lead Plaintiffs were fully informed regarding Defendants' positions, factual and legal theories, and arguments, and were able to thoroughly evaluate the strengths and weaknesses of the Parties' respective positions. This record is more than sufficient to support approval of the Settlement.[11]

### b. The Circumstances of the Settlement Negotiations

Courts should also consider the circumstances surrounding the settlement negotiations in evaluating the settlement's fairness. This factor focuses on the nature of the negotiations and whether they were free from fraud or collusion. "Absent evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Kirven v. Cent. States Health & Life Co.*, No. 3:11-2149-MBS, 2015 U.S. Dist. LEXIS 36393, at *12 (D.S.C. Mar. 23, 2015); *see also* 4 NEWBERG ON CLASS ACTION § 11.51, at 158 (courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered").

---

[11] *See Smith v. Toyota Motor Credit Corp.*, No. WDQ-12-2029, 2014 U.S. Dist. LEXIS 141402, at *11 (D. Md. Oct. 2, 2014) (finding representatives sufficiently informed where "[t]he parties negotiated the Settlement after a thorough review and analysis of the legal issues involved for nearly two years after the filing of the lawsuit, and in light of the Court's [motion to dismiss order]"); *Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 460 (D. Md. 2014) (Factor favored settlement where "the parties fully briefed a motion to dismiss and then a subsequent motion to reconsider" and "Plaintiffs conducted an extensive investigation of [the] claims.").

-10-

Here, the duration, intensity and contested nature of the settlement negotiations further supports a finding that the Settlement is fair and reasonable. The Parties negotiated for over eight months before agreeing to the Settlement. These negotiations included two face-to-face, all-day sessions in Charlotte and New York City, and countless telephonic conferences and written exchanges. Joint Decl., ¶¶63-69. The negotiations were conducted with the assistance of the Honorable Layn R. Phillips (Ret.), a former federal district judge for the Western District of Oklahoma who presided over one of the formal in-person mediation sessions with the exchange of several rounds of comprehensive mediation briefing, and detailed oral and written presentations regarding the Parties' views on the strengths and weaknesses of their respective positions. *Id*., ¶¶67-68. Given the complex factual and legal issues involved and the Parties' differing views regarding the import of those issues, an additional six months of hard-fought negotiations directly between the Parties ensued before an agreement in principle was reached. *Id*., ¶68. Even then, the Parties had to engage in three months of further negotiations over the specific terms of the Settlement and memorialize their final agreement in the Stipulation dated March 5, 2015. *Id*., ¶69. *See Mills*, 265 F.R.D. at 255 (finding factor weighed in favor of approval where settlement was "product of a long series of dealings" between class counsel and defendants and the negotiations were "sufficiently thorough, [and] contentious"); *Strang*, 890 F.Supp. at 501-02 (fairness requirement was met where "[p]laintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

The "supervision by a mediator lends an air of fairness to agreements that are ultimately reached." *Temp. Servs.*, 2012 U.S. Dist. LEXIS 131201, at *31 ("highly adversarial litigation took place before being resolved by a formal, in-person mediation session held before [a former

-11-

federal judge]"); *see also DeWitt*, 2013 U.S. Dist. LEXIS 172624, at *13-14 (factor supported settlement where "[t]he mediation was conducted before an [experienced mediator] and the proposed Settlement Agreement was reached after extensive, bona fide, arms-length negotiations"). Furthermore, Judge Phillips is an "experienced and well-respected mediator," and courts across the country have found that his oversight supports the fairness of settlements, especially in complex, high-profile cases of this nature. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 U.S. Dist. LEXIS 26635, at *7 (N.D. Cal. Mar. 3, 2015) (the parties participated in "arm's-length negotiations through Hon. Layn Phillips (Ret.), an experienced mediator"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2014 U.S. Dist. LEXIS 178989, at *9 (E.D. La. Dec. 31, 2014) (same).[12] Simply put, "[t]he fact that negotiations were 'adversarial' and were conducted at 'arm's length' helps dispel any concern that counsel colluded in reaching agreement." *MicroStrategy*, 148 F. Supp. 2d at 665.

### c. The Experience of Lead Counsel in Securities Litigation

The final *Jiffy Lube* factor focuses on "whether counsel is competent, dedicated, qualified, and experienced enough to conduct the litigation and whether there is an assurance of vigorous prosecution." *Kirven*, 2015 U.S. Dist. LEXIS 36393, at *13. Courts in this Circuit recognize that where "counsel for both sides are nationally recognized members of the securities litigation bar," "it is appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole, and to find that the proposed partial settlement is fair." *MicroStrategy*, 148 F. Supp. 2d at 665.[13]

---

[12] *See also In re NFL Players' Concussion Injury Litig.*, MDL No. 2323, 2015 U.S. Dist. LEXIS 52565, at *20-21 (E.D. Pa. Apr. 22, 2015) ("United States District Court Judge Layn Phillips [appointed] as mediator to help the Parties explore settlement.").

[13] *See also Mills*, 265 F.R.D. at 255 (appropriate to "pay heed to [class counsel's] judgment in approving, negotiating, and entering into a putative settlement" when they are "nationally recognized members of the securities litigation bar"); *Deem v. Ames True Temper, Inc.*, No.

-12-

Here, Lead Counsel—two of the most experienced and skilled practitioners in the securities litigation field—both believe that the Settlement is in the best interests of the Settlement Class. Joint Decl., ¶70. Notably, Lead Counsel here have been involved in many of the largest and most successful securities litigation recoveries in U.S. history, including *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.); *In re Bank of America Corp. Securities*, *Derivative*, *and ERISA Litig.*, Master File No. 09 MD 2058-PKC (S.D.N.Y.); and *In re Lehman Brothers Securities and ERISA Litigation*, Master File No. 09 MD 2017–LAK (S.D.N.Y.). As such, this factor weighs in favor of approving the Settlement. *See also Anselmo v. West Paces Hotel Grp., LLC*, No. 9:09-cv-02466-DCN, 2012 U.S. Dist. LEXIS 164618, at *8 (D.S.C. Nov. 12, 2012) ("The court gives substantial weight to [Class Counsel's] suggestion" "that settlement is the preferable alternative.").[14]

> **2.    An Analysis of the *Jiffy Lube* Adequacy Factors Demonstrates That the Settlement Is Adequate and Warrants Final Approval**

The *Jiffy Lube* "adequacy" analysis focuses on whether the settlement consideration is sufficient given the risks and costs of continued litigation. Thus, the natural starting point is the settlement consideration itself. Here, Defendants have agreed to pay $146,250,000 to compensate damaged shareholders—the largest securities class action recovery ever in the state of North Carolina. Joint Decl., ¶6. By comparison, the median securities class action settlement in 2014 was just $6 million (and $6.6 million in 2013). *See* Laarni T. Bulan, Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2014 Review and Analysis* (Cornerstone Research 2015), at 1, 6. Moreover, 98 percent of securities class actions in 2014 settled for less

---

6:10-cv-01339, 2013 U.S. Dist. LEXIS 72981, at *6 (S.D. W.Va. May 22, 2013) (same); *S.C. Nat'l Bank*, 749 F. Supp. at 1424 (same).

[14] Sidley Austin LLP and Womble Carlyle Sandridge & Rice, LLP—which have well-earned national reputations for vigorously defending complex class actions—represented Defendants.

than $100 million. *Id.* at 5. As Professor James Cox told the Associated Press, the $146,250,000 recovery obtained here is "<u>off the charts</u>" for a case of this nature. Dalesio, *supra,* at 1. Indeed, the Settlement represents the *only* financial recovery for Duke and former Progress investors, as neither the SEC nor any other regulatory agency has recovered compensation for shareholders due to Defendants' conduct.

The $146,250,000 recovery also represents a remarkably high 26% of likely recoverable damages in this Action, as estimated by Lead Counsel and their economic and damages experts. *Id.*, ¶101. This recovery compares extremely "favorably to amounts recovered in similar cases." *MicroStrategy*, 148 F. Supp. 2d at 667 n.22. In fact, in 2014, median securities class action settlements as a percentage of estimated damages were only 2.2%, and only 1.8% for cases, like this one, with estimated damages between $500 million and $999 million. Cornerstone Research at 8-9. In fact, for the entire period of 2005 to 2014, the average recovery as a percentage of damages in securities class actions *never* rises above 3.1%. *Id.* Given that "[t]he most important factor [in evaluating settlement] is a comparison of the terms of the proposed settlement with the likely recovery that the plaintiffs would realize if they were successful at trial," this factor strongly supports approval of the Settlement. *Kirven*, 2015 U.S. Dist. LEXIS 36393, at *11.

### a. The Relative Strength of Plaintiffs' Case and Existence of Difficulties of Proof or Strong Defenses

The Settlement is even more extraordinary in light of the myriad risks that Lead Plaintiffs faced in this Action. Indeed, "[s]ecurities cases, like the present one, are 'notably difficult and notoriously uncertain.'" *Mills*, 265 F.R.D. at 255-57; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.") (O'Connor, J, sitting by designation). Here, Lead Plaintiffs

-14-

faced numerous hurdles to establishing liability. Joint Decl., ¶¶72-79. For example, throughout the case, Defendants maintained that SEC rules permitted them to withhold information regarding CEO terminations until the termination actually occurred. *Id.,* ¶74. Defendants also argued that they withheld information about Johnson's potential removal, not with any intent to deceive investors, but, rather, to further Duke's (and its shareholders') competitive interests by completing a merger that would ultimately benefit Duke investors. *Id.*, ¶75. Thus, a risk existed that either the Court or a jury could find Defendants acted in good faith and tried to follow SEC rules, particularly given their expected arguments that they relied on the advice of counsel. *Id.*

The element of falsity also presented unique challenges in this Action. *Id.*, ¶72. For example, the Parties hotly contested the relevant "effective date" for purposes of determining falsity and the likelihood that Defendants intended to oust Johnson for purposes of triggering liability under §11 of the Securities Act. Lead Plaintiffs contended that the effective date was in July 2012, in accordance with the wording of the offering documents. Defendants, however, argued that the effective date was in July 2011, when plans were less complete and only a few board members expressed concerns about Johnson. This is an unsettled area of the law. Indeed, prior to the determination of Defendants' motion to dismiss, the Fourth Circuit issued a new decision in *Yates v. Municipal Mortgage & Equity LLC*, 744 F.3d 874, 888-99 (4th Cir. 2014)— an opinion that both Parties believed supported their legal position. Needless to say, had Defendants prevailed, proving falsity would have been significantly more difficult.

Additionally, Defendants argued that when the allegedly misleading statements were made, Duke's Board had not officially determined to remove Johnson and could not make such a decision until a formal vote by the new Duke Board. Defendants also argued that a decision to remove a corporate CEO is within the sound discretion of corporate boards. Finally, Defendants

argued that their statements that Johnson would be appointed as CEO were not misleading, as he ultimately was appointed CEO during the first post-Merger board meeting. As a result, Lead Plaintiffs' success in this Action may have ultimately turned on whether (and when) the Court or a jury concluded that the Board's internal concerns regarding Johnson's role as future CEO reached a level of materiality and falsity that required disclosure. *See MicroStrategy*, 148 F. Supp. 2d at 666 ("Elements such as scienter, materiality of misrepresentation and reliance by the class members often present significant barriers to recovery in securities fraud litigation.").

Thus, when the Settlement was reached, there was a risk that the Court would decline to adopt Judge Cayer's Recommendation based on a failure to plead falsity, scienter, materiality, a duty to disclose or numerous other issues raised by Defendants. *Temp. Servs.*, 2012 U.S. Dist. LEXIS 131201, at *33 ("Defendants have filed thoroughly briefed dispositive motions that have not been ruled upon and present a substantial threat of adversarial rulings to the Plaintiffs."). Even if Lead Plaintiffs ultimately "successfully defended a threshold dismissal motion . . . , success at trial is another matter entirely. Victory at the threshold does not necessarily forecast victory on the merits." *MicroStrategy*, 148 F. Supp. 2d at 666.

Further, if Lead Plaintiffs overcame these challenges and ultimately established Defendants' liability, Lead Counsel anticipated aggressive challenges to loss causation and damages. Joint Decl., ¶¶77-79. For instance, Defendants would continue to argue that the disclosure of Johnson's termination as CEO did not reveal "fraud" at all, but simply conveyed a truthful fact. Defendants also maintained that most, if not all, of the stock price declines between July 3 and July 9, 2012 were due to factors unrelated to the alleged fraud and, in any event, were only temporary. Thus, there was a possibility that Lead Plaintiffs would be unable to recover for losses from the alleged stock price declines, which would have eliminated or significantly

reduced recoverable damages. At best, the jury would have been confronted with a "battle of the experts" and forced to assess the credibility of contradictory testimony from highly qualified economists. As the court explained in *MicroStrategy*, 148 F. Supp. 2d at 666-67,

> Defendants' experts likely would have challenged plaintiffs' estimated maximum recoverable damages [] and argued [] the company's stock price movement during the class period could be explained as being caused, in whole or in part, by factors other than alleged artificial inflation . . . . In this regard, the damages issue would have become a battle of experts at trial, with no guarantee of the outcome in the eyes of the jury. These risks, inherent in the divergent expert testimony reasonably anticipated in a case of this sort, further support the adequacy of the [] settlement.

Moreover, while Lead Plaintiffs strongly believe this Action satisfies Rule 23 and can be maintained as a class action, Defendants would have vigorously contested class certification—a process that has become increasingly complex and highly litigious in light of recent Supreme Court authority. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) (permitting defendants to attempt to rebut the presumption of reliance under the fraud-on-the-market theory in securities fraud cases). Thus, Lead Plaintiffs faced the risk that part or all of the proposed class action would fail to be certified, thereby drastically reducing or even nullifying any class recovery. *See McDaniels v. Westlake Servs., LLC*, No. ELH-11-1837, 2014 U.S. Dist. LEXIS 16081, at *27 (D. Md. Feb. 7, 2014) ("Plaintiff could also face further difficulties in trying this case as a class action because Westlake would litigate the issue of whether the classes should be certified for purposes of trial under Fed. R. Civil P. 23(b)(3).").

Simply put, "[i]n this case, a fair assessment of plaintiffs' burden of establishing the elements of their fraud claim against the asserted defenses of the [Duke] Defendants on liability and damages grounds firmly supports the propriety of the [] settlement." *MicroStrategy*, 148 F. Supp. 2d at 665; *see also Rowles v. Chase Home Fin., LLC*, No. 9:10-cv-01756-MBS, 2012 U.S. Dist. LEXIS 3264, at *7 (D.S.C. Jan. 10, 2012) (The Parties' "dispute underscores not only the

uncertainty of the outcome but also why the Court finds the [settlement] to be fair, reasonable, adequate, and in the best interests of the Class Members.").

### b. The Anticipated Duration and Expense of Litigation

The third *Jiffy Lube* adequacy factor considers the additional time and expense that would be necessary if the litigation proceeded to trial. *See S.C. Nat'l Bank*, 749 F. Supp. at 1426 ("The likely duration and associated expense of continued litigation likewise favor approval of the settlement."). As noted in *Mills*, "[p]erhaps the most telling evidence under this factor are the proceedings in this case to date [including] vigorous opposition over motions to dismiss," which indicates that further litigation would be long, costly, and contentious. 265 F.R.D. at 256. Indeed, "[s]urviving defendants' motion to dismiss [] would only be the beginning of what would surely be lengthy, contentious and expensive litigation. *MicroStrategy*, 148 F. Supp. 2d at 666.[15] Moreover, the Action, if taken to trial, would have required tremendous preparation and expense by both sides, as well as substantial Court resources.[16]

"Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs." *MicroStrategy*, 148 F. Supp. 2d at 667; *see also Temp. Servs.*, 2012 U.S. Dist. LEXIS 86474, at *35-36 ("[A] fully contested class action lawsuit would be expected

---

[15] *See Toyota*, 2014 U.S. Dist. LEXIS 141402, at *10-11 ("If this case were to proceed without settlement, the resulting litigation would be complex, lengthy and expensive. The Settlement eliminates a substantial risk that the [class] would walk away empty handed after trial."); *Westlake*, 2014 U.S. Dist. LEXIS 16081, at *24 ("The Supreme Court has recognized that the delay and risk of protracted litigation is a primary reason for [settlement approval]").

[16] *See Kirven*, 2015 U.S. Dist. LEXIS 36393, at *15-16 ("[T]he court must weigh the settlement in consideration of the substantial time and expense litigation of this sort would entail if a settlement was not reached. This factor is based on a sound policy of conserving the resources of the Court and the certainty that [avoiding] 'unnecessary and unwarranted expenditure of resources and time benefit[s] all parties.'").

-18-

to take several years to resolve at the District Court level [and] [a]ny appeal would likely add at least another year. In the meantime, the expenses for such a complex case could easily range in to the hundreds of thousands of dollars."). Indeed, given the complex legal issues involved here—including several issues of first impression in this Circuit—it is almost certain that any jury verdict would be appealed, delaying any recovery even further. Joint Decl., ¶¶7, 72, 104. In other words, "the old adage, 'a bird in hand is worth two in the bush' applies with particular force in this case." *MicroStrategy*, 148 F. Supp. 2d at 667.

### c. The Solvency of Defendants and Likelihood of Recovery of a Litigated Judgment

This *Jiffy Lube* factor considers "defendants' abilities to pay any subsequent judgment and the availability or lack thereof of insurance proceeds." *Kirven*, 2015 U.S. Dist. LEXIS 36393, at *16; *Jiffy Lube*, 927 F.2d at 159. There is no dispute that Duke and the other Defendants here had the ability to pay any judgment. However, even where defendants' solvency is not at issue, courts have found that this factor supports approval because a settlement avoids any future risk of insolvency. *Ames True Temper*, 2013 U.S. Dist. LEXIS 72981, at *9 ("Although the court is unaware of any threat to Defendant's solvency, recovery of a litigated judgment cannot be taken for granted in these uncertain economic times. The proposed settlement avoids all risk of eventual insolvency and provides immediate cash to Class Members."). In any event, where other factors support approval, defendants' ability to pay is "largely beside the point." *See Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002) ("The Court has no doubt [defendant] would be able to satisfy any judgment entered against it. That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution."). Indeed, "a defendant is not required to 'empty its coffers' before a settlement can be found adequate." *In re Sony SXRD Rear Projection*

-19-

*Television Class Action Litig.*, No. 06 Civ. 5173(RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008).

**d.       The Degree of Opposition to the Settlement**

Finally, the reaction of class members to the proposed settlement "as expressed directly or by failure to object" is also a "proper consideration for the trial court." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975). As of May 22, 2015, a total of 440,953 copies of the Notice have been mailed to potential Settlement Class Members and nominees and the Summary Notice was published in *Investor's Business Daily* and over the *PR Newswire*. Sylvester Decl., ¶¶10, 13. To date, there have been no objections to the Settlement. Joint Decl., ¶84. Moreover, just 54 requests for exclusion on behalf of potential Settlement Class Members who, to the extent this information was provided, collectively held less than 14,000 shares of Duke common stock during the Settlement Class Period—approximately .005% of the estimated number of damaged shares—have been submitted. *Id.* This absence of dissent thus far militates in favor of final approval of the Settlement.[17] Accordingly, the *Jiffy Lube* factors support a finding that the Settlement is fair, reasonable and adequate under Rule 23.

**IV.      THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE**

Following approval of the Settlement and upon the Effective Date, the Net Settlement Fund will be distributed to Authorized Claimants. The proposed Plan of Allocation contained in the Notice (the "Plan") details the manner in which the Net Settlement Fund shall be allocated. *See* Sylvester Decl., Ex. A. Approval of a plan of allocation is governed by the same standards by which a class action settlement is scrutinized—namely, it must be fair, reasonable and adequate. *See In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2011 U.S. Dist. LEXIS

---

[17]  Any objections and/or requests for exclusion received after the date of this submission will be addressed in Lead Plaintiffs' reply to be filed with the Court on or before July 29, 2015.

-20-

155045, at *30-31 (W.D.N.C. Oct. 24, 2011). In evaluating a proposed allocation plan, courts give considerable weight to the opinion of experienced class counsel. *See Mills*, 265 F.R.D. at 258 ("given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis"). Here, the Plan was prepared by Lead Counsel after careful consideration and analysis, and with the assistance of experienced economics and damages experts. Joint Decl., ¶86.[18] The Plan was also reviewed and approved by Gilardi, a claims administrator with over 25 years of experience administering the distribution of settlement funds in thousands of cases.

It is appropriate for plans of allocation in securities class actions to distribute settlement proceeds based on an assessment of the relative strengths and weaknesses of class members' claims. *MicroStrategy*, 148 F. Supp. 2d at 669 (approving plan that "sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue"); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strengths and values of different categories of claims."). Plans of allocation, however, need not be tailored to calculate each class member's claims with "scientific precision." *Mills*, 265 F.R.D. at 258. Rather, broad classifications may be used to promote "[e]fficiency, ease of administration and conservation" of the settlement fund. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133-35 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

---

[18] In preparing the Plan, these experts, among other things, analyzed publicly available information regarding Duke, the trading volume and price movements of Duke stock and the price performance of relevant market and peer indices during the Settlement Class Period. Joint Decl., ¶86. The calculations used for the Plan reflect the expert's estimates of the stock price declines likely attributable to Defendants' alleged conduct and the risks in establishing loss causation and damages. *Id.* As set forth in the Notice, the Plan, however, is not a formal damages analysis. *Id.*

-21-

Pursuant to the Plan, a "Recognized Loss Amount" will be calculated for each share of Duke common stock purchased or otherwise acquired during the Settlement Class Period (*i.e.*, June 11, 2012 through July 9, 2012) and for which adequate documentation is provided. Joint Decl., ¶87. In order to have a compensable loss under the Plan, eligible Duke common stock must have been held through at least one of the corrective disclosure dates set forth in the Notice. *Id.*, ¶88.[19] Recognized Loss Amounts also take into account the PSLRA's statutory limitation on recoverable damages. *Id.*, ¶89. The sum of a claimant's Recognized Loss Amounts will be the claimant's Recognized Claim. The Net Settlement Fund will be allocated on a *pro rata* basis based on each Authorized Claimant's Recognized Claim compared to the total Recognized Claims of all Authorized Claimants. The Plan was fully disclosed in the Notice that was mailed to 440,953 potential Settlement Class Members and nominees. To date, there have been no objections to the Plan. *Id.*, ¶91. Accordingly, for all of the reasons set forth herein and in the Joint Declaration, the Plan is fair and reasonable, and should be approved.

## V.  THE COURT SHOULD AFFIRM ITS CERTIFICATION OF THE SETTLEMENT CLASS FOR SETTLEMENT PURPOSES

For purposes of effectuating the Settlement, the Parties stipulated to certification of the following Settlement Class (*see* Stipulation, ¶¶1.35, 3.1):

> [A]ll Persons who purchased or acquired shares of Duke common stock between June 11, 2012 and July 9, 2012, inclusive, including former Progress shareholders who acquired shares of Duke common stock directly in the Merger of Duke and Progress. Excluded from the Settlement Class are the Settling Defendants, including all predecessors, successors, past, present or future parents, subsidiaries or affiliates of Duke and the families and affiliates of the Individual Defendants. Also excluded from the Settlement Class are all Persons who exclude themselves

---

[19]  Lead Plaintiffs alleged that corrective information was released prior to the market opening on July 3, 2012, during market hours on July 6, 2012 and prior to the market opening on July 9, 2012 that affected the market price on these dates in a statistically significant manner and removed the alleged artificial inflation from the stock price. Joint Decl., ¶88.

-22-

from the Settlement Class by timely and validly requesting exclusion in accordance with the requirements set forth in the Notice.

By its Preliminary Approval Order, the Court certified the Settlement Class pursuant to Rule 23, solely for purposes of effectuating the Settlement. *See* Preliminary Approval Order, ¶¶3-5; *see also Mills*, 265 F.R.D. at 266 ("[C]ertification for settlement 'has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants.'"). Specifically, the Court found the prerequisites for a class action under Rules 23(a) and (b)(3) to be satisfied. *See* Preliminary Approval Order, ¶5. Nothing has changed to alter the propriety of class certification. Accordingly, for all the reasons stated in their preliminary approval papers (ECF No. 90, at 11-14), Lead Plaintiffs request that the Court affirm its prior ruling (i) certifying the Settlement Class for purposes of effectuating the Settlement pursuant to Rules 23(a) and (b)(3); (ii) certifying Lead Plaintiffs as representatives for the Settlement Class; and (iii) appointing Lead Counsel as class counsel.

## VI. NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23, THE PSLRA AND DUE PROCESS

Rule 23 requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). To satisfy this requirement, notice of a settlement need only: (i) be directed to class members in a "reasonable manner" (Fed. R. Civ. P. 23(e)(1)); and (ii) fairly apprise "'members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005); *In re MicroStrategy, Inc. Sec. Litig.*, 150 F. Supp. 2d. 896, 906 (E.D. Va. 2001)

-23-

(same). Thus, "[n]otice need not be perfect" or received by every class member, but instead be reasonable under the circumstances. *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008). Further, notice is adequate "if the average person understands the terms of the proposed settlement and the options provided to class members thereunder." *Id.*

Both the substance of the Notice as well as the method through which it was disseminated to potential Settlement Class members satisfy these standards. The Court-approved Notice includes all of the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. §§ 77z-1(a)(7), 78u-4(a)(7).[20] The Notice also provides information on how to submit a Proof of Claim to be potentially eligible to receive a distribution from the Settlement.

Further, pursuant to the Court's Preliminary Approval Order, as of May 22, 2015, Gilardi has mailed a total of 440,953 Claim Packages by first-class mail to potential Settlement Class Members and nominees. Sylvester Decl., ¶10.[21] In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire* on April 16, 2015. *Id.*, ¶13. Gilardi also established a toll-free informational telephone line and caused Settlement information to be posted on the website specifically established for the Settlement, www.DukeSecuritiesSettlement.com, which gives access to, among other important documents, downloadable copies of the Notice, Summary Notice and Proof of Claim. *Id.*, ¶¶11-12.

---

[20] In particular, the Notice contains, *inter alia*: (i) an explanation of the nature of the Action and claims asserted; (ii) a definition of the Settlement Class; (iii) the amount of the Settlement; (iv) the proposed Plan of Allocation; (v) the reasons why the Parties are proposing the Settlement; (vi) the attorneys' fees and expenses that will be sought; (vii) a description of the right to request exclusion or object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on the Settlement Class.

[21] To disseminate the Claim Packages, Gilardi used data received from Duke and Duke's transfer agent regarding potential Settlement Class Members. *Id.*, ¶3. Gilardi also mailed copies of the Claim Package to the brokerages, custodial banks and other institutions contained in Gilardi's proprietary mailing database, as well as the names and addresses of additional potential Settlement Class Members provided to Gilardi by nominees. *Id.*, ¶¶4-9.

This combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by publication of a summary notice in two widely-circulated publications and an informative website provides reasonable notice and fulfills the purpose of Rule 23. The notice regime was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *MicroStrategy*, 148 F. Supp. 2d. at 669-70; *S.C. Nat'l Bank*, 749 F. Supp. at 1427-28.

## VII. <u>CONCLUSION</u>

For the reasons set forth above, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement; approve the Plan of Allocation; and affirm its certification of the Settlement Class for purposes of settlement.


DATED: May 22, 2015           Respectfully submitted,


KESSLER TOPAZ MELTZER        ROBBINS GELLER RUDMAN
    & CHECK, LLP                  & DOWD LLP
Eli R. Greenstein (*pro hac vice*)      Tor Gronborg (*pro hac vice*)
Stacey M. Kaplan (*pro hac vice*)      Jeffrey D. Light


*/s/ Eli R. Greenstein*                 */s/ Tor Gronborg*
ELI R. GREENSTEIN                TOR GRONBORG

One Sansome Street, Suite 1850      655 West Broadway, Suite 1900
San Francisco, CA 94104           San Diego, CA 92101
Telephone: 415/400-3000          Telephone: 619/231-1058
415/400-3001 (fax)                 619/231-7423 (fax)
E-mail: egreenstein@ktmc.com       E-mail: torg@rgrdlaw.com
E-mail: skaplan@ktmc.com         E-mail: jeffl@rgrdlaw.com

KESSLER TOPAZ MELTZER
  & CHECK, LLP
Gregory M. Castaldo
Jennifer L. Enck
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)
E-mail: gcastaldo@ktmc.com
E-mail: jenck@ktmc.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Paul Geller (*pro hac vice*)
David J. George (*pro hac vice*)
Elizabeth A. Shonson (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
E-mail: pgeller@rgrdlaw.com
E-mail: dgeorge@rgrdlaw.com
E-mail: eshonson@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

BLUE STEPHENS & FELLERS LLP
Dhamian A. Blue (N.C. Bar #31405)
Daniel T. Blue, Jr. (N.C. Bar #5510)
Daniel T. Blue, III (N.C. Bar #27720)

205 Fayetteville Street, Suite 300
Raleigh, NC  27601
Telephone:  919/833-1931
919/933-8009 (fax)
E-mail: dab@bluestephens.com
E-mail: danblue@bluestephens.com
E-mail: dtb3@bluestephens.com

*Liaison Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 22, 2015.

*/s/ Eli R. Greenstein*

Eli R. Greenstein

**Mailing Information for a Case 3:12-cv-00456-MOC-DSC**

**Electronic Mail Notice List**
The following are those who are currently on the list to receive e-mail notices for this case.

- **Steven M. Bierman**
  sbierman@sidley.com,emalin@sidley.com
- **Dhamian A. Blue**
  dab@bluestephens.com,danblue@bluestephens.com
- **Paul Jeffrey Geller**
  e_file_fl@rgrdlaw.com,pgeller@rgrdlaw.com,swinkles@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **David J George**
  dgeorge@rgrdlaw.com,kdouglas@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com
- **Eli R. Greenstein**
  egreenstein@ktmc.com,jhouston@ktmc.com,rnathcook@ktmc.com,yjayasuriya@ktmc.com
- **Tor Gronborg**
  torg@rgrdlaw.com,hectorm@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Debbie Weston Harden**
  dharden@wcsr.com,shanley@wcsr.com,brsmith@wcsr.com,rferguson@wcsr.com
- **Stacey M. Kaplan**
  skaplan@ktmc.com
- **Jeffrey D. Light**
  jeffl@rgrdlaw.com
- **L. Bruce McDaniel**
  mcdas@mcdas.com,kbwatt@mcdas.com
- **William Everett Moore , Jr**
  bmoore@gastonlegal.com,mcarpenter@gastonlegal.com,selliott@gastonlegal.com,mrcarpenter@gastonlegal.com
- **Claire J. Rauscher**
  CRauscher@wcsr.com
- **David A. Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jennifer Sarnelli**
  JSARNELLI@GARDYLAW.COM
- **Elizabeth A Shonson**
  eshonson@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com